IN THE UNITED STATES BANKRUPTCY
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7: CASE No. 25-51660 |
| | § | |
| COLLINS ASSET GROUP, LLC, | § | |
| DEBTOR. | § | |
| | § | |

| | | |
|---|---|---|
| JUDY A. MUSGROVE, INDIVIDUALLY | § | |
| AND AS BENEFICIARY OF THE MAINSTAR | § | |
| TRUST, CUST. FBO JUDY A MUSGROVE | § | ADV. PROC. No. 25-05047-CAG |
| IRA, ET AL., | § | |
| PLAINTIFFS, | § | |
| | § | |
| v. | § | |
| | § | |
| BROOKLYNN CHANDLER WILLY, | § | |
| ET. AL. | | |
| DEFENDANTS. | | |

| | |
|---|---|
| JOHN PATRICK LOWE IN HIS CAPACITY | § |
| AS COURT APPOINTED RECEIVER, | § |
| PLAINTIFF, | § |
| | § |
| v. | § |
| | § |
| COLLINS ASSET GROUP, LLC, ET AL., | § |
| DEFENDANTS. | § |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

TO THE HONORABLE CRAIG A. GARGOTTA, U.S. CHIEF BANKRUPTCY JUDGE:

NOW COME Judy A. Musgrove, Kathleen E. Priebe, Paul D. Sheetz, Wanda Sheetz, Alvin Zigmond, Sharon Zigmond, Dan A. Doolittle, Kelly M. Doolittle, Carolyn Newman, Tammara Owrey, Travis Mitchell, Donna Mitchell, Michael Gibson, Barbara Gibson, Arthur Del Negro, Laurie Del Negro, Mark Aerts, Melissa Aerts Individually and as Beneficiaries and Trustees of the Mark and Melissa Aerts Revocable Trust), Edward Nicolas, Linda Doubrava, Kevin Bennett, Diane Durant, Donald Turco, Mi Hui Turco, Sally McBee, Juanita Clary, Tommy York, Vickie

1

York, Cody York, Norman Kaczorowski, Zoraida Kaczorowski, Angelyn Nicholson, Steve Nicholson, Shelley Lee, Donald Lee Woods, Greg Schnell, Jane Schnell, Irma Alonzo, Dennis Woods, Ross Rucker, Dwain Strait, Grace Strait, Errol Glenn Archer, Cody Herndon, Pamela Herndon, John Raver, Robert Cook, Brent Couch, Gayle Reese, Roland K. Stanaland, Nancy Burnett, Jay Adkins, Michael Boyd, Holly Boyd, Debra Rae Keesee, Lennie J. Mills, Anthony Beauchamp, Traci Beauchamp, Thomas Beauchamp, Debra Beauchamp, Angela Beauchamp, Tony Newton, Mary Newton, Philip McNabb, Jennifer McNabb, Justin St. Clair, John Ayers, Randall Sparks, Angela Sparks, Amanda Coburn, Mason Coburn, Scotta Knight, Barbara Muzny, Richard Muzny, Robert Mayhew, Maria Mayhew, Terry Hunter, Susan Hunter, Michael Bass, Lorie Bass, Steven Bloyd, Albert Blades and Susan Blades, Jay R. Adams and Mary Adams (collectively "**Plaintiffs**")[1] and file this *Motion for Leave to File Third Amended Complaint* ("**Motion**"), and would respectfully show the Court as follows:

## I.  JURISDICTION AND VENUE

1.      This Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (H), (K) and (O).

## II.  SUMMARY OF RELIEF REQUESTED

2.      On August 18, 2025, this Court entered its *Order Granting Plaintiffs' Motion for Abstention and Remand and Denying Receiver's Motion for Remand as Moot* (Dkt. No. 46) (the "**Remand Order**"). Pursuant to the Remand Order, this Court retained jurisdiction of all claims against Defendants Collins Asset Group, LLC and Hollins Holdings, Inc.; and all claims where

---

[1] All Plaintiffs appear individually and/or as beneficiaries of the self-directed IRAs or trusts through which they purchased the unregistered securities made the basis of this lawsuit. Plaintiffs are the holders of Claim Nos. 21 through 92 and 140 through 141 against Collins Asset Group, LLC; and Claim Nos. 7 through 62; 64 through 78; and 126 through 127 against Hollins Holdings, Inc. Plaintiff's claims total $28,127,097.25.

Plaintiffs allege that another Defendant received funds from Collins Asset Group, LLC or Hollins Holdings, Inc.

3.      The *Third Amended Complaint* comports with the Remand Order because it makes clear which Defendants and which claims the Plaintiffs are pursuing in this Court versus which Defendants and which claims Plaintiffs are pursuing in the 131st Judicial District Court of Bexar County Texas. In addition, the Third Amended Complaint includes claims objections to proofs of claims filed by Defendants Oliphant Inc., Oliphant Financial, LLC and Oliphant USA, LLC.

4.      A copy of the proposed order granting the requested relief is attached hereto as **Exhibit A** and a copy of Plaintiffs' Third Amended Complaint is attached hereto as **Exhibit B** in accordance with Local Rule 7015(b).

### III.     AUTHORITIES AND ARGUMENT

5.      Federal Rules of Civil Procedure Rule 15 made applicable to this proceeding by Federal Rules of Bankruptcy Procedure Rule 7015 provides that a party may amend its pleading with the court's leave.  Rule 15(c)(1) provides that an amendment to a pleading relates back to the date of the original pleading when:

"…

(B) the amendment asserts a claim that arose out of the conduct, transaction or occurrence set out – or attempted to be set out in the original pleading; or

(C ) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(C)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and the complaint, the party to be brought in by amendment:

    (i)      received such notice of the action that it will not be prejudiced in defending on the merits; and

    (ii)     knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

*See* Fed. R. Civ. P. 15(c)(1)(C).

6.     Granting leave to amend is within the discretion of the trial court and should not be denied unless there is a substantial reason to do so.  *See* Fed. R. Civ. P. 15(a)(2); *see also Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (citing to *Leffal v. Dallas Indep. Sch. Dist.*, 28 F.3d 521, 524 (5th Cir. 1994)); *see also Am. Home Assurance Co. v. Flasher Ltd.*, SA-10-CA-265-H, 2011 WL 13234439, at *2 (W.D. Tex. Nov. 22, 2011).  Fifth Circuit mandates that courts entertain a presumption in favor of granting parties leave to amend. *See Mayeaux v. Louisiana Health Serv. & Indem. Co*., 376 F.3d 420, 425 (5th Cir. 2004).

7.     In deciding whether to grant a motion for leave to amend, courts should consider the following factors: (1) whether the amendment would cause "undue delay . . . or undue prejudice" in the proceedings; (2) whether the moving party requested leave in bad faith or "with a dilatory motive"; (3) whether the plaintiff has "previously failed to cure deficiencies . . . by prior amendments"; (4) whether amendment would be in the interest of judicial economy and "whether [it] would lead to expeditious disposition of the merits of the litigation"; (5) "whether the amendment [would add] substance to the original allegations"; and (6) whether the amendment is relevant to the cause of action.  *See Chitimacha Tribe of Louisiana v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1162 (5th Cir. 1982) (citing *Foman v. Davis*, 371 U.S. 178 (1962).

8.     In this instance, factors one, five and six weigh in favor of granting the Motion because no delay or prejudice would be occasioned to the Defendants from the amendments.  The amendments add more details to the facts set forth in the original pleading and save for objections to the proof of claims recently filed by Defendants Oliphant Financial, LLC, Oliphant Inc. and Oliphant Servicing, USA, LLC, no new causes of action are alleged against the Defendants.

9.     Two new Defendants have been added to the Third Amended Complaint. These Defendants are Oliphant United Inc. (formerly doing business as Oliphant United, LLC) and Oliphant Inc. These defendants will be timely served with summons and the complaint and will

not be prejudiced in defending on the merits. Oliphant Inc. filed the Notice of Removal that removed the case to this Court on June 6, 2025; and Oliphant United Inc. (formerly doing business as Oliphant United, LLC) is an affiliate and insider of the debtor Defendants Collins Asset Group, LLC and Hollins Holdings, Inc.  These newly added Defendants knew or should have known that they should have been named in this suit because of their relationship with and control over Defendants Collins Asset Group, LLC and Hollins Holdings, Inc. and because they have filed proofs of claims in this proceeding.

10.     Factors two and four also weigh in favor of granting the Motion because Plaintiffs are not requesting leave in bad faith or with a dilatory motive. On the contrary, the Third Amended Complaint comports with the Remand Order, is more streamlined and reduces the number of claims and the number of Defendants against which relief is sought.  Granting the Motion will therefore result in judicial economy.  Factor 3 is not relevant as there have been no prior deficiencies.

### III.  CONCLUSION AND PRAYER

11.     In conclusion, Plaintiffs' request that the Court grant them leave to file their Third Amended Complaint and that the Third Amended Complaint is deemed to relate back to their Original Petition filed in the 438th Judicial District Court in Bexar County on October 18, 2023, as amended by the First Amended Petition on December 19, 2023, and the Second Amended Petition on August 30, 2024.  Plaintiffs request such other and further relief, at law or in equity, to which they may show themselves to be justly entitled.

Dated: November 11, 2025,

Respectfully submitted,

**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile

By: */s/ Randall A. Pulman*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Kerry S. Alleyne-Simmons
    Texas State Bar No. 24066090
    kalleyne@pulmanlaw.com

*Counsel for Plaintiffs Judy A. Musgrove, et al..*

## CERTIFICATE OF CONFERENCE

The undersigned hereby certifies that on November 6, 2025, she sent an email with a draft of this Motion and the Third Amended Petition to counsel for the Chapter 7 Trustee, counsel for the Receiver, counsel for represented Defendants, and directly to pro se Defendants, regarding the requested relief. As of the filing of this Motion, she has not received an indication of whether the Motion is opposed or unopposed. Counsel presumes the Motion stands opposed.

*/s/ Kerry S. Alleyne-Simmons*
Kerry S. Alleyne-Simmons

### CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2025, a true and correct copy of the above and foregoing instrument was served on all counsel of record via CM/ECF and on other interested parties via the method(s) indicated below:

*Via US First Class Mail and*
*Via email:*
*Lynn.butler@hushblackwell.com*
Lynn Hamilton Butler
Hush Blackwell LLP
111 Congress Ave., Suite 1400
Austin, Texas 78701
*Bankruptcy Counsel for Debtor Collins Asset Group, LLC and*
*Debtor Hollins Holdings, LLC*

*Via US First Class Mail and*
*Via email: dbehrends@dykema.com;*
*ddouglas@dykema.com*
Danielle Rushing Behrends
Dominique Douglas
Dykema Gossett PLLC
112 E. Pecan St., Suite 1800
San Antonio, Texas 78205
*Counsel for Chapter 7 Trustee*

*Via US First Class Mail and*
*Via email: rsatija@haywardfirm.com*
Ron Satija
*Chapter 7 Trustee*
PO Box 660208
Austin, Texas 78766

*Via CM/ECF or email:*
*James.rose@usdoj.gov;*
*Aubrey.thomas@usdoj.gov*
James Rose
Aubrey Thomas
United States Trustee
615 E Houston St #533
San Antonio, TX 78205

*Via CM/ECF: jbinford@krcl.com*
*arogers@krcl.com*
Jason Bradley Binford
Abigail Rogers
Kane Russell Coleman Logan
401 Congress Avenue #2100
Austin, TX 78701
*Counsel for Defendants Accelerated Inventory Management LLC,*
*Oliphant Financial, LLC; and Oliphant USA, LLC*

*Via CM/ECF: mridulfo@krcl.com*
Michael P. Ridulfo
Kane Russell Coleman Logan
5151 San Felipe, Suite 800
Houston, TX 77056
*Counsel for Defendants Accelerated Inventory Management LLC,*
*Oliphant Financial, LLC; and Oliphant USA, LLC*

*Via CM/ECF:*
*jfrost@lubbocklawfirm.com*
Josh Frost
Field Manning Stone Aycock
2112 Indiana Ave
Lubbock, TX 79410
*Counsel for Defendants Ferrum Capital, LLC, Ferrum IV, LLC; and*
*Joshua Allen*

*Via CM/ECF:*
*ahartry@themoralesfirm.com*
Allison Sarah Hartry
The Morales Firm, P.C.
6243 IH-10 West, Suite 132
San Antonio, TX 78201
*Counsel for Defendant Yvette Barrera*

*Via US First Class Mail and*
*Via email:* *lawrence@themoralesfirm.com*
Lawrence Morales
The Morales Firm, P.C.
6243 IH-10 West, Suite 132
San Antonio, TX 78201
*Counsel for Defendant Yvette Barrera*

*Via CM/ECF:*
*ybajwa@sandersbajwa.com;*
*lstricker@sandersbajwa.com*
Yusuf A. Bajwa
Lad Stricker
Sanders Bajwa LLP
919 Congress Suite 1305
Austin, TX 78701
*Counsel for Defendant Walt Collins*

*Via CM/ECF:*
*jonathan.robbin@jrobbinlaw.com*
Jonathan M. Robbin
J. Robbin Law
200 Business Park Drive
Armonk, NY 10504
*Counsel for Defendant Walt Collins*

*Via CM/ECF:*
*david.whittlesey@aoshearman.com*
David Philip Whittlesey
Allen Overy Shearman Sterling US LLP
300 W. 6th Street Ste 2250
Austin, TX 78701
*Counsel for Defendant Walt Collins*

*Via CM/ECF:* *xmartin@mgl.law*
Eugene Xerxes Martin, IV
Martin Golden et al.
8750 N. Central Expressway
NorthPark Central, Suite 1850
Dallas, TX 75231
*Counsel for Defendant Collins Asset Group LLC*

*Via CM/ECF:* *evan.miller@saul.com*
Evan T. Miller
Saul Ewing LLP
1201 N. Market Street, Suite 2300
PO Box 1266
Wilmington, DE 19801
*Counsel for Delaware Chapter 7 Trustee*

*Via CM/ECF:* *royal@royallealaw.com*
Royal B. Lea, III
Royal Lea Law Office PLLC
1901 NW Military Hwy Ste. 218
San Antonio, TX 78213
*Counsel for John Patrick Lowe, State Court Receiver*

*Via US First Class Mail and*
*Via email:* *ecano@jeffersoncano.com;*
*wdavidson@jeffersoncano.com*
Emma Cano
William S. Davidson
Jefferson Cano
112 E. Pecan St., Suite 1650
San Antonio, TX 78205
*Counsel for MLC Financial, Inc. dba MLC Financial Services, Inc. and MKMH Interest LLC*

*Via email:*
*Brooklyn_chandler@icloud.com*
Brooklyn Chandler Willy and
Queen B Advisors, LLC
Address unknown
*(Defendants)*
*PRO SE*

*Via email:*
*robert@ryanprojectfunding.com*
Robert Ryan and
Ryan Project Funding LLC
1050 Connecticut Ave. NW #500
Washington DC 20036
*(Defendants)*
*PRO SE*

4933-1258-8150, v. 2

***Via US First Class Mail***
Allen Financial Agency, Inc.
c/o Joshua L. Allen
4415 66th Street, Ste. 107
Lubbock, TX 79414
***Pro Se Defendant***

***Via US First Class Mail***
Lehman Duane Allen
dba L. Duane Allen, C.P.A.
4415 66th Street, Ste. 107
Lubbock, TX 79414
***Pro Se Defendant***

***Via US First Class Mail***
Landzacha Holdings, Ltd.
c/o  Joshua L. Allen
4415 66th Street, Suite 101
Lubbock, Texas 7941
***Pro Se Defendant***

*/s/ Randall A. Pulman*
Randall A. Pulman

# EXHIBIT A

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7: CASE NO. 25-51660 |
| COLLINS ASSET GROUP, LLC, | § | |
| DEBTOR. | § | |
| | | |
| JUDY A. MUSGROVE, INDIVIDUALLY | § | |
| AND AS BENEFICIARY OF THE MAINSTAR | § | |
| TRUST, CUST. FBO JUDY A MUSGROVE | § | ADV. PROC. NO. 25-05047-CAG |
| IRA, ET AL., | § | |
| PLAINTIFFS, | § | REMOVED FROM THE 438TH |
| | § | JUDICIAL DISTRICT COURT, BEXAR |
| V. | § | COUNTY, TEXAS |
| | § | CASE NO. 2023-CI-22575 |
| BROOKLYNN CHANDLER WILLY, | § | |
| ET. AL. | § | |
| DEFENDANTS. | § | |
| | § | |
| JOHN PATRICK LOWE IN HIS CAPACITY | § | |
| AS COURT APPOINTED RECEIVER, | § | |
| PLAINTIFF, | § | |
| | § | |
| V. | § | |
| | § | |
| COLLINS ASSET GROUP, LLC, ET AL., | § | |
| DEFENDANTS. | § | |

**ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

1

CAME ON FOR CONSIDERATION, the *Motion for Leave to File Third Amended Complaint* ("Motion") filed by Plaintiffs Judy A. Musgrove, Individually and as Beneficiary of the Mainstar Trust, Cust. FBO Judy A. Musgrove IRA, *et al.* (the "**Motion**").

The Court having reviewed the Motion finds that cause exists to grant the same. It is therefore

ORDERED that Plaintiff's Motion is GRANTED and the Plaintiffs are authorized to file their Third Amended Complaint within seven days of the date of entry of this Order in accordance with L. Rule 7015-1.  It is therefore

ORDERED, that upon filing, the Third Amended Complaint shall relate back to the date of the Original Petition filed in the 438th Judicial District Court of Bexar County in Cause No. 2023-CI-22575 on October 18, 2023, as amended by the First Amended Petition on December 19, 2023, and the Second Amended Petition on August 30, 2024.

# # #

**Prepared and submitted by:**

Randall A. Pulman
Texas State Bar No. 16393250
rpulman@pulmanlaw.com
Kerry S. Alleyne-Simmons
Texas State Bar No. 24066090
kalleyne@pulmanlaw.com
**PULMAN, CAPPUCCIO & PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
(210) 222-9494 Telephone
(210) 892-1610 Facsimile
*ATTORNEYS FOR PLAINTIFFS*

2

# EXHIBIT B

IN THE UNITED STATES BANKRUPTCY
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CHAPTER 7: CASE NO. 25-51660 |
| | § | |
| COLLINS ASSET GROUP, LLC, | § | |
|    DEBTOR. | § | |
| | § | |
| | | |
| JUDY A. MUSGROVE, INDIVIDUALLY AND | § | |
| AS BENEFICIARY OF THE MAINSTAR TRUST, | § | |
| CUST. FBO JUDY A MUSGROVE IRA, ET AL., | § | ADV. PROC. NO. 25-05047-CAG |
|    PLAINTIFFS, | § | |
| | § | REMOVED FROM THE 131ST JUDICIAL |
| v. | § | DISTRICT COURT, BEXAR COUNTY, TEXAS |
| | § | CASE NO. 2023-CI-22575 |
| BROOKLYNN CHANDLER WILLY, ET AL. | § | |
|    DEFENDANTS. | § | |
| | § | |
| JOHN PATRICK LOWE IN HIS CAPACITY AS | § | |
| COURT APPOINTED RECEIVER, | § | |
|    PLAINTIFF, | § | |
| | § | |
| v. | § | |
| | § | |
| COLLINS ASSET GROUP, LLC, ET AL., | § | |
|    DEFENDANTS. | § | |

**PLAINTIFFS' THIRD AMENDED COMPLAINT**

1

**PULMAN LEFLORE, PULLEN & REED, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
Telephone: (210) 222-9494
Facsimile: (210) 892-1610

By: */s/ Randall A. Pulman*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Shari P. Pulman
    Texas State Bar No. 16388100
    spulman@pulmanlaw.com
    Byron L. Leflore
    Texas State Bar No. 12161070
    bleflore@pulmanlaw.com
    Kerry S. Alleyne-Simmons
    Texas State Bar No. 24066090
    kalleyne@pulmanlaw.com
    **ATTORNEYS FOR PLAINTIFFS**

# Table of Contents

I.JURISDICTION AND VENUE ........................................................................ 6

II.PRELIMINARY STATEMENT ..................................................................... 6

III.PARTIES ..................................................................................................... 10

  A. PLAINTIFFS ............................................................................................ 10

  B. DEFENDANTS......................................................................................... 18

IV.STATEMENT OF FACTS ............................................................................ 20

  A. CAG- The Beginning. ............................................................................. 20

  B. Cox, Allen, Willy through Ferrum Capital, Step in to Fill the CAG Financing Breach. ..................................................................................................... 22

  C. Ferrum Capital Was A Ponzi Scheme And Its Managers, Cox And  Allen, Were Corrupt. .......................................................................................... 23

  D. Brooklyn Chandler Willy Promoted the Ferrum Capital Ponzi Scheme, Recommended the Purchase of Unregistered Securities by her Clients and Simply Stole their Money. ............................................................................ 25

  E. Walt, Crossan and Morris form the Joint Venture. ................................. 29

  F. Conway, Pope And Scanlan Take Over CAG And Continue The Ponzi Scheme. .. 32

V.CAUSES OF ACTION ................................................................................... 36

  Count I: Violation Of Texas Gov't Code § 4008.051—Offeror/Seller Liability For Registration Violations-[Defendants CAG and HH] ................................ 36

  Count II: Violation Of Texas Gov't Code § 4008.052—Untruth And Omissions (Offeror Or Seller Liability) [Defendants CAG and HH]........................................ 39

  Count III. Controlling Person Or Aider Liability Of Issuers, Offerors Or Sellers [Defendants CAG and HH]........................................................................... 41

  Count IV: Violation Of Texas Govt. Code §§ 4008.101 And 4008.102 Investment Advisor Or IAR Liability (Secondary Violations) [Defendants CAG and HH]....... 43

  Count V: Breach Of Promissory Notes –[Defendants CAG, HH and The Oliphant Entities] ........................................................................................................ 44

  Count VI: Promissory Estoppel – [Defendants CAG and HH] ................................ 45

  Count VII: Money Had And Received- .................................................................... 46

  [Defendants CAG, HH, Walt and The Oliphant Entities]........................................ 46

  Count VIII: Fraud And Fraudulent Inducement [Defendants CAG and HH]........... 46

  Count IX: Fraud by Non-Disclosure [Defendants CAG and HH] ........................... 50

  Count X: Violations of the Texas Theft Liability Act Tex. Civ. Prac. & Rem. Code §§ 134.001 To 134.005 A-[Defendants CAG, HH, Walt and The Oliphant Entities]....... ........................................................................................................................ 53

3

Count XI: Declaratory Judgment (Defendants CAG and the Oliphant Entities)...... 53

Count XII: Violations Of Texas Uniform Fraudulent Transfer Act ("TUFTA")[Defendants CAG, HH, Walt and The Oliphant Entities] .................... 54

Count XIII: Negligence –[Defendants CAG and HH]............................................... 56

Count XIV: Negligence Per Se [Defendants CAH and HH] ................................... 58

Count XV: Negligent Misrepresentation [Defendants CAG and HH] .................... 59

Count XVI: Gross Negligence [Defendants CAG and HH] ..................................... 61

Count XVII: Civil Conspiracy To Commit Intentional Torts [Violation Of Securities Act, Fraud, TUFTA, Theft, Breach Of Fiduciary Duties][Defendants CAH, HH, Walt and The Oliphant Entities] ................................................................................. 61

Count XVIII: Aiding And Abetting—Negligence, Violation Of The TSA, Fraud, TUFTA, Theft, Breach Of Fiduciary Duties [Defendants CAG, HH, Walt and The Oliphant Entities] ................................................................................................. 64

Count XIX: Ratification Of Ponzi Scheme [Defendants CAG, HH, Walt and The Oliphant Entities] ................................................................................................. 66

Count XX: Alter Ego Of Ferrum Capital, LLC [Defendants CAG and HH] ........... 66

Count XXI: Vicarious Liability—[Defendants Walt And The Oliphant Entities] ... 68

COUNT XXII: Objection to Claims [Defendants Oliphant Inc., Oliphant Financial, LLC and Oliphant USA, LLC] ................................................................................. 69

Count XXIII: Tolling Of Limitations [Defendants CAG, HH, Walt and The Oliphant Entities]................................................................................................................. 72

Count XXIV: Application For Auditor [Defendants CAG, HH, Walt and The Oliphant Entities]................................................................................................................. 72

COUNT XXV: Disgorgement [Defendants CAG, HH, Walt and the Oliphant entities] ................................................................................................................. 73

COUNT XXVI: Attorneys' Fees [Defendants CAG, HH, Walt and the Oliphant Entities]................................................................................................................. 73

VI.CONDITIONS PRECEDENT .................................................................................. 73

VII.PRAYER ............................................................................................................. 74

4

**TO THE HONORABLE JUDGE OF SAID COURT:**

NOW COME Judy A. Musgrove, Kathleen E. Priebe, Paul D. Sheetz, Wanda Sheetz, Alvin Zigmond, Sharon Zigmond, Dan A. Doolittle, Kelly M. Doolittle, Carolyn Newman, Tammara Owrey, Travis Mitchell, Donna Mitchell, Michael Gibson, Barbara Gibson, Arthur Del Negro, Laurie Del Negro, Mark Aerts, Melissa Aerts Individually and as Beneficiaries and Trustees of the Mark and Melissa Aerts Revocable Trust), Edward Nicolas, Linda Doubrava, Kevin Bennett, Diane Durant, Donald Turco, Mi Hui Turco, Sally McBee, Juanita Clary, Tommy York, Vickie York, Cody York, Norman Kaczorowski, Zoraida Kaczorowski, Angelyn Nicholson, Steve Nicholson, Shelley Lee, Donald Lee Woods, Greg Schnell, Jane Schnell, Irma Alonzo, Dennis Woods, Ross Rucker, Dwain Strait, Grace Strait, Errol Glenn Archer, Cody Herndon, Pamela Herndon, John Raver, Robert Cook, Brent Couch, Gayle Reese, Roland K. Stanaland, Nancy Burnett, Jay Adkins, Michael Boyd, Holly Boyd, Debra Rae Keesee, Lennie J. Mills, Anthony Beauchamp, Traci Beauchamp, Thomas Beauchamp, Debra Beauchamp, Angela Beauchamp, Tony Newton, Mary Newton, Philip McNabb, Jennifer McNabb, Justin St. Clair, John Ayers, Randall Sparks, Angela Sparks, Amanda Coburn, Mason Coburn, Scotta Knight, Barbara Muzny, Richard Muzny, Robert Mayhew, Maria Mayhew, Terry Hunter, Susan Hunter, Michael Bass, Lorie Bass, Steven Bloyd, Albert Blades and Susan Blades, Jay R. Adams and Mary Adams (collectively "**Plaintiffs**")[1] and file this **Third Amended Complaint** complaining of Collins Asset Group, LLC, ("**CAG**"), Hollins Holdings, Inc. (formerly doing business as Hollins Holdings, Inc.), ("**HH**"), Oliphant United, Inc.,

---

[1] All Plaintiffs appear individually and/or as beneficiaries of the self-directed IRAs or trusts through which they purchased the unregistered securities made the basis of this lawsuit. Plaintiffs are the holders of Claim Nos. 21 through 92 and 140 through 141 against Collins Asset Group, LLC; and Claim Nos. 7 through 62; 64 through 78; and 126 through 127 against Hollins Holdings, Inc.  Plaintiff's claims total $28,127,097.25.

formerly doing business as Oliphant United LLC ("**Oliphant United**"), Oliphant, Inc. ("**Oliphant Inc.**"), Oliphant Financial, LLC ("**Oliphant Financial**"), Oliphant USA, LLC ("**Oliphant USA**"), Accelerated Inventory Management, LLC ("**AIM**"), (Oliphant United, Oliphant Inc., Oliphant Financial, Oliphant USA, and AIM, are collectively referred to herein as "**Oliphant**" or the "**Oliphant Entities**"), and Walt Collins ("**Walt**"). CAG, HH, the Oliphant Entities and Walt are collectively referred to hereinafter as (the "**Defendants**") and in support thereof respectfully show the Court as follows:

## I.      JURISDICTION AND VENUE

1.      The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1331 and 1334. This adversary proceeding constitutes a core proceeding pursuant to 28 U.S.C. § 157. Plaintiffs consent to entry of final orders by the Bankruptcy Court. To the extent the reference is withdrawn, or the Bankruptcy Court is unable to enter a final judgment, Plaintiffs request the Bankruptcy Court be permitted and assigned to preside over all pre-trial matters, including the issuance of fact and conclusions of law. Venue for this adversary proceeding is proper before this Court pursuant to 28 U.S.C. § 1409.

## II.      PRELIMINARY STATEMENT

2.      From 2017 to the present CAG and HH together with the Oliphant Entities stole over $50,000,000 from the Plaintiffs (who are mostly retirees) through a Ponzi Scheme. The Ponzi Scheme fell apart in July of 2023. By then all of CAG's and HH's assets had been fraudulently transferred to the Oliphant Entities. Thereafter, the Oliphant Entities spun CAG and HH out from under their corporate umbrella to escape liability for their conduct. Numerous co-conspirators acted with CAG and HH to operate this Ponzi

6

Scheme.

3.      These co-conspirators are Ferrum Capital, LLC ("**Ferrum Capital**"), and its owners Michael Cox[2] ("**Cox**") and Joshua L. Allen ("**Allen**"). Cox owned Ferrum Capital through his entity known as MKMH Interest LLC ("**MKMH**") and received unauthorized commissions from Ferrum Capital through his other entities MLC Financial, Inc. dba MLC Financial Services ("**MLC**"), and MCKC Services, LLC ("**MCKC**"). Allen jointly owned Ferrum Capital with Cox through his entity Landzacha Holdings, Ltd. ("**Landzacha**") and received unauthorized commissions from Ferrum Capital individually and through his entity Allen Financial Agency, Inc. ("**AFA**"). Ferrum Capital issued and sold fraudulent investment notes through unlicensed dealers and investment advisors including Brooklyn Chandler Willy, individually and dba Chandler Capital Holdings, ("**Willy**"), Queen B Advisors, LLC d/b/a Texas Financial Advisory ("**Queen B**"), Chandler Capital Holdings, LLC ("**Chandler**"), Yvette Barrera ("**Barrera**") and L. Duane Allen CPA ("**L. Duane Allen**"). Other co-conspirators that owned or controlled CAG and HH were Chesa Holdings, LLC ("**Chesa**"), AUSSRQ Holdings, LLC ("**AUSSRQ**"), Michael Crossan ("**Crossan**"), Robert Morris ("**Morris**"), Colin Conway ("**Conway**"), Michael Pope ("**Pope**"), David Scanlan ("**Scanlan**"), and SkyPeak Fund I, LP ("**Skypeak**"). Plaintiffs' claims against CAG and HH's co-conspirators (collectively referred to as the "**State Court Defendants**") are pending in the 131st Judicial District Court, Bexar County, Texas in *Judy A. Musgrove et al v. Willy et al.*, Cause No. 2023-CI-22575 (the "**State Court Lawsuit**"). Walt and the Oliphant Entities are also defendants in the State Court Lawsuit for other bad acts they committed. Because they received fraudulent transfers from

---

[2] Mr. Cox filed bankruptcy on February 20, 2024, and the claims against him are severed into Cause No. 2024CI26337 in the 438th, Judicial District Court of Bexar County.

CAG and HH, they are also being sued in this Adversary Proceeding.

4.     CAG, HH, Ferrum Capital, and the Oliphant Entities, issued unregistered securities to the unsuspecting public in the form of secured promissory notes. The promissory notes were sold as part of Ferrum Capital's Commercial Lending Program, which ostensibly matched lender/investors with borrowers.  In this case, Ferrum Capital had one borrower – CAG.  CAG was controlled by the Oliphant Entities, who were in turn controlled by Oliphants' shareholders, officers and directors – Walt, Crossan, Morris, Conway, Pope, Scanlan and Skypeak.  CAG needed funds to operate its debt buying business and co-created the Ferrum Capital Commercial Lending Program, a Ponzi Scheme that peddled unregistered investments mainly to retired investors seeking to invest in suitable investments.  CAG and HH through Walt and Morris masterminded the Ferrum Commercial Lending Program (in 2017) and used unregistered salespeople and dealers who held themselves out as investment advisors to peddle the investments to unsuspecting investors.  The marketing materials for the Commercial Lending Program contained fraudulent statements including that investor funds would be invested into CAG and that Plaintiffs would receive a guaranteed return on their investments plus interest at ten percent (10%) interest per annum in four years. When the first promissory notes became due in 2022, CAG and HH (now under new owners -  Crossan, Morris, Conway, Pope, Scanlan and Skypeak) offered Ferrum Capital owners, an interest in Skypeak, if they convinced those Plaintiffs whose Notes had matured to roll over the Notes for another four (4) years to avoid repaying the Plaintiffs.  The promissory notes sold as part of Ferrum's Commercial Lending Program are securities under Texas Government Code § 4001.068 and required registration with, and a permit issued by, the Texas State Securities Board ("**TSSB**") before

8

they were offered for sale to the public. Each Ferrum Capital Note to an investor was in turn secured by an undivided interest in an underlying or "dependent" promissory note issued by CAG. The two notes were described in the marketing materials set forth in Ferrum's Commercial Lending Program as an "Asset Backed Security", and each investor in Ferrum Capital was promised a "Senior Secured Loan" in exchange for their investment. The promissory notes were indeed securities, but they were not senior or secured. Neither Ferrum Capital nor CAG, sought a permit from the TSSB for an offering.

5.     Ferrum Capital, LLC was formed for the sole and exclusive purpose of financing CAG. Ferrum Capital had no borrowers other than CAG. CAG's prior source of funding, from an entity known as Sonoqui, used the same sales, marketing and financing structure—it too was a Ponzi scheme. Sonoqui was sued for violating the federal securities acts and failed in 2016 when new investor money ran out. Sonoqui's principal was convicted of federal securities fraud. The Oliphant Entities, through a series of corporate machinations, looted CAG of its assets and the monies which were raised by Ferrum Capital from the Plaintiffs. The Oliphant Entities are control persons or aiders of securities fraud.

6.     The Ponzi scheme collapsed in July of 2023 when CAG refused to repay any additional monies to Ferrum Capital. Several of the principals involved have been indicted for wire and securities fraud. Cox, CAG and HH have filed for bankruptcy protection.

7.     After two years of investigation, it is now apparent that each of the principal issuers and promoters of the promissory notes issued by CAG and Ferrum Capital were engaged in several distinct fraudulent schemes. But each had the same purpose and

9

outcome—to separate investors (who were for the most part retired, unsophisticated and naïve) from their money. The various schemes and their relationships to each other are described in detail below.

8. With the exception of a few Plaintiffs who received interest payments, each has now lost virtually all of their investment. The Plaintiffs' collective damages are approximately $28,127,091.25, for which they seek judgment.

### III. PARTIES

#### A. PLAINTIFFS

9. Judy A. Musgrove, Individually, and as Beneficiary of the Mainstar Trust, Cust. FBO Judy A Musgrove IRA #T2181568, and GoldStar Trust FBO Judy A. Musgrove IRA ("Musgrove"), resides in Comal County, Texas.

10. Kathleen E. Priebe, Individually, and as Beneficiary of the GoldStar Trust FBO Kathleen E. Priebe IRA ("Priebe"), resides in Comal County, Texas.

11. Paul D. Sheetz, Individually, and as Beneficiary of the GoldStar Trust FBO Paul D Sheetz IRA ("Paul"), resides in Bexar County, Texas.

12. Wanda Sheetz, Individually, and as Beneficiary of the GoldStar Trust FBO Wanda A Sheetz IRA ("Wanda"), resides in Bexar County, Texas. Paul and Wanda are referred to collectively herein as "Sheetz".

13. Alvin Zigmond, Individually, and as Beneficiary of the GoldStar Trust FBO Alvin Zigmond IRA ("Alvin"), resides in Aransas County, Texas.

14. Sharon Zigmond, Individually, and as Beneficiary of the GoldStar Trust FBO Sharon Zigmond IRA ("Sharon"), resides in Aransas County, Texas. Alvin and Sharon are referred to collectively herein as the "Zigmonds".

15. Dan A. Doolittle, Individually, and as Beneficiary of the GoldStar Trust

10

FBO Dan A Doolittle IRA ("Dan"), resides in Bexar County, Texas.

16.     Kelly M. Doolittle, Individually, and as Beneficiary of the GoldStar Trust FBO Kelly M Doolittle IRA ("Kelly"), resides in Bexar County, Texas. Dan and Kelly are referred to collectively herein as the "Doolittles."

17.     Carolyn Newman, Individually, and as Beneficiary of the GoldStar Trust FBO Carolyn Newman IRA ("Newman"), resides in Bexar County, Texas.

18.     Tammara Owrey, Individually, and as Beneficiary of the GoldStar Trust FBO Tammara Owrey IRA ("Owrey"), resides in Guadalupe County, Texas.

19.     Travis Mitchell, Individually, and as Beneficiary of the GoldStar Trust FBO Travis Mitchell IRA ("Travis"), resides in Comal County, Texas.

20.     Donna Mitchell, Individually, and as Beneficiary of the GoldStar Trust FBO Donna Mitchell IRA ("Donna") resides in Comal County, Texas. Travis and Donna are referred to collectively herein as the "Mitchells".

21.     Michael Gibson, Individually, and as Beneficiary of the GoldStar Trust FBO Michael Gibson IRA ("Michael"), resides in Bexar County, Texas.

22.     Barbara Gibson, Individually, and as beneficiary of the GoldStar Trust FBO Barbara Gibson IRA ("Barbara"), resides in Bexar County, Texas. Michael and Barbara are referred to collectively herein as the "Gibsons".

23.     Arthur Del Negro Individually, and as beneficiary of the GoldStar Trust FBO Arthur Del Negro IRA ("Arthur"), resides in Bexar County, Texas.

24.     Laurie Del Negro Individually, and as beneficiary of the GoldStar Trust FBO Laurie J. Del Negro IRA ("Laurie"), resides in Bexar County, Texas. Arthur and Laurie are referred to collectively herein as the "Del Negros".

4937-0635-5059, v. 2

25. Mark Edgard Aerts and Melissa Anne Aerts, Individually and As Co-Trustees of the Mark and Melissa Aerts Revocable Trust (the "Aerts') reside in Bexar County, Texas.

26. Edward Nicolas Individually, and as Beneficiary of the GoldStar Trust FBO Edward Nicholas IRA ("Nicolas"), resides in Bexar County, Texas.

27. Linda Doubrava Individually, and as Beneficiary of the GoldStar Trust FBO Linda Doubrava IRA ("Doubrava"), resides in Bexar County, Texas.

28. Kevin Bennett Individually, and as beneficiary of the GoldStar Trust FBO Kevin Bennett IRA ("Kevin"), resides in Blanco County, Texas.

29. Gail A. Bennett, Individually, ("Gail"), resides in Blanco County, Texas. Kevin and Gail may be referred to collectively herein as the "Bennetts".

30. Diane Durant Individually and as Beneficiary of GoldStar Trust FBO Diane Durant IRA ("Durant") resides in Comal County, Texas.

31. Donald Turco, Individually and as Beneficiary of GoldStar Trust FBO Donald R Turco Roth IRA resides in Bexar County, Texas.

32. Mi Hui Turco, Individually and as Beneficiary of GoldStar Trust FBO Mi Hui Turco Roth IRA resides in Bexar County, Texas. Donald and Mi Hui are referred to collectively herein as the "Turcos".

33. Sally McBee, Individually and as Beneficiary of GoldStar Trust FBO Sally McBee IRA ("Mcbee") resides in Bexar County, Texas.

34. Juanita Clary, Individually and as Beneficiary of Mainstar Trust FBO Juanita Clary IRA ("Clary") resides in Eddy County, New Mexico.

35. Tommy York, Individually and as Beneficiary of GoldStar Trust FBO

12

Tommy York IRA ("Tommy") resides in Garza County, Texas.

36.     Vickie York, Individually and as Beneficiary of GoldStar Trust FBO Vickie L York IRA ("Vickie") resides in Gaza County, Texas. Tommy and Vickie are referred to collectively herein as the "Yorks".

37.     Cody York, Individually and as Beneficiary of Mainstar Trust FBO Cody York IRA ("Cody") resides in Lea County, New Mexico.

38.     Norman Kaczorowski, Individually and as Beneficiary of the Mainstar Trust FBO Norman Kaczorowski Roth IRA ("Norman") resides in Comal County, Texas.

39.     Zoraida Kaczorowski individually and as Beneficiary of the Mainstar Trust FBO Zoraida Kaczorowski Roth IRA ("Zoraida") resides in Comal County, Texas. Norman and Zoraida are referred to collectively herein as herein as the "Kaczorowskis."

40.     Angelyn Nicholson, Individually and as Beneficiary of GoldStar Trust FBO Angelyn Nicholson an inherited IRA and as Beneficiary of GoldStar Trust FBO Angelyn Nicholson Roth IRA ("Angelyn") resides in Lubbock County, Texas.

41.     Steve Nicholson, Individually and as Beneficiary of the GoldStar Trust FBO Steve Nicholson IRA ("Steve") resides in Lubbock County, Texas. Steve and Angelyn are referred to collectively herein as herein as the "Nicholsons."

42.     Shelley Lee, Individually and as Beneficiary of the GoldStar Trust FBO Shelley Lee, IRA ("Lee") resides in Lubbock County, Texas.

43.     Donald Lee Woods, Individually and as Assignee of Goldstar Trust FBO Jerry S. Akin Ira and as Assignee of Goldstar Trust FBO Kimberly L Akin Roth Ira ("Woods") resides in Midland County, Texas.

44.     Gregory L. Schnell, Individually and as Beneficiary of GoldStar Trust FBO

Gregory L. Schnell, IRA ("Gregory") resides in Comal County, Texas.

45.     Jane Schnell, Individually and as Beneficiary of GoldStar Trust FBO Jane M. Schnell, IRA ("Jane") resides in Comal County, Texas. Gregory and Jane are referred to collectively herein as herein as the "Schnells."

46.     Irma L. Alonzo Individually ("Irma"), is an individual who resides in Bexar County Texas.

47.     Dennis Woods, Individually and as Beneficiary of GoldStar Trust FBO Dennis Woods, IRA ("Dennis") resides in Lubbock County, Texas.

48.     Ross Rucker, Individually and as Beneficiary of GoldStar Trust FBO Ross A. Rucker, IRA ("Ross") resides in Kendall County, Texas.

49.     Dwain Strait Individually ("Dwain") is an individual who resides in Lubbock County, Texas.

50.     Grace Strait Individually and as Beneficiary of GoldStar Trust FBO Grace Strait IRA and as Assignee of the Brent Pendergrass Note No. FE 26-20041-410-1057-05 ("Grace") resides in Lubbock County, Texas. Dwain and Grace are referred to collectively herein as the "Straits."

51.     Errol Glenn Archer Individually ("Errol") is an individual who resides in Lubbock County, Texas.

52.     Cody Herndon Individually and as Beneficiary of Provident Trust Group LLC FBO Cody Herndon IRA ("Cody") is an individual who resides in Ellis County, Texas.

53.     Pamela Herndon Individually ("Pamela") is an individual who resides in Lubbock County, Texas.

14

54.     Robert Cook, Individually and as Beneficiary of the GoldStar Trust FBO Robert Cook, IRA ("Cook") resides in Lubbock County, Texas.

55.     Brent Couch, Individually and as Beneficiary of GoldStar Trust FBO Brent Couch, IRA ("Brent") resides in Lubbock County, Texas.

56.     Gayle Reese, Individually and as Independent Executrix of and Beneficiary of the Estate of Nyla Medlock, Deceased, owner of Provident Trust Group, LLC FBO Nyla Medlock 401k ("Gayle")[3] resides in Lubbock County, Texas.

57.     Roland K. Stanaland, Individually and as Beneficiary of GoldStar Trust FBO Roland K. Stanaland, IRA ("Roland") resides in Lubbock County, Texas.

58.     Nancy Burnett ("Nancy") is an individual who resides in Lubbock County, Texas.

59.     Jay Adkins, Individually and as Beneficiary of GoldStar Trust FBO Jay C. Adkins, (IRA), ("Jay"), resides in Lubbock County, Texas.

60.     Michael J. (Butch) Boyd Individually and as Beneficiary of GoldStar Trust FBO Michael Butch Boyd, IRA ("Butch") resides in Lubbock County, Texas

61.     Holly Boyd Individually and as Beneficiary of Provident Trust Group FBO Holly Boyd IRA ("Holly") resides in Lubbock County, Texas. Holly and Butch are referred to collectively herein as the "Boyds."

62.     Debra Rae Keesee Individually ("Keesee") is an individual residing in Terry County, Texas.

63.     Lennie J. Mills, Individually and as Beneficiary of GoldStar Trust FBO

---

[3] Nyla Medlock died. Her Will was probated in April 2021, and her interest passed to Gayle Reese. Nyla Medlock invested 401k rollover funds with Provident Trust for investment in life insurance policy proceeds and in Ferrum. Allen sold Nyla Medlock these investments. Gayle is the real party in interest due to Nyla's death.

Lennie Jozette Mills IRA ("Lennie"), resides in Lubbock County, Texas.

64.  Anthony Beauchamp Individually and as Beneficiary of Mainstar Trust FBO Anthony W Beauchamp IRA and as co-trustee of the Tony and Traci Beauchamp Trust ("Anthony"), resides in Parmer County, Texas

65.  Traci Beauchamp Individually and as Beneficiary of Mainstar Trust FBO Traci L Beauchamp IRA, and as co-trustee of the Tony and Traci Beauchamp Trust ("Traci") resides in Parmer County, Texas. Anthony and Traci are referred to collectively herein as the "Beauchamps."

66.  Thomas Beauchamp, Individually and as Beneficiary of Mainstar Trust FBO Thomas M. Beauchamp IRA ("Thomas"), resides in Parmer County, Texas.

67.  Debra Beauchamp, Individually and as Beneficiary of Mainstar Trust FBO Debra Beauchamp IRA ("Debra"), resides in Parmer County, Texas. Debra and Thomas are referred to collectively herein as "Debra and Thomas Beauchamp".

68.  Angela Beauchamp, Individually and as Beneficiary of Mainstar Trust FBO Angela M Beauchamp IRA ("Angela") resides in Parmer County, Texas.

69.  Tony Newton, Individually and as Beneficiary of Mainstar, Custodian, FBO Tony Newton Roth IRA ("Tony") resides in Lubbock County, Texas.

70.  Mary Elizabeth Newton, Individually and as Beneficiary of Mainstar Custodian, FBO Mary Newton Roth IRA ("Mary") resides in Lubbock County, Texas. Tony and Mary are referred to collectively herein as the "Newtons."

71.  Philip McNabb Individually and as Beneficiary of Provident Trust Group, LLC FBO Philip McNabb IRA ("Phillip") resides in Lubbock County, Texas.

72.  Jennifer McNabb Individually and as Beneficiary of Provident Trust Group,

16

LLC FBO Jennifer McNabb IRA ("Jennifer") resides in Lubbock County, Texas. Phillip and Jennifer are referred to collectively herein as the "McNabbs."

73.     Justin St. Clair Individually and as Beneficiary of GoldStar Trust FBO Justin R St. Clair IRA ("St. Clair") is an individual who resides in Lubbock County, Texas.

74.     John Ayers Individually and as Beneficiary of GoldStar Trust FBO John Ayers, IRA, ("Ayers"), resides in Lea County, New Mexico.

75.     Randall Sparks is a resident of Lubbock, Lubbock County, Texas. Mr. Sparks intervened in this lawsuit as a plaintiff on May 7, 2025.

76.     Angela Sparks is a resident of Lubbock, Lubbock County, Texas. Mrs. Sparks intervened in this lawsuit as a plaintiff on May 7, 2025.

77.     Amanda Coburn is a resident of Lubbock, Lubbock County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

78.     Mason Coburn is a resident of Lubbock, Lubbock County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

79.     Scotta Knight is a resident of Shallowater,  Lubbock County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

80.     Barbara Muzny resides at 31541 Bulverde Hills, Bulverde, TX 78163, Comal County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

81.     Richard Muzny resides at 31541 Bulverde Hills, Bulverde, TX 78163, Comal County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

82.     Robert Mayhew is a resident of San Antonio, Bexar County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

83.     Maria Mayhew is a resident of San Antonio, Bexar County, Texas and

intervened in this lawsuit as a plaintiff on May 7, 2025.

84.     Terry Hunter is a resident of Lubbock, Lubbock County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

85.     Susan Hunter is a resident of Lubbock, Lubbock County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

86.     Michael Bass is a resident of San Antonio, Bexar County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

87.     Lorie Bass is a resident of San Antonio, Bexar County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

88.     Steven Bloyd is a resident of Grandbury, Hood County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

89.     Albert Blades is a resident of San Antonio, Bexar County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

90.     Susan Blades is a resident of San Antonio, Bexar County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

91.     Jay R. Adams is a resident of Lubbock, Lubbock County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

95.     Mary Adams is a resident of Lubbock, Lubbock County, Texas and intervened in this lawsuit as a plaintiff on May 7, 2025.

**B.      DEFENDANTS**

96.     Collins Asset Group, LLC, is a Delaware limited liability company with its principal place of business in Travis County, Texas. CAG has answered and appeared herein

18

97.     Hollins Holdings LLC (now doing business as Hollins Holdings, Inc.) is a foreign limited liability company doing business in Texas. Hollins Holdings, LLC has answered and appeared herein.

98.     Oliphant Financial, LLC is a Florida limited liability company with its principal place of business in Sarasota County, Florida. Oliphant Financial , LLC has answered and appeared herein.

99.     Oliphant USA, LLC is a Florida limited liability company with its principal place of business in Sarasota County, Florida. Oliphant USA, LLC has answered and appeared herein.

100.    Oliphant Inc. is a Delaware corporation with its principal place of business at 6001 W. William Cannon Drive, Suite 102, Austin, Texas 78749. Oliphant Inc. removed the State Court Lawsuit to this Court as a party and has made an appearance in this case and submitted itself to this Court's jurisdiction on June 6, 2025, and no service of process is necessary on Oliphant Inc. However, in the event Oliphant Inc. takes the position that service of process has not been effect, then in accordance with Fed. R. Civ. P. 4(h)(1)(B), as made applicable by Fed. R. Bankr. P. 7004(a), Oliphant, Inc. may be served with process by serving the Summons and this Third Amended Complaint by United States First Class mail to: 6001 W. William Cannon Drive, Suite 102, Austin, Texas 78749 or alternatively to its registered agent, VCorp Services LLC, 108 W. 13th Street, Suite 100, Wilmington, DE 19801.

101.    Oliphant United, Inc., formerly doing business as Oliphant United, LLC, is a foreign corporation incorporated under the laws of Florida, with its principal place of business located at 6001 W. William Cannon Dr. Suite 102 Austin, TX 78749. In

19

accordance with Fed. R. Civ. P. 4(h)(1)(B), as made applicable by Fed. R. Bankr. P. 7004(a), Oliphant United, Inc., may be served with process by delivering a copy of the Summons and the Third Amended Complaint to Oliphant United, Inc. at its home office at 6001 W. William Cannon Drive, Suite 102, Austin, Texas 78749 or alternatively its registered agent Vcorp Services, LLC, 1200 South Pine Island Road, Plantation, Florida 33324.

102.    Accelerated Inventory Management, LLC, is a foreign limited liability company registered to do business in Texas. AIM has answered and appeared herein.

103.    Walt Collins is an individual residing at 2300 Barton Creek Boulevard, Austin, Texas 78735.  Walt has answered and appeared herein.

## IV.    STATEMENT OF FACTS

### A.  CAG- the Beginning.

104.    CAG was founded by Walt and Crossan in 2011. Since its inception, CAG has been in the business of purchasing portfolios of charged-off consumer debt from financial institutions for pennies on the dollar.  CAG would then collect the purchased debt from the original account debtors.  CAG would make money on the difference between the amount of money that the consumer's account was purchased for and what monies were ultimately collected from the consumer.  CAG financed the bad debt portfolio purchases with investor money raised through conduits such as Ferrum Capital.  The investors in the conduits were promised collateral for the loans.  Each investor was delivered a package at funding which described the collateral as follows:  "COLLATERAL: The Loan is collateralized by Senior Secured Loans ("**SSL**") or Asset Backed Securities ("**ABS**"). SSL's have a senior claim on assets, are collateralized with tier-one assets and secured by

20

stringent covenants which allow re-pricing of risk. ABS's are financial securities backed by a pool of assets."

105.    CAG's business model was flawed from the outset because: 1) it raised money through conduits, in this case Ferrum Capital, by issuing unregistered securities to the unsophisticated investing public; 2) the underlying investment was mismatched to the note obligation.  The promissory notes CAG issued to Ferrum Capital were payable over a four (4) year term when CAG, HH and the Oliphant Entities knew that the bad debt portfolios purchased could not generate the amount of money necessary to repay the amount of money borrowed plus the promised interest  in four years.

106.    The latest iteration of CAG's conduit business model was Ferrum Capital which started raising investor funds in 2017.  However, in or around 2014, CAG implemented the almost exact financing scheme through another conduit by the name of "Integrated" or  "Sonoqui." Integrated and Sonoqui failed because they, like Ferrum Capital,  were designed and operated as a Ponzi scheme.  Each was sued by its investors for securities fraud.  Cox, Allen and Willy were either individual  investors in Sonoqui or recommended to their clients that they purchase Sonoqui notes. When Sonoqui failed, the bankruptcy Trustee for Sonoqui demanded that CAG repay all its notes to the Sonoqui bankruptcy estate.  CAG ultimately paid back approximately fifty cents ($.50 cents) on the dollar of its borrowings from Sonoqui. The principal behind Sonoqui, Mr. Dale Ledbetter, was convicted of federal securities fraud and went to prison[4].

107.    Ferrum Capital and CAG are issuers or sellers of unregistered securities. CAG is a control person of and an aider of Ferrum Capital.

---

[4] *USA v. Andrew Dale Ledbetter*, Case: 0:20-CR-60103, United State District Court of Florida.

**B. Cox, Allen, Willy through Ferrum Capital, Step in to Fill the CAG Financing Breach.**

108.    In a reprise of the same flawed business model as Sonoqui, Cox and Allen formed Ferrum Capital and started raising money for the exclusive purpose of funding CAG.  Ferrum Capital marketed promissory notes issued by Ferrum Capital to each investor—a "**FC/Investor Note**." Each FC/Investor Note was to be secured in a dependent note issued by CAG to Ferrum Capital—a "**CAG/FC Note**." Each note was represented to be secured with the same description quoted above.  This statement was material and untrue. CAG participated in the drafting and approval of the Ferrum Capital marketing materials and consulted with Ferrum Capital's lawyers in 2017 regarding concerns that the CAG/FC and Investor/FC Notes were securities.

109.    From 2017 – 2023, the FC/Investor Notes and the CAG/FC Notes were marketed together as one integrated package.  If an investor purchased an FC/Investor Note, the proceeds of that note would transfer to CAG, and the investor would receive a Senior Secured Loan from CAG in the same amount but divided up with other investors in the same tranche of debt.  Each FC/Investor Note references the dependent CAG/FC Note. For example, Ms. Musgrove, a plaintiff, was issued an FC/Investor Note in the amount of $301,610.74 which was assigned the Ferrum Capital number of Fe26-2001-410-1052-04. This note then ties to the CAG/FC Note number Fe-26-410-1052.  This naming convention tells the note holder that Musgrove owns a 10% note ("**410**"), payable in four years ("**410**"), that the note is the 52nd note ("10**52**") issued by CAG to Ferrum Capital and that Musgrove is the fourth investor ("04") to take an undivided interest in the dependent CAG/FC Note. Both the FC/Investor and CAG/FC Notes were supposed to be secured by UCC-1 filings made against Ferrum Capital and CAG. From 2017 through 2023, Ferrum Capital raised

22

approximately $60,000,000 from investors and turned over to CAG approximately $50,000,000 in investor funds from approximately 250 investors. CAG then issued 100 notes to Ferrum Capital. As the managing member of CAG, HH through its managers and authorized representatives including Walt, Crossan and Scanlan, then executed the CAG/FC Notes and delivered them to CAG who passed those notes on to the Plaintiffs.

110.    Ferrum Capital was presented to the investor as the loan servicer and charged .75% for its services. Ferrum Capital was not equipped to and did not track, account for, manage or service the Investor/FC Notes, portfolios or collateral. Ferrum Capital did not maintain a systematic accounting system, did not use accounting software and did not ask for or receive information on the state of the underlying collateral held by CAG. Although obligated to do so, CAG did not provide to Ferrum Capital any reporting on the monies collected, the allocation of those monies to individual CAG/FC or FC/Investor Notes or any of the other information required by the Security and Loan Agreements executed between the parties. **Ferrum Capital was merely a shill and did nothing but pass money between investors and CAG.**

111.    CAG allegedly pledged almost $1 billion in face value of defaulted consumer debt to secure the 100 CAG/FC Notes and 250 Investor/FC Notes. As discussed below, the pledge of the collateral was either non-existent or illusory at best.

### C.  Ferrum Capital was a Ponzi Scheme and its managers, Cox and Allen, were corrupt.

112.    Ferrum Capital was formed for the sole purpose of raising money for CAG in order to fund CAG's purchase of bad debt portfolios. Like its predecessor and other CAG conduits, Ferrum Capital was designed and operated to fail. Ferrum Capital's only source of revenue was a 10% origination fee charged to CAG and a fee of .75% charged

for two years for servicing[5].  Ferrum Capital promoted its notes by promising to pay interest to investors quarterly at eight percent (8%) per annum or the sum of ten percent (10%) per annum at maturity of the loan four years from the date of the underlying and dependent CAG/FC Note.  Using simple math, Ferrum Capital's only source of available revenue was the origination and service fees.  So, if those monies were paid out in commissions to Cox and Allen or other sales agents such as Willy, Ferrum Capital would **never** be able to repay its investors.

113.    Despite the representation made to investors in the offering documents (referred to by Ferrum Capital as the "Lending Relationship Agreement") that no transaction-based compensation was paid to the "Ferrum Team," in every instance, Cox and Allen paid themselves a 10.75% commission on all  monies that were raised for CAG (or rolled over as described below).  Thus, Ferrum Capital had no ability to pay for its ongoing expenses such as salary, overhead, accounting and other costs necessary to be a loan servicer.  Not satisfied with just taking an undisclosed commission, Cox and Allen also took advantage of the float and simply stole  investor monies from Ferrum Capital for their own benefit.  Most of these stolen investor funds flowed through their entities, AFA, MCKC, and MLC Financial.  In all, Cox, Allen and Willy (individually and through their entities) skimmed $12,000,000 out of Ferrum Capital for their own personal benefit.  All of those funds came from or belonged to investors.  None of these transfers, including the commissions, were disclosed to investors. Thus, from the inception of Ferrum Capital and the first transfer of money from Ferrum Capital to Cox and Allen, its ultimate failure was

---

[5] When Ferrum Capital transferred monies to CAG in exchange for a CAG/FC Note, Ferrum Capital shorted the payment by the amount of the origination and servicing fee. For example, if Ferrum Capital raised $100,000.00 from an investor, Ferrum Capital would only deliver $89,250.00 to CAG in exchange for a CAG/FC Note in the amount of $100,000.00.

assured and inevitable.

114.    Nor did Cox or Allen disclose to the investors that they owned 100% of Ferrum Capital, and later that one or both of them had acquired an interest in Oliphant Inc.—the ultimate owner of CAG.

115.    Ferrum Capital had no legitimate business, promised an unreasonably high return to investors, paid its owners investor monies from  investment proceeds, and repaid early investors from later investor monies. Ferrum Capital could never have repaid the investors the principal amount of the FC/Investor Notes plus the promised return. Ferrum Capital, like its predecessor conduits for CAG,  was a Ponzi scheme from the outset.

116.    Ferrum Capital was an issuer, seller or offeror of the FC/Investor Notes which were securities that required registration with the TSSB. Cox and Allen were sellers of the FC/Investor Notes, and they were control persons of Ferrum Capital and aiders of securities fraud.

   **D.    Brooklyn Chandler Willy Promoted the Ferrum Capital Ponzi Scheme, Recommended the Purchase of Unregistered Securities by her Clients and Simply Stole their Money.**

117.    Willy was a licensed  Investment Advisor Representative ("**IAR**").[6] In March of 2014,  she began working with a Registered Investment Advisor ("**RIA**"), Global Financial Private Capital, LLC ("**GFPC**"), an Investment Advisor registered with the U.S. Securities and Exchange Commission. Pursuant to the Investment Advisor Act and the TSA, every IAR must be associated with an RIA. Willy conducted her outside business under the d/b/a Texas Financial Advisory. As an IAR associated with GFPC, Willy's

---

[6] Many of these facts are taken from the Texas State Securities Board Disciplinary Order No. REG20-SUS-04 dated October 16, 2020 (the "**TSSB Disciplinary Order**"). The CAG/FC Notes are described in the TSSB Disciplinary Order as "Debt Notes."

approved investment related activity was limited to managing client accounts or portfolios of publicly registered and traded securities for a fee. Willy flagrantly ignored that limitation.

118.     Beginning in 2013, Willy began working with issuers of unregistered promissory notes or "alternative" investments.  One of these issuers was Sonoqui.

119.     As early as 2017 and through her indictment for fraud in December of 2024, Willy extensively advertised her services on both radio and television.  She hosted weekly television and radio programs appearing on stations local to the San Antonio area.  As part of these programs, she routinely tried to separate her services from those of other financial professionals by stressing that she is a "fiduciary" to her clients. On her website biography, Willy is listed as "President & CEO [of Texas Financial Advisory], Certified Financial Fiduciary®[7]."

120.     Willy, Queen B, and Ferrum Capital began their business relationship on January 10, 2018—just as Ferrum Capital began raising money for CAG. Prior to signing up with Ferrum Capital, Willy met personally with Walt for the purpose of understanding the relationship between CAG and Ferrum.  Walt confirmed to Willy that CAG would never charge more than 50% of the money collected by CAG for its Maker's Efforts.

121.     Ms. Yvette Barrera began working with Ms. Willy sometime prior to 2018.

122.     The arrangement between Ferrum and Willy was simple—Willy, Queen B[8] and Barrera would recommend that their clients purchase the unregistered securities to their clients and would be paid an upfront eight percent (8%) commission on any amount that

---

[7] Willy is a member of the National Association of Certified Financial Fiduciaries and agreed to abide by its Code of Conduct which can be found at www.nationalcffassociation.org/code-of-conduct. Willy agreed to practice the duties of loyalty, good faith, care, and disclosure, among others.
[8] At the time, Queen B was d/b/a Texas Financial Advisory – Willy's sole proprietorship.

4937-0635-5059, v. 2

each investor loaned to Ferrum—in direct violation of the Texas Securities Act and the Ferrum Terms and Conditions. Despite holding themselves out as fiduciaries to their clients and agreeing to make full disclosure, Willy, Queen B and Barrera made no effort to disclose that they received commissions that would reduce the principal of the Plaintiffs' investments, or to determine whether the investments were in the best interests of their clients. It appears that none of the Defendants conducted any due diligence, financial or credit analysis on CAG or the Oliphant Entities, before lending them Plaintiffs' money. No disclosure was made of any monies to be paid to Ferrum Capital or its principals as part of the transaction. In hindsight, it is clear that Ferrum Capital and its owners took a 10.75% origination fee and servicing fee off the top of the monies raised and then paid themselves a commission from each investor. Ferrum Capital then paid Willy and Queen B, typically through AFA, an eight percent (8%) commission per their wholesale agreement.

123. In an effort to conceal the fact that she was receiving commissions from issuers, Willy never reported to GFPC or its successor in interest[9] that her activities through TFA included the recommendations of unregistered alternative investments, including those offered by Ferrum Capital. However, she was eventually found out.

124. On October 1, 2019, Willy was terminated from J.W. Cole Advisors, Inc. ("JWC" -- the successor to GFPC) for violation of firm policies regarding participation in the recommendation and sale of unapproved securities transactions. Willy's termination and separation from her affiliated RIA did not stop her from continuing to recommend the sale of Ferrum Capital Notes and defrauding her clients. From 2018 to 2020, Willy and her employees at Queen B, such as Barrera, recommended that 249 of her clients invest

---

[9] In April 2019, GFPC was sold to J.W. Cole Advisors, Inc. ("JWC").

approximately $45,100,000 in Investor/FC Notes and in the dependent CAG/FC Notes. For those recommendations, Willy and her employees at Queen B, such as Barrera, were compensated with at least $2,665,000.00 in undisclosed commissions.

125.    There were a couple of legal challenges with this arrangement between Willy and Ferrum Capital. Under the TSA, commissions can  only be paid by an issuer (Ferrum Capital) to a registered securities dealer, which Willy was not.  Undisclosed commissions are both illegal and  a breach of fiduciary  duty. Second, the FC/Investor notes are securities which have to be registered, and a permit must be issued by the Texas State Securities Board for an offering to the public. The Ferrum Capital notes were never registered with the TSSB. Third, no disclosure was made to the investors that the commissions were actually coming out of the funds that they had invested.

126.    Willy, Queen B and Barrera, were not registered as dealers, sellers, or issuers, and receiving a commission in exchange for making any recommendations of these "alternative investments"—read unregistered security—is *per se* unlawful under the TSA.

127.    After Willy's association with J.W. Cole was terminated, Willy continued to recommend to clients that they purchase Ferrum Capital Notes. Willy applied to the TSSB for her own RIA license in the name of Queen Bee Advisors, LLC.  The TSSB recognized the illegality of what Willy was doing. Willy ultimately agreed to the TSSB Disciplinary Order which was dated October 16, 2020.  In that order, Willy agreed that the Ferrum Capital Notes were securities which were not properly registered and was ordered to refund $2,750,000 in commissions she had been paid by Ferrum Capital and other issuers to her customers.

128.    Willy did not have the money to refund the commissions. Willy turned  to

28

her corrupt colleagues at Ferrum Capital, Cox and Allen, who arranged for her to open bank accounts with their bank in Lubbock, Texas, and started funneling monies into Willy's accounts in order to finance the refund of the commissions. A significant amount of those funds came from another entity owned and controlled by Cox and Allen, Ferrum IV, LLC. The entry of the TSSB Disciplinary Order should have stopped Willy, Ferrum Capital, Cox and Allen from recommending the purchase of any other unregistered promissory notes, and it should have caused CAG to stop issuing any other unregistered notes, but it did not. Ferrum Capital and CAG continued to issue unregistered securities and Cox, Allen and Willy continued to sell them.

129. Willy then engaged in an elaborate hoax for the purpose of convincing her customers to waive their right to a refund of the commissions. Most of her customers, including many of the Plaintiffs, fell for the ruse in which she forged their signatures on a waiver and buried the refund check in the back of an elaborate marketing piece. But by the end of 2022, Willy ran out of money and simply started stealing millions of dollars from her customers using the accounts of Ferrum IV to launder the monies. Cox and Allen aided her by allowing the stolen monies to pass through the accounts of Ferrum IV.

130. Willy was a seller of an unregistered security. She materially aided the sale of the FC/Investor, CAG/FC and Ferrum IV/RPF notes in violation of Texas securities law. She was also an unlicensed dealer. Willy was aided at all material times by her long-time employee, Yvette Barrera, in these various schemes to defraud her clients.

**E. Walt, Crossan and Morris form the Joint Venture.**

131. Mr. Robert Morris was a long-time business associate of Walt Collins and owner of a competing business, Oliphant Financial, LLC, and its affiliated entities,

Oliphant USA, LLC, and Oliphant United. In 2017 or 2018, Morris and Oliphant presented CAG with an opportunity to purchase portfolios of charged-off loans from Lending Tree and Lending Club. Oliphant had the purchasing opportunity but no cash; and CAG, flush with money raised from Ferrum Capital and its investors, had the cash. Mr. Collins, Mr. Crossan and Mr. Morris decided to combine their entities' operations together so that each owned 21% of the combined businesses and maintained 100% of the voting control. Thus, in 2017 or 2018, CAG and its owners, Walt, Crossan and Morris combined to create a partnership or joint venture between their respective companies, Collins Asset Group, LLC and Oliphant Financial Services, LLC under the umbrella of Oliphant United. Another entity (rolled up under the Oliphant Entities), AIM, became the "debt-buying" part of the joint venture. AIM is a wholly owned subsidiary of Chesa, which is wholly owned by Oliphant United. Oliphant USA is the wholly owned subsidiary of AUSSRQ, LLC., which is wholly owned by Oliphant United.

132. In 2019, CAG and the Oliphant Entities changed the way they did business. All monies collected from all portfolios were deposited into and co-mingled into a single account. Oliphant USA became the servicer of all of the accounts, including those owned by CAG and pledged to Ferrum Capital. The changes made in 2019 were not disclosed to the investors in Ferrum Capital, and the offering documents delivered to investors were not altered to reflect the changes. Essentially all of the money that had been invested and was now generating returns, and all of the money that was raised from investors from 2019 forward was not used to purchase "Asset Backed Securities" or "Senior Secured Loans" as represented in the offering and loan documents. In fact, by mid-2021, CAG had stopped buying new portfolios of charged off debt. No new UCC-1's were filed after June 2021,

even though Ferrum Capital kept raising new money, and CAG continued to accept the new funds and issue new CAG/FC Notes in exchange for the funds.

133.    By the end of October of 2021, CAG had transferred $42,288,948 dollars to its affiliates. Of these monies, CAG transferred at least $27,750,000 to AIM, and $5,500,000 to Oliphant USA, LLC. Another $6,000,000 was collected by Oliphant USA, LLC, on behalf of CAG but never paid to CAG.  At some point, the owners of CAG even paid themselves $6,000,000 in distributions (dividends), all with Investor money.  These transfers were noted in the books and records of CAG, and sometimes documented by promissory notes, but for the most part were not documented—even though CAG promised to Ferrum Capital and its investors that all of the investments made would be "Senior Secured Loans." The promissory notes between the CAG/Oliphant affiliates were never enforced by CAG.  After the sale described below and by the end of 2022, another $9.5 million was transferred out of CAG to its new parent company, Oliphant, Inc.

134.    By the end of 2022, CAG had been looted in the amount of $53,449,249. In short, while $50,000,000 in investment dollars were placed by Ferrum Capital with CAG, and CAG had issued $60,000,000 in CAG/FC Notes, approximately eighty-one percent (81%) of those monies were transferred out of CAG to its various affiliates and owners and never paid to Ferrum Capital or its investors. The representation made by Ferrum Capital and CAG that the proceeds of the investor monies would be Senior Secured Loans was false.

135.    Walt, Morris and Scanlan are control persons and aiders of CAG and Ferrum Capital.

136.    The Oliphant Entities, Chesa, and AUSSQR received monies from CAG

31

which came from Ferrum Capital and are control persons and aiders of CAG and Ferrum Capital.

137.    On October 12, 2021, Walt and Crossan, the majority owners of CAG through their family trusts, sold the company or its assets to Oliphant Inc., which then merged with, or otherwise took a controlling interest in CAG.

### F. Conway, Pope and Scanlan take over CAG and continue the Ponzi Scheme.

138.    On October 13, 2021, Collins and Crossan sold all of their controlling interests in the CAG/Oliphant joint venture  to an investor group comprised of Conway, through his company ICAG, Pope through his company Skypeak and David Scanlan.  Upon information and belief, Scanlan also owns an interest in ICAG.  Conway, Pope and Scanlan used another entity, Oliphant, Inc., to take direct or indirect ownership and control of CAG and all of the Oliphant Entities. What monies were left in CAG post-closing were looted by the new owners. By the end of 2022, $9,000,000 in cash had been transferred from CAG to Oliphant, Inc., **for no consideration-- at all. The cash was just taken**.

139.    Walt and Crossan received transfers from CAG at closing at a time when CAG was insolvent and in contravention of the liens promised to Plaintiffs.

140.    Just prior to closing, Conway and Scanlan recognized that CAG was worthless and hatched the plan to spin-off CAG from Oliphant, Inc., so that Ferrum Capital and the investors would not be paid. Knowing that CAG owed Ferrum Capital substantial monies that could not be paid, they proceeded to close CAG with the intention of never paying Ferrum Capital—which is exactly what happened.

141.    Recalling that the early FC/Investor and CAG/FC Notes were issued starting in late 2017 and early 2018, and that those investor notes had four-year terms, those

notes started coming due in late 2021 and early 2022. Conway, Pope and Scanlan decided to keep the Ponzi Scheme going because CAG had been looted of all of its cash and assets by Oliphant, Inc. and its sister affiliates. Beginning in early 2022, Conway, Pope and Scanlan began the process of rolling over the original CAG/FC Notes into new "Converted Notes" so that CAG, (but really Oliphant, Inc. and its subsidiaries such as AIM and Oliphant USA), would not have to immediately fund the payment of the maturing notes.

142. CAG needed Cox and Allen to cooperate in the process of rolling over the notes, so they offered Cox and Allen a financial incentive to cooperate. Pope invested in Oliphant, Inc., through his investment fund, Skypeak Fund I, LP. Pope offered Cox and Allen limited partnership interests in Skypeak Fund I, LP. The minimum investment in Skypeak Fund I LP was $500,000. Pope waived that requirement and only required that Cox invest $150,000 in the fund, which he did. Cox, who would have to convince his clients to rollover their investments instead of getting paid out, was now financially aligned with CAG and Oliphant. And Mr. Cox delivered. $17,758,591.00 worth of CAG/FC Notes were rolled over in 2022 and 2023. Mr. Cox also continued to solicit new money from investors for Ferrum Capital and CAG. From October of 2021 until the scheme collapsed, Mr. Cox and Mr. Allen raised an additional $11,000,000 in new investor funds which were used to pay off early investors. Only $1,250,000 of the new money actually made it back to CAG.

143. Starting in March of 2022 and continuing through June of 2023, CAG "converted" maturing CAG/FC notes 1001 through 1040 in the total amount due of $30,708,512.04 into new CAG/FC Notes 1076 through 1101. The total amount of the new converted notes (1076 through 1101) is $17,758,591.00. Scanlan was appointed as the sole

33

manager of HH, which was the sole member of CAG. Scanlan executed all of the CAG/FC Notes post-closing after October 13, 2021. The new "Converted CAG/FC" Notes were not secured by Senior Secured Liens; there were no new portfolios purchased. CAG was in fact insolvent at the time of making of the "Converted Notes" because virtually all of its assets had been transferred out of its control to its affiliates and parent.

144. In January of 2023, one of the last major investors, Plaintiff Randall Sparks, placed $2,000,000 with Ferrum Capital in exchange for a ten percent (10%) and an eight percent (8%) note each in the amount of $1,000,000[10]. Plaintiffs Amanda Coburn, Mr. and Mrs. Sparks' daughter, and her husband, Mason Coburn, also purchased a $200,000 10% Ferrum Capital note in December of 2022. Randall and Angela Sparks were delivered a copy of CAG/FC Note #Fe-26-23021-410-1096-3 and #FE-26-23201-408-1095-2 both signed by Scanlan. The Coburns also were given a copy of CAG/FC Note 1096 and identified as the third investor in that note. The bank records of Ferrum Capital confirm that none of the monies paid by Sparks or Coburn were turned over by Ferrum Capital to CAG.[11] The money was either stolen by Cox or Allen or used to pay early investors. CAG did not receive $2,200,000 in new funds and it certainly did not purchase bad debt portfolios with the proceeds.

145. During the spring of 2023, Mr. Sparks made inquiry of Mr. Cox as to the status of his investment in CAG. Shortly thereafter, representatives of the Oliphant Entities reached out to Mr. Sparks and the Coburns and invited them to Austin, Texas, for a tour of CAG's offices and a golfing weekend at Barton Creek Country Club on May 4 through

---

[10] The Sparks had previously purchased a $500,000 10% note in December of 2020 which was to mature in December of 2024.
[11] In later months, the Ferrum Capital records do reflect that approximately $126,000 in proceeds for Notes 1095 and 1096 were transferred to CAG by Ferrum.

May 6, 2023.  Mr. Sparks, Ms. Coburn and Mr. Coburn accepted the invitation and attended the weekend event. Conway, Pope, Scanlan, and principals and management team of the Oliphant Entities such as Mr. Nick Swinea met with Mr. Sparks and the Coburns, and presented what they termed the "dog and pony show."  The "dog and pony show" was essentially the same presentation that the prior management of CAG and Oliphant had used to lure investors. Everything was presented as solid, the investments were safe, and returns would be paid.  No mention was made that CAG had transferred virtually all of its assets to its affiliates and was running out of money, that CAG had not received all of the $2,200,000 in monies invested with Ferrum Capital, that no new portfolios had been purchased with their monies or that their loans were, in fact, not "senior" or "secured" as represented in the offering documents.

146.     Two months later, in July of 2023, CAG or more accurately, Oliphant, Inc. (Conway, Pope, and Scanlan) informed Ferrum Capital that it would no longer pay any of the CAG/FC Notes.  The gig was up.  CAG collapsed and defaulted on the outstanding fifty-eight (58) CAG/FC notes with an outstanding balance exceeding $60,000,000 in principal and interest owed to Ferrum Capital and its investors.

147.     Ferrum Capital in turn defaulted.  Cox, Allen and Willy have now all been indicted by federal grand juries for wire fraud and securities fraud for their participation in this scheme.

148.     On a combined basis, Plaintiffs lost approximately $28,127,091.25 related to the fraudulent FC/Investor Notes and CAG/Ferrum Notes.

149.     In September of 2023, Conway, Pope, Scanlan and the Oliphant Entities had full and complete control of CAG's business operations.  Following through with the

original idea hatched at the closing of the Oliphant, Inc., purchase in October of 2021, Conway, Pope and Scanlan sought the consent of their lender, Metropolitan PC, Inc., and spun CAG and HH out of the Oliphant, Inc. corporate umbrella in the hopes of never making good on the Ferrum Capital and investor obligations. This resulted in CAG's breach of and failure to fulfill the terms of its contractual debt obligations to Ferrum Capital and ultimately resulted in the filing of this lawsuit. Subsequently, HH and CAG each filed for bankruptcy protection in June of 2025. CAG does not list or acknowledge that its former parent and its affiliates- the Oliphant Entities, owe CAG $50,000,000 in cash that was looted from the companies.

150.    Conway, Pope, Morris and Scanlan are control persons and aiders of CAG and Ferrum Capital.

151.    The Oliphant Entities and their other affiliates who received monies from CAG which came from Ferrum Capital are control persons and aiders of CAG and Ferrum Capital in securities fraud.

152.    Further, it is believed that the funds provided to CAG by Ferrum as a result of the Plaintiffs' investments were ultimately transferred to the Oliphant Entities as the new operator of CAG.

## V.    CAUSES OF ACTION

### COUNT I: VIOLATION OF TEXAS GOV'T CODE  § 4008.051− OFFEROR/SELLER LIABILITY FOR REGISTRATION VIOLATIONS- [DEFENDANTS CAG AND HH]

153.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

4937-0635-5059, v. 2

154.    The Texas Government Code defines an issuer as a person or company who has issued, proposes to issue, or issues any security. Texas Govt. Code §§ 4001.061. A "dealer" is defined as a "… person or company…, who for all or part of the person's or company's times engages in this state, directly or through an agent in selling, offering for sale, or delivery of securities…" Texas Govt. Code §§ 4001.052 and .056.

155.    The FC/Investor Notes and the, CAG/FC Notes are securities as defined in the Texas Securities Act, Tex. Gov Code, Section 4001.068(a)(1)(J). In addition to the notes meeting the prima facie definition of a security under subsection(J), the FC/Investor Notes and the CAG/FC Notes also fall under other statutory definitions of a "security," or "investment contract" and generally fall under the definition of a security as defined by the United States Supreme Court, in *S.E.C. v. W.J. Howey Co*., 328 U.S. 293, 296 (1946), *Reves v. Ernst & Young*, 494 U.S. 56 (1990) and the Texas Supreme Court in *Life Partners, Inc. v. Arnold*, 464 S.W.3d 660 (Tex. 2015). On the face of the FC/Investor Notes and CAG/FC Notes, it is clear that the monies were pooled together by Ferrum Capital and then "invested" in CAG. The profits expected by the Investor/Plaintiffs were interest payments to be earned solely from the entrepreneurial efforts of the management of CAG in purchasing at the right price and collecting from the individual borrowers in the portfolios of distressed consumer debt CAG had purchased.

156.    Therefore, under the Texas Securities Act, Section 4001.068(a)(1), the FC/Investor Notes and the CAG/FC Notes are at least one or more of the following: a note (J), commercial paper (K), a certificate in or under a profit sharing or participation agreement (L), a certificate or instrument representing or secured by an interest in any of the capital, property, assets, profits or earnings of a company, an investment contract (O),

37

or an instrument commonly known as a security … (P).

157.    Pursuant to Tex. Govt. Code § 4003.001 A dealer or agent may not sell or offer any securities without a permit issued by the TSSB.  Dealers, investment advisors, investment advisor representatives, and their agents must be registered to sell, make a sale or offer for sale any securities in this state pursuant to §§ 4004.051, 4004.052. 4004.101 and 4004.102.

158.    CAG and HH are issuers, sellers, offerors and dealers of the FC/Investor Notes and the, CAG/FC Notes under the Texas Government Code. Willy wholesaled these Notes as a sales agent for Ferrum Capital, LLC and has already admitted such by consenting to the Findings of Fact and Conclusions of Law contained in the TSSB Disciplinary Order[12].

159.    CAG and HH offered for sale, sold and delivered FC/Investor Notes and the CAG/FC Notes to Plaintiffs without a permit or registration qualifying the securities for sale and without a permit or registration as a dealer, agent, investment advisor or investment adviser representative. The investments are not exempt from registration and are undoubtedly securities under the Texas Securities Act. Judge Mullins in the Western District of Texas in Michael Cox's bankruptcy case determined that the FC/Investor Notes were unregistered securities in violation of the Texas Government Code. See *Judy A. Musgrove et al v. Micheal Cox*., Adversary Proceeding No. 25-05002-MXM, Docket No. 33.

---

[12] "Respondent Willy acted as a 'dealer' as the term is defined in Section 4.C of the Texas Securities Act by recommending clients invest in the Real Estate and Debt Notes and subsequently facilitating her clients' investments." TSSB Disciplinary Order at pg. 6, Conclusions of Law Section 1.

160.     Pursuant to Texas Securities Act §§ 4008.051, and .057, CAG and HH are liable to Plaintiffs, jointly and severally, for statutory damages in the amount of $28,127,091.25 which is the original investment plus six percent (6%) interest less any payments received by Plaintiffs. In addition, Plaintiffs are entitled to exemplary damages, attorneys' fees, court costs and pre- and post-judgment interest on all amounts awarded.

161.     Pursuant to Texas Securities Act § 4008.051(b), because Plaintiffs still own the securities, Plaintiffs seek recission of their respective investments as defined by Texas Securities Act § 4008.056.

### COUNT II: VIOLATION OF TEXAS GOV'T CODE  §  4008.052–UNTRUTH AND OMISSIONS (OFFEROR OR SELLER LIABILITY) – [DEFENDANTS CAG AND HH]

162.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

163.     Texas Govt. Code § 4008.052 provides that an offeror or seller of a security to a buyer is liable if the sale is made by way of untrue statements of material facts or omissions of material facts that are necessary to make the statements made not misleading.

164.     Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial and Defendants CAG and HH are issuers, sellers, offerors and dealers of the FC/Investor Notes and the CAG/FC Notes  under the Texas Government Code. Willy wholesaled these Notes as a sales agent for Ferrum Capital, LLC and has already admitted such by consenting to the Findings of Fact and Conclusions of Law contained in the TSSB Disciplinary Order.

165.     Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial and Defendants CAG and HH offered for sale, sold and delivered the

39

FC/Investor Notes and the CAG/FC Notes to Plaintiffs by means of (1) untrue statements of a material fact regarding the use of the funds, and the nature, extent and priority of the Plaintiffs' security interest in the portfolios that served as collateral to secure repayment of the investment. Further, Defendants omitted material facts that the Ferrum Capital Commercial Lending Program was a Ponzi Scheme, modeled on a prior Ponzi Scheme that was never intended to provide the promised returns to the Plaintiffs. Additonally, Defendants did not disclose to Plaintiffs that the FC/Investor Notes and the CAG/FC Notes were unregistered securities that needed to be registered with the TSSB.

166. At the time of the solicitation Plaintiffs were unaware of the lies and omissions. Between 2017 – 2022, relying on the above misrepresentations, each Plaintiff entered into the Ferrum Commercial Lending Program with Defendants for the purchase of *the* FC/Investor Notes and the CAG/FC Notes for a total of $37,000.00.

167. Defendants defaulted on the CAG/FC Notes leading to a default on the FC/Investor Notes and have failed to repay the amounts due under the Notes.

168. Pursuant to Texas Securities Act §§ 4008.052, .055, and .057, Defendants are liable to Plaintiffs, jointly and severally, for statutory damages, in the amount of $28,127,091.25 which is the original investment plus six percent (6%) interest less any payments received by Plaintiffs. In addition, Plaintiffs are entitled to exemplary damages, attorneys' fees, court costs and pre- and post-judgment interest on all amounts awarded. .

169. Pursuant to Texas Securities Act § 4008.052(b), because Plaintiffs still own the securities, Plaintiffs seek recission of their respective investments as defined by Texas Securities Act § 4008.056.

## COUNT III. CONTROLLING PERSON OR AIDER LIABILITY OF ISSUERS, OFFERORS OR SELLERS [DEFENDANTS CAG AND HH]

170.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

171.     If Defendants CAG and HH were not issuers, sellers, offerors and dealers themselves (along with Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial), then Defendants CAG and HH were aiders and control persons of Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial as defined in Texas Securities Act § 4008.055 because CAG and HH  directly or indirectly owned, directed and controlled Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial who were the issuers, offerors or sellers of the unregistered securities. CAG and HH exercised control over the operations of Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial in general, and actual control, power or influence over and participated in the Ferrum Commercial Lending Program because they approved the marketing material, the use of the funds, and the terms of the repayment, including the conditions under which reinvestment of the Notes occurred. .

172.     As control persons, CAG and HH, knew or in the exercise of reasonable care should have known that CAG and HH along with Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial were unregistered dealers, selling unregistered securities through a Ponzi Scheme.

173.     Further these Defendants knew that they lacked the required permit or registration as a dealer, agent, investment advisor or investment adviser representative  to sell, offer or deal in these unregistered securities.  Indeed, this was a major premise of the

41

investment fraud scheme – to peddle securities disguised as a commercial lending program in order to induce investors to invest.

174.    CAG and HH were aiders as defined in Texas Govt. Code § 4008.055 because with intent to deceive or defraud or with reckless disregard for the truth or the law, materially provided support, logistics, legal assistance, substantial assistance and aided Ferrum Capital, Willy, Queen B, Allen, Barrera, AFA, Michael Cox, and MLC Financial by approving the marketing materials and providing the structure of how the Commercial Lending Program would work regarding the use of the funds, and the terms of the repayment, including the conditions under which reinvestment of the Notes occurred. CAG and HH officers, shareholders and managing directors signed the Notes, serviced the Notes and diverted the investment funds to their own use.  Further Defendants caused these Notes to be sold without the required dealers' licenses and by untrue statements and omissions of material fact regarding the actual terms, conditions, return and use of investment funds and Ponzi Scheme nature of the Ferrum Commercial Lending Program.  CAG and H (through their insiders and affiliates the Oliphant Entities,  Walt, Crossan, Morris, Conway, Pope, Scanlan and Skypeak) masterminded the Ponzi Scheme having been involved in a prior Ponzi Scheme with Sonoqui and Integrated.

175.    Pursuant to Texas Securities Act §§ 4008.051, .052, .055, and .057, Defendants CAG and HH are liable to Plaintiffs, jointly and severally, for statutory damages, in the amount of $28,127,091.25 which is the original investment plus six percent (6%) interest less any payments received by Plaintiffs. In addition, Plaintiffs are entitled to exemplary damages, attorneys' fees, court costs and pre- and post-judgment interest on all amounts awarded.  .

4937-0635-5059, v. 2

176.     Pursuant to Texas Securities Act § 4008.052(b), because Plaintiffs still own the securities, Plaintiffs seek recission of their respective investments as defined by Texas Securities Act § 4008.056.

### COUNT IV: VIOLATION OF TEXAS GOVT. CODE §§ 4008.101 AND 4008.102 INVESTMENT ADVISOR OR IAR LIABILITY (SECONDARY VIOLATIONS) [DEFENDANTS CAG AND HH]

177.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

178.     Willy, Queen B, Cox, Allen, Barrera, AFA and MLC acted as and held themselves out to be IARs or Investment Advisors as defined under Texas Govt. Code § 4001.059 and 4001.060 when they offered, sold and recommended the sale of the unregistered FC/Investor Notes and CAG/FC Notes and received unlawful commissions and fees in return.

179.     Willy, Queen B, Cox, Allen, Barrera, AFA and MLC purported to render services as Investment Advisors or IARs to Plaintiffs and in so doing made (1) untrue statements of material fact; and (2) or failed to state a material fact necessary in order to make the statements made, not misleading.

180.     Defendants CAG and HH by and through Crossan, Morris, (and Conway, Pope, Scanlan, and Skypeak after October 12, 2021), directly or indirectly controlled Willy, Queen B, Cox, Allen, Barrera, AFA and MLC and materially aided their conduct in relation to the sale of the unregistered investments using untrue statements and omissions of material fact, making them aiders and abettors and/or controlling persons under the Texas Govt. Code. 4008.102.

43

181.    Pursuant to Texas Securities Act §§ 4008.101, .102, and .103, CAG and HH are liable to Plaintiffs, jointly and severally, for statutory damages, in the amount of $28,127,091.25 which is the original investment plus six percent (6%) interest less any payments received by Plaintiffs. In addition, Plaintiffs are entitled to exemplary damages, attorneys' fees, court costs and pre- and post-judgment interest on all amounts awarded.

182.    Pursuant to Texas Securities Act § 4008.052(b), because Plaintiffs still own the securities, Plaintiffs seek recission of their respective investments as defined by Texas Securities Act § 4008.056.

### COUNT V: BREACH OF PROMISSORY NOTES – [DEFENDANTS CAG, HH AND THE OLIPHANT ENTITIES]

183.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

184.    Defendants CAG, HH and the Oliphant Entities have contractual relationships with Ferrum through loan agreements, promissory notes and one or more Master Servicer Agreement(s) (the "Dependent Agreements"). The Dependent Agreements were the consideration and inducement for Plaintiffs to invest in Ferrum. Plaintiffs are third-party beneficiaries and/or assignees of the Dependent Agreements between Ferrum, CAG, and the Oliphant Entities and have standing to sue.

185.    Defendants CAG, HH and the Oliphant Entities breached their contract with Plaintiffs as third-party beneficiaries or assignees of the Dependent Agreements, by failing to repay the Ferrum Notes at maturity or anticipatorily breaching by indicating, prior to maturity, that they would not be repaying the Notes.

186.    Further, Defendants CAG, HH and the Oliphant Entities breached their contract with Plaintiffs as third-party beneficiaries of the Ferrum Notes by failing to

provide the security and/or collateral and impairing such security and/or collateral in contravention with the terms of the promissory notes sold to Ferrum. In addition, Defendants breached the contracts by assigning the assets secured by CAG to the Oliphant Entities without the consent of the Plaintiffs. Thus, the full amount of principal and interest is now past due, delinquent, and owing to Plaintiffs from CAG and the Oliphant Entities as third-party beneficiaries of the Ferrum Notes.

### <u>COUNT VI: PROMISSORY ESTOPPEL – [DEFENDANTS CAG AND HH]</u>

187.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

188.    CAG and HH through Walt Collins made oral or written promises to Plaintiffs that they did not keep about the terms and conditions  of the FC/Investor Notes and the CAG/FC Notes for investment, the return on the Notes, the terms of the Notes, and compensation, commissions and fees paid to Defendants under the Notes.

189.    Plaintiffs relied on Defendants' promises that the investments were sound, guaranteed, and appropriate for them taking into account their age, lifestyle and needs. Plaintiffs' reliance on Defendant's promises was both reasonable, justifiable and substantial because Defendants used Willy, Queen B, Cox, Allen, Barerra, L. Duane Allen, AFA and MLC, who were the Plaintiffs trusted financial advisors to sell the securities.

190.    Defendants knew, or reasonably should have known, that Plaintiffs would rely on the promises made by Willy, Queen B, Cox, Allen, Barerra,  L. Duane Allen, AFA and MLC because these Defendants held a special fiduciary relationship with Plaintiffs. Defendants knew or reasonably should have known that the glossy marketing materials created or approved for use would make it more likely that Plaintiffs would be induced to

45

invest in the worthless Notes.

191.    Injustice to Plaintiffs can be avoided only if Defendants' promises are enforced and the principal and interest in an amount of at least $28,127,091.25 is recovered from Defendants jointly and severally.

## COUNT VII: MONEY HAD AND RECEIVED- [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

192.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

193.    Defendants hold money that, in equity and good conscience, belongs to Plaintiffs. Through their mastermind and control of the Ferrum Commercial Lending Program, these Defendants directly and indirectly received millions of dollars from Plaintiffs. The money was obtained wrongfully and without Plaintiffs' consent through fraud, negligence, gross negligence, breach of fiduciary duty and deceit and in violations of the Texas Securities Act.

194.    Defendants received substantial monies through elaborate transfers of funds that should never have ended up in their accounts. Those monies in truth and good conscience belong to Plaintiffs.

195.    Plaintiffs seek liquidated damages in the amount of at least $28,127,091.25, which is the principal and interest on the Ferrum investments.

## COUNT VIII: FRAUD AND FRAUDULENT INDUCEMENT [DEFENDANTS CAG AND HH]

196.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

197.    Defendants made oral and written representations about the FC/Investor Notes and the CAG/FC Notes that were false, or made recklessly as a positive assertion, and without knowledge of their truth. The representations were made directly by CAG and HH or if not, CAG and HH were responsible for the representations which were made with actual or apparent authority of CAG and HH as agents of the State Court Defendants and CAG and HH ratified the representations made by the other State Court Defendants In the alternative, CAG and HH have joint and several liability for the conduct of the other State Court Defendant because CAG and HH benefitted from the fraudulent representations and had knowledge of the fraud. The representations made by the CAG and HH with the other State Court Defendants were material to the Plaintiffs' decision to enter into Ferrum's Commercial Lending Program, i.e. a reasonable person would attach importance to the representations regarding the return on the investments and the guaranteed nature of the investments in deciding to invest. The representations that were made by CAG, HH or by the State Court Defendants and adopted and ratified by CAG and HH were that the:

1) The Notes were perfected by a security interest in the collateral of CAG.

2) That the FC/Investor Notes were not securities and the offering did not have to be registered or sold by registered dealers.

3) That the return of principal and interest on the FC/Investor Notes was guaranteed.

4) That Ferrum Capital was a loan servicer when it kept no records of loan payments, and in fact, Oliphant USA and other CAG or other Oliphant affiliates performed all of the loan servicing.

5) That Ferrum Capital would turn over to the Investor/Creditor any pre-payments of note balances by CAG.

6) That the principals of Ferrum Capital would not be paid any transaction-based compensation, when in fact they were paid 10.75% of every Investor/Creditor transaction from the inception of the loan program

47

including additional commissions on the Notes that were rolled over after October of 2021.

7) That the proceeds of the CAG/FC notes would be invested exclusively in and secured by distressed consumer debt portfolios owned by CAG. In many instances, CAG transferred the proceeds of the CAG/FC notes to its affiliates on either a secured or unsecured basis.

198. At the time the misrepresentations described herein were made, CAG and HH knew the representations were false. The investments were not guaranteed, were required to be registered, were not secured and did not or could not pay out the promised return. Therefore, Defendants' representations were false statements of fact or false statements of opinion that Defendants knew to be false or supported with false statements of fact and that Plaintiffs would justifiably rely on the false statements of opinions because of Defendants' and their agents Willy, Cox, Queen B and Allen's purported special knowledge as IA's or IARs. At the time of the written and oral statements were made, Defendants had no intention or knew that CAG's business model would never support repayment of the Notes at the promised returns. In 2021 when this bore true, Defendants along with Scanlan, orchestrated roll overs and incentivized Cox and Allen to sell the roll overs by giving them interests in Skypeak. Therefore, Defendant's representations to Plaintiffs were false promises of future performance.

199. In addition, Defendant's conduct amounted to a false representation to Plaintiffs as Defendants took the money and immediately transferred it to Oliphant, never documenting the transfers to secure Plaintiffs interest in the funds and ultimately defaulted on the repayment of the funds that they took in.

200. CAG and HH with the intention and expectation that the representations about its status as a viable borrower would be repeated by Ferrum and their sales agents to

48

Plaintiffs, created the marketing materials, and hosted Plaintiffs at events to peddle the securities. CAG and HH used Cox's and Willy's specialized knowledge as IARs having special knowledge of the value, security and future performance of the Notes to bolster their false statements about the return on the investments. Further, CAG and HH and the other State Court Defendants knew at the time they induced the Plaintiffs to invest that Ferrum would never operate as servicer of the investments or ensure the collateral was secure. In the alternative the representations were made recklessly, as positive assertions of fact, without any knowledge of their truth. Defendants did not conduct sufficient due diligence of the issuers or the securities issued by CAG, HH, and Ferrum before selling them to Plaintiffs.

201. Defendants made these affirmative misrepresentations of fact with the intention that Plaintiffs rely upon their representation to fork over millions of dollars to them, and/ or made the representations believing that Plaintiffs were substantially certain to invest in reliance on the false representations.

202. Plaintiffs entered into Ferrum's Commercial Lending Program with the attendant FC/Investor Notes, and the CAG/FC Notes based on Defendant's false representations as stated above. Plaintiffs actually relied on the Defendants' representations when they entered into the Ferrum Lending Relationship Agreement and the Noble Investments. Plaintiffs' actions in investing in the Ferrum Commercial Lending Program were justifiable under the circumstances because a reasonable person would rely on their investment advisor's opinion about the suitability of investments. Defendants received unfair financial gain to the detriment of Plaintiffs because of their misrepresentations.

49

203.    Defendant's false representation directly and proximately caused injury to Plaintiffs, which resulted in the loss of the amount of not less than $28,127,091.25, which is the principal and interest on the investments.

204.    Plaintiffs seek recovery for actual damages, attorneys' fees and cost, recission and recovery for mental anguish and emotional distress.

## COUNT IX: FRAUD BY NON-DISCLOSURE [DEFENDANTS CAG AND HH]

205.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

206.    Defendants concealed from and/or failed to disclose to Plaintiffs material information and facts related to the investment scheme, the nature of the securities and the return on the investments. Specifically, Defendants concealed the following information from Plaintiffs:

1) That Ferrum Capital failed to conduct adequate due diligence on the financial ability of CAG to repay the CAG/FC notes.

2) That Ferrum Capital failed to act as a servicer of the account portfolios, did not track the collection of accounts held in the CAG portfolios and did not require CAG to report on the status of collections of the CAG portfolios.

3) That the proceeds from the collections of CAG collateral would be managed by CAG's affiliate Oliphant USA or other affiliates and commingled with the proceeds of portfolio accounts pledged to other lenders of CAG and Oliphant USA, LLC, Oliphant United, LLC, Oliphant Financial, LLC and Accelerated Inventory Management, LLC.

4) That the initial investment or proceeds from the purchase of portfolios which were pledged to Ferrum Capital were left with the Oliphant Entities and pledged to other lenders.

5) That Ferrum Capital was designed to and did in fact operate as a *Ponzi* scheme using later investments by subsequent investors to pay early investors. Since the FC/Investor Notes matched the same terms as the CAG/FC notes, the payments taken out of Ferrum Capital by the Ferrum Capital principals doomed Ferrum Capital to ultimate failure. Using simple mathematics, any monies taken

by the Ferrum principals made it mathematically impossible for Ferrum Capital to repay its investors from the proceeds of the CAG/FC Notes.

6)  That beginning on October 13, 2021, CAG was operated as a Ponzi scheme when it failed to pay the CAG/FC notes which matured and started rolling over existing notes into new CAG/FC notes, and in concert with Ferrum Capital, used new investor money to pay, in substantial part, maturing debts owed to Ferrum Capital and in turn the Investor/Creditors.

7)  That Ferrum Capital did not have a first lien on all of the portfolios and accounts purchased with Investor/Creditor money.

8)  That Ferrum Capital failed to file UCC-1s on all of the collateral pledged by CAG.

9)  That there were insufficient monies in both Ferrum Capital and CAG to pay existing notes.

10) That CAG stopped buying new portfolios of bad debt and pledging any new portfolios to Ferrum Capital after June of 2021.

207.   Defendants had a duty to disclose the information to Plaintiffs because Defendants created the marketing materials with the false information described above and the actual information regarding the securities made in the marketing materials was false and misleading. Defendants had a duty to disclose the information to Plaintiffs because Defendants partially disclosed the information to Plaintiffs, which created a substantially false impression about the securities.

208.   The undisclosed facts were material to the Plaintiffs' decision to enter into the Ferrum's Commercial Lending Program, i.e. a reasonable person would not invest if the facts were disclosed.

209.   Plaintiffs were not qualified investors as that term is defined by the Texas Securities Act. Defendants conspired with Willy, Queen B, Cox, Allen, MLC Financial, and AFA who all held themselves out as being financial advisors having special knowledge

51

relative to the value, security and future performance of the Notes to sell the Notes to the Investors. Defendants conspired with Willy, Queen B, Cox, Allen, MLC Financial, and AFA to use their media presence, prominence in their communities, and a web of affiliates to induce Plaintiffs into the worthless investments. Defendants knew that Plaintiffs were ignorant of the true nature of the Ponzi scheme and did not have an equal opportunity to discover the facts.

210.    In addition, the other Defendants had a duty to disclose the true nature of the alternative investments in which they induced the Plaintiffs to invest in because the information that they did disclose created a substantially false impression about the investments, knowing that Plaintiffs were ignorant of the undisclosed facts and did not have a reasonable opportunity to discover the truth.

211.    Defendants created a substantially false impression that the investments were safe and guaranteed, by making only partial disclosures about the kickbacks, holdbacks, commissions and servicing fees that Defendants would take or cause its affiliates to take off the top. Defendants also created a false impression that the investments were properly perfected in collateral of CAG.

212.    Defendants deliberately remained silent although they had a duty to disclose the information to Plaintiffs. By deliberating remaining silent failing to disclose the facts, Defendants intended to induce Plaintiffs to invest in Ferrum's Commercial Lending Program with the attendant FC/Investor Notes, the CAG/FC Notes and the Ferrum IV/RPF Notes without the true facts about the securities. Plaintiffs reasonably and justifiably relied on Defendants' deliberate silence.  By deliberately remaining silent, defendant proximately caused injury to plaintiff, which resulted in the following damages and suffered injury as a

52

result of these misrepresentations caused damages to Plaintiff in the amount of not less than $28,127,091.25 which is the principal and interest on the Ferrum investments.

### COUNT X: VIOLATIONS OF THE TEXAS THEFT LIABILITY ACT TEX. CIV. PRAC. AND REM. CODE §§ 134.001 TO 134.005 A-[DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

213.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

214.    Defendants unlawfully appropriated Plaintiffs' funds under the Texas Theft Liability Act. *See* Texas Penal Code § 31.03. Plaintiffs are entitled to repayment of the notes with interest pursuant to the terms of the FC/Investor Notes and the CAG/FC Notes. *See* Tex. Pen. Code § 31.01(5)(B) and (C). Defendants unlawfully appropriated Plaintiffs' investment funds with the intent to deprive Plaintiffs of their property by using the funds without Plaintiffs' effective consent for their personal gain. *See* Texas Penal Code § 31.03.

215.    Defendants' unlawful appropriation was made with the intent to deprive Plaintiffs of the property. Plaintiffs sustained actual and additional damages of at least $28,127,091.25 which is the principal and interest on the Ferrum investments Defendants acted with malice or actual fraud, which entitles Plaintiffs to exemplary damages under Texas Civil Practice and Remedies Code section 41.003(a).

### COUNT XI: DECLARATORY JUDGMENT (DEFENDANTS CAG AND THE OLIPHANT ENTITIES)

216.    Pursuant to Chapter 37 of the Texas Civil Practice and Remedies Code, and the terms of the Plaintiffs' Notes, Plaintiffs request the Court to declare that they are secured by a first priority pledge and security interest in the CAG, HH and the Oliphant Entities' collateral pledged to Ferrum as security for the aforementioned promissory notes.

4937-0635-5059, v. 2

217.    Plaintiffs further request that this Court declare that Plaintiffs' liens arising out of the notes attached to the collateral and/or assets of CAG, HH and the Oliphant Entities are valid, and that they have the right to file a UCC-1 Financing Statement or to make any other filing in order to perfect their liens on collateral and/or assets of Collins and Oliphant.

218.    Plaintiffs seek a declaratory judgment that the Dependent Agreements are securities as defined by the Texas Securities Act.

**COUNT XII: VIOLATIONS OF**
**TEXAS UNIFORM FRAUDULENT TRANSFER ACT ("TUFTA")**
**[DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]**

219.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

220.    Ferrum received over $50,000,000 of Plaintiffs' funds for the stated purpose of funding the business operations of CAG.  Plaintiffs are creditors of CAG and HH and have standing to bring these claims.

221.    Shortly after receiving each tranche of Plaintiffs' investment funds, Ferrum Capital packaged the funds and transferred the funds to CAG. Shortly thereafter CAG transferred the funds to HH, the Oliphant Entities and Walt.

222.    The transfers of the Plaintiffs' investment funds from Ferrum to CAG and from CAG to HH, the Oliphant Entities and Walt were made with the actual intent to hinder, delay, or defraud the Plaintiffs. *See* TUFTA § 24.005(a)(1). Ferrum Capital and CAG's fraudulent intent can be established from the following badges of fraud prescribed by TUFTA § 24.005(b).

    a.  The Ferrum Commercial Lending Program created by the principals of Ferrum Capital and CAG was a Ponzi Scheme.

54

    b.   The fraudulent transfer defendants are affiliates and insiders of each other due to their common ownership and control of each other.

    c.   The fraudulent transfer defendants were the sole beneficiaries and control persons of the Plaintiffs' funds that were invested in the Ferrum Commercial Lending Program.

    d.   The transfers from Ferrum Capital to CAG and from CAG to the other Defendants were of all of Ferrum Capital and CAG's assets (which only consisted of the Plaintiffs' investment funds.)

    e.   Neither Ferrum Capital nor CAG received consideration for the transfers and became insolvent shortly after the transfers were made.

223.   The transfers out of Ferrum Capital and CAG were constructively fraudulent under TUFTA 24.005(a)(2) in that these entities did not receive a reasonably equivalent value in exchange for the transfer of the funds, and at the time of the transfers, these entities had no assets left to conduct business. In addition, because Ferrum Capital had no other business purpose than to fund CAG, the principals of Ferrum Capital intended to incur, or believed or reasonably should have believed that Ferrum Capital would not have been able to repay the Plaintiffs the principal of their investment plus the contract rate of interest. In addition, HH, the Oliphant Entities, Walt, Crossan, Conway, Pope, Scanlan, and Skypeak, controlled CAG for the benefit of themselves and CAG did not receive a reasonably equivalent value in exchange for the transfer of the funds, and at the time of the transfers, CAG had no assets left to conduct business. In addition, HH, the Oliphant Entities, Walt, Crossan, Conway, Pope, Scanlan, and Skypeak intended to incur, or believed or reasonably should have believed that CAG would not have been able to repay the Plaintiffs the principal of their investment plus the contract rate of interest.

224.   The transfers from Ferrum Capital to CAG and from CAG to its insiders and affiliates were also fraudulent under TUFTA § 24.006 because neither Ferrum Capital

nor CAG received a reasonably equivalent value from the transferees in exchange for the transfers and these entities were insolvent at the time of the transfers or became insolvent as a result of the transfers. In addition, the transfers from CAG to its insiders and affiliates were preferences under TUFTA § 24.006(b) to the extent that CAG claims that the payments were for servicing fees. TUFTA § 24.006(b) prohibits transfers for antecedent debt made to insiders while the debtor is insolvent.

225.    The Defendants did not provide reasonably equivalent value for the transfers and did not receive the transfers in good faith.

226.    Plaintiffs are entitled to judgment against Defendants CAG, HH, Walt and the Oliphant Entities as either the first transferees of the investment funds from Ferrum or the person for whose benefit the transfers were made.  In the alternative, Plaintiffs are entitled to a judgment against CAG, HH, Walt and the Oliphant Entities as subsequent transferees of the fraudulent transfers, who did not receive the transfers in good faith and gave no value for the transfers.

227.    Accordingly, Plaintiffs are entitled to avoid the transfers to CAG, HH, Walt and the Oliphant Entities to the extent of at least $28,127,091.25 to satisfy their claims. Plaintiffs are entitled to an attachment against the assets of CAG, HH, Walt and the Oliphant Entities in the amount of at least $28,127,091.25 to satisfy their claims. Plaintiffs are entitled to an injunction against CAG, HH, Walt and the Oliphant Entities to prevent further disposition of assets.

## COUNT XIII: NEGLIGENCE –[DEFENDANTS CAG AND HH]

228.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein. Defendants owed the following

4937-0635-5059, v. 2

duties to Plaintiffs:

  a. To exercise reasonable care to avoid a foreseeable risk of harm to Plaintiffs.

  b. To take affirmative action to control or avoid increasing the danger from a condition that has been at least partially created by their conduct.

  c. To use ordinary care in not placing Plaintiff in harm's way of foreseeable criminal activity related to theft of services and securities fraud.

  d. To use ordinary care in making representations and in ascertaining the accuracy of information given to Plaintiffs.

  e. To protect Plaintiffs based on a special relationship the parties shared as members of the so called Ferrum Commercial Lending Program.

  f. To use reasonable care when referring Plaintiffs to invest in the alternative investments.

  g. To refrain from interfering with or encouraging noncompliance with each other's duties under the Texas Securities Act.

  h. To comply with civil and criminal statutes and administrative rules.

  i. To exercise reasonable care in servicing the investment Notes and ensuring they were properly perfected by security interests in CAG, whether they offered those services gratuitously or for consideration, because they should have recognized those services were necessary for the protection of the pecuniary and non-pecuniary interests of the Plaintiffs.

  j. To avoid misfeasance or negligent affirmative conduct in the performance of the Ferrum investment contracts.

  k. To perform their duties under the Ferrum investment contracts with care, skill and reasonable expedience.

  l. To exercise good faith and fair dealing in the performance of their duties under the Ferrum investment contracts.

  229. Defendants breached the above duties by masterminding, participating in, encouraging, assisting in the preparation of, issuing, offering, marketing and selling worthless and unregistered securities to Plaintiffs. Defendants prepared, issued, offered,

marketed or sold securities that were not vetted by due diligence, were not properly funded, were not designed to provide the eight percent to ten percent (8-10%) returns that were marketed and were not properly secured or perfected by a security interest in any collateral.

230.     Defendants were the but for and proximate cause of the injuries to Plaintiffs because their actions were a substantial factor in causing Plaintiffs to invest in the securities and it was foreseeable that, based upon the fact that Defendants held themselves out to be financial professionals that Plaintiffs would invest in the securities based on Defendants' representations.

231.     Defendants' false and misleading statements and omissions resulted in economic and non-economic injuries to Plaintiffs in the loss of their investments. Plaintiffs suffered emotional distress due to Defendants' negligence in the form of sleeplessness, emotional pain, and an unending feeling of doom at the thought of the loss of their retirement. Plaintiffs seek recovery in the amount of not less than $28,127,091.25  which is the principal and interest on the Ferrum investments.

**COUNT XIV: NEGLIGENCE PER SE [DEFENDANTS CAG AND HH]**

232.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

233.     Defendants' violation of the Texas Securities Act §§ 4004.051, 4004.052, 4004.101, 4004.102, 4008.051, 4008.052, 4008.058, 4008.101, and 4008.102 by issuing, offering, marketing and selling unregistered securities, the TSSB Order and the Texas Theft Act constitutes negligence per se.

234.     The Texas Securities Act is designed to protect investors such as Plaintiffs from investment fraud in the issuance, sales or offering of securities. The Texas Securities

4937-0635-5059, v. 2

Act is intended to protect investors from fraud in the sale of securities which is the type of injury suffered by Plaintiffs.

235.    Further, Defendants' violation of the Texas Theft Act as set forth below and the Texas Theft Act constitutes negligence per se.

236.    The Texas Theft Act is designed to protect citizens like the Plaintiffs from illegal activities by others.  The Texas Theft Act is intended to protect citizens from illegal activities like theft which is the type of injury suffered by Plaintiffs.

237.    Defendants' violation of the Texas Securities Act, the TSSB Order and the Texas Theft Act was without a legal excuse.

238.    These Texas Theft Act and Texas Securities Act are statutes that impose tort liability for violations, in the nature of recission, disgorgement of profits and punitive damages.

239.    Defendants' breach of duties imposed by the Texas Theft Liability Act and Texas Govt. Code - Securities Act proximately caused injury to Plaintiffs, which resulted in actual damages of at least $28,127,091.25 which is the principal and interest on the Ferrum investments.

## COUNT XV: NEGLIGENT MISREPRESENTATION
## [DEFENDANTS CAG AND HH]

240.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

241.    Defendants made representations to Plaintiffs in the course of their business as securities issuers, agents, dealers, investment advisors, registered investment advisors, or other financial advisors regarding the FC/Investor Notes and the CAG/FC Notes.

242.    Defendants made misrepresentations about the suitability, nature and security of the FC/Investor Notes and the CAG/FC Notes for investments.

243.    Defendants drafted the governing contracts and documents for the unregistered securities and issued, offered, marketed or sold the securities to Plaintiffs.

244.    Defendants stated that no commissions or origination fees or other overhead fees would be taken out of Plaintiffs' investments. Defendants represented that the funds would be used to fund CAG's business operations. Defendants made the representation in the course of Defendants' business. Defendants made the representations so that Plaintiffs would invest in the investment notes. Defendants' representations were misstatements of fact because the funds were never used for CAG's business operations but were instead transferred to CAG's affiliates with no documentation to secure repayment to CAG, Ferrum or the Plaintiffs.

245.    Defendants supplied false information for the guidance of Plaintiffs to invest in Ferrum. The Defendants failed to use reasonable care to ensure that the representations set forth in the Ferrum Commercial Lending Program and the FC/Investor Notes and CAG/Ferrum Notes were correct.

246.    Plaintiffs were not sophisticated investors and reasonably and justifiably relied on the representations of Defendants, who even provided Plaintiffs with opinion letters from attorneys which induced them to continue with the investments, even after the TSSB put everyone on notice in 2020 that the Ferrum investments were securities that needed to be registered and sold by registered agents, dealers, brokers, issuers, advisors and advisor representatives. Plaintiffs actually and justifiably relied on Defendants' representations and invested in the FC/Investor Notes and CAG/Ferrum Notes to their

60

detriment. Defendants' misrepresentations proximately caused injury to Plaintiffs which resulted in the loss of at least $28,127,091.25 which is the principal and interest on the Ferrum investments.

### COUNT XVI: GROSS NEGLIGENCE [DEFENDANTS CAG AND HH]

247.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein. Defendants' acts when viewed objectively from the standpoint of the actor at the time of their occurrence involved an extreme degree of risk, considering the probability and magnitude of the potential harm to Plaintiffs and Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Plaintiffs. Plaintiffs' injuries resulted from Defendants' gross negligence, which entitles Plaintiffs to exemplary damages under Texas Civil Practice and Remedies Code section 41.003(a)(3).

### COUNT XVII: CIVIL CONSPIRACY TO COMMIT INTENTIONAL TORTS [VIOLATION OF SECURITIES ACT, FRAUD, TUFTA, THEFT, BREACH OF FIDUCIARY DUTIES] [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

248.    Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein. If Defendants were not control persons or directly liable for the above-described conduct then Defendants were all members of a conspiracy to violate Texas Securities Act §§ 4004.051, 4004.052, 4004.101, 4004.102, 4008.051, 4008.052, 4008.058, 4008.101, and 4008.102 and to commit fraud, theft, breach of fiduciary duties, and violations of TUFTA by issuing, offering, marketing and selling unregistered securities.

4937-0635-5059, v. 2

249.    Cox, Allen, Queen B, Willy, Barrera and L. Duane Allen by and through their wholly owned entities, were – or held themselves out as financial advisors –who owed fiduciary duties to the investors. Walt, CAG and HH used the status of these financial advisors to peddle the worthless securities as a legitimate business opportunity. Walt, CAG and HH knew that Plaintiffs trusted Cox, Allen, Queen B, Willy, Barrera and L. Duane Allen to act in their best interest because of the fiduciary duties they owed to the Plaintiffs. Walt, CAG and HH stood to benefit financially if Cox, Allen, Queen B, Willy, Barrera and L. Duane Allen convinced Plaintiffs, through their fiduciary positions, to invest in the worthless FC/Investor, and CAG/FC Notes. Walt, CAG and HH acted in furtherance of that plan to the detriment of the Plaintiffs and for their own pecuniary gain.

250.    Defendants CAG and HH acted in concert to allow Cox, Allen, Queen B, Willy, Barrera and L. Duane Allen to intentionally breach their fiduciary duties towards Plaintiffs for their own pecuniary gain.  Defendants' intent is established because Ferrum Capital, LLC was a Ponzi Scheme just like the predecessor Sonoqui scheme.

251.    Defendants Walt, CAG, HH and the Oliphant Entities conspired with the State Court Defendants to create the false impression that Ferrum Capital presented legitimate business opportunities.  In the alternative, if CAG and HH believed they had conspired to accomplish a lawful purpose – such lawful purpose was undertaken by unlawful means of fraud, theft, breach of fiduciary duties, and violations of TUFTA.

252.    Defendants Walt, CAG, HH and the Oliphant Entities had a meeting of the minds on the objective and course of action to use investor funds for their own gain through securities law violations, fraud, theft, breach of fiduciary duty, and violations of TUFTA. Each Defendant had knowledge of the objectives of the conspiracy to obtain investor funds

unlawfully through the marketing and selling of unregistered securities by fraud. Defendants took steps in furtherance of the conspiracy by creating marketing materials and selling the investments to investors.

253. Defendants CAG and HH engaged in a "meeting of the minds" and with intent when they issued, offered, marketed and sold the unregistered FC/Investor Notes and CAG/Ferrum Notes, without the proper registration and fraudulently induced the Plaintiffs through material misstatements and omissions, to invest in the securities.

254. Acting with the intent to defraud or harm Plaintiffs by deception, Defendants CAG and HH intentionally misrepresented and omitted material facts relating to the investments with the intention that Plaintiffs rely on those misrepresentations and omissions and invest in the Notes.

255. Acting with the intent to defraud or harm Plaintiffs by deception, Defendants CAG and HH sold the unregistered FC/Investor and CAG/FC without the proper authority to do so in violation of the Texas Securities Act and with the intention that Plaintiffs rely on such unlawful actions and invest in the Notes. Each Defendant committed the unlawful, overt act of transferring Plaintiffs' funds to themselves through Ferrum Capital to further the objective of the act.

256. Acting with the intent to hinder, delay or defraud Plaintiffs, Defendants transferred funds for no reasonably equivalent value and left Ferrum Capital insolvent. Defendants engaged in a "meeting of the minds" and with intent when they engaged in these fraudulent transfers.

257. Plaintiffs suffered injury as a proximate result of the wrongful acts carried out by this conspiracy in the amount of not less than $28,127,091.25 which is the principal

63

of and interest on the Ferrum investments.

258.     As a result of the conspiracy, Defendants, Walt, CAG, HH and the Oliphant Entities are jointly and severally liable for Plaintiffs' damages. In addition, Plaintiffs seek and are entitled to recover exemplary damages because the conspiracy and such acts performed in furtherance of it were undertaken by Defendants with malice and the intent to defraud Plaintiffs.

## COUNT XVIII: AIDING AND ABETTING—NEGLIGENCE, VIOLATION OF THE TSA, FRAUD, TUFTA, THEFT, BREACH OF FIDUCIARY DUTIES [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

259.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

260.     If Defendants were not control persons or directly liable for the above-described conduct then Defendants assisted and encouraged; or assisted and participated in negligent conduct; and in a scheme to violate the Texas Securities Act and to commit fraud, theft, breach of fiduciary duties, and violations of TUFTA.

261.     Defendants had knowledge of intended to agree to accomplish the goal of issuing, offering, marketing and selling unregistered securities that they (along with Ferrum Capital, Willy, Queen B, Cox, Allen, Barrera, MLC Financial, and AFA) issued offered or sold to Plaintiffs for their own financial gain.

262.     Defendants intended to assist and substantially assisted and encouraged each of the State Court Defendants in negligence, fraud, theft, breach of fiduciary duties, and violations of TUFTA described above and described against each State Court Defendant in the Fourth Amended Petition filed in the State Court Litigation.

263.     Defendants and the State Court Defendants acted together and their assistance and encouragement to each other caused Plaintiffs to suffer the losses described herein.

264.     Defendants committed an unlawful, overt act of placing the securities in the stream of commerce to further the objective of the act.

265.     Defendants' assistance and participation in the wrongful conduct constituted an independent breach of their own duty of reasonable care, good faith and fair and honest dealing towards Plaintiffs and was a substantial factor in causing Plaintiffs to suffer the losses described herein.

266.     Defendants' assistance and participation described above constituted a breach of their own legal duty to Plaintiffs to refrain from malfeasance or negligent affirmative conduct in the performance of their promise to repay the CAG/Ferrum Notes.

267.     Defendants owed Plaintiffs a duty to perform their obligations under the Lender Notes with good faith, care, skill and reasonable experience.  Defendants owed a duty of good faith and fair dealing towards Plaintiffs as beneficiaries of the Notes.

268.     Defendants encouraged or assisted Willy, Queen B, Cox, Barrera, Allen, AFA, Landzacha, MLC and MCKC in a substantial way in the breach of their fiduciary duties by creating the marketing materials, drafting the FC/Investor Notes and the CAG/Ferrum Notes and contributing to the Ferrum operations to give credence to the false representations to the Plaintiffs.

269.     Defendants also agreed to ensure that the Plaintiffs' investments were secured by UCC-1 filings and in undertaking to do so, owed Plaintiffs a duty of care in discharging this duty.

65

270.     The conduct of Defendants was a substantial factor in causing Plaintiffs' damages. Plaintiffs suffered substantial damages of not less than $28,127,091.25  which is the principal of and interest on the Ferrum investments.

271.     As a result of the assistance, encouragement and assistance and participation given to the State Court Defendants, Defendants are liable for Plaintiffs' damages. In addition, Plaintiffs seek and are entitled to recover exemplary damages because the acts performed in furtherance of it were undertaken by Defendants with malice and the intent to defraud Plaintiffs.

## COUNT XIX: RATIFICATION OF PONZI SCHEME
## [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

272.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

273.     At the time of the transactions and events described above, Defendants had full knowledge of, controlled, directed, acted on behalf of, approved and ratified the Ponzi Scheme, fraud, theft, negligence and breach of fiduciary duties undertaken by the State Court Defendants. Defendants benefitted from, validated and retained the fruits of the evil committed by the State Court Defendants.

274.     As a result, Plaintiffs suffered damages of at least $28,127,091.25 which is the principal and interest on the Ferrum investments.

## COUNT XX: ALTER EGO OF FERRUM CAPITAL, LLC
## [DEFENDANTS CAG AND HH]

275.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

66

276.    CAG and HH were the alter egos of Ferrum Capital, LLC. CAG and HH deliberately stripped Ferrum Capital, LLC of its assets (solely consisting of the Plaintiffs' investment funds) by transferring all of the funds received from Ferrum Capital, LLC to their insiders and affiliates.

277.    CAG and HH created, designed, organized, operated and controlled Ferrum Capital, LLC as a mere tool or business conduit to defraud investors.

278.    CAG and HH through its owners and directors (together with the owners and directors of Ferrum Capital, LLC) created, designed, organized, operated and controlled Ferrum Capital, LLC to circumvent personal liability for the Ponzi Scheme for which it was created.

279.    CAG and HH designed Ferrum Capital, LLC as a conduit through which investment funds would flow to and remain with it for the use of its affiliates – with only illusory promises of a return on investments to the Plaintiffs. The structure of the FC/Investor Notes and the CAG/Ferrum Notes contained too many self-serving holdbacks, kickbacks, commissions and fees to ever pay Plaintiffs the promised returns on their investments.

280.    As a result of the actions of CAG and HH, the Ferrum Entities were rendered insolvent, likely never intended to be solvent, and unable to repay Plaintiffs the promised returns on their investments.

281.    Therefore, CAG and HH are jointly and severally liable for the resulting damages to Plaintiffs in the amount of at least $28,127,091.25 which is the unpaid principal and interest on the Ferrum Capital investments.

## COUNT XXI: VICARIOUS LIABILITY—
## [DEFENDANTS WALT AND THE OLIPHANT ENTITIES]

282.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

283.     Walt and the Oliphant Entities are the alter egos of CAG and HH at all relevant times and are liable for all causes of action pled against CAG and HH by the Plaintiffs.

284.     Walt and the Oliphant Entities exerted control and influence over CAG and HH, shared the same owners, officers, directors and controllers and materially aided and supported CAG and HH as they carried out the Ponzi Scheme against Plaintiffs.

285.     Walt and the Oliphant Entities were the primary mastermind and beneficiaries of the scheme to defraud the Plaintiffs by selling the unregistered securities to the Plaintiffs  and misappropriating and diverting the Plaintiffs' investment funds to themselves

286.     Walt and the Oliphant Entities used CAG and HH as mere tools or business conduits to obtain a captive source of funds from Plaintiffs to Ferrum to CAG, for their own pecuniary interests.

287.     Walt and the Oliphant Entities organized and operated CAG and HH to circumvent personal liability for their fraud. These Defendants spun CAG and HH out from their corporate umbrella to avoid repaying Plaintiffs.

288.     Walt and the Oliphant Entities knew that CAG and HH were inadequately capitalized to repay Plaintiffs the promised returns on their investments.  The Oliphant Entities took the position that they were entitled to over ninety percent (90%) of the proceeds of the sale of the portfolios that were purchased with the investment funds without

authorization or disclosure to the Plaintiffs.  If the Oliphant Entities were truly entitled to these exorbitant service fees, then the Ferrum Commercial Lending Program was not designed to repay the promised eight to ten percent (8-10%) returns promised to the Plaintiffs.

289.   As a result of the actions of Walt and the Oliphant Entities, CAG, HH and the Ferrum Entities were rendered insolvent, likely never intended to be solvent, and unable to repay Plaintiffs the promised returns on their investments.

290.   Therefore, Walt and the Oliphant Entities' actions were the direct and proximate cause of the loss of Plaintiffs' investment funds, and Walt and the Oliphant Entities are jointly and severally liable for the resulting damages to Plaintiffs in the amount of at least $28,127,091.25 which is the unpaid principal and interest on the Ferrum Capital investments.

## COUNT XXII: OBJECTION TO CLAIMS [DEFENDANTS OLIPHANT INC., OLIPHANT FINANCIAL, LLC AND OLIPHANT USA, LLC]

291.   Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

292.   The actions undertaken by CAG and the Oliphant Entities in concert with the State Court Defendants constitute a scheme to sell fraudulent securities by wire fraud and conspiracy to commit wire fraud under 18 U.S.C. § 1343 and 18 U.S.C. § 1349. 18 U.S.C. § 1343 prohibits schemes to defraud others using electronic communications, such as phone calls, emails, or internet transmissions, that cross state lines. CAG, HH, and Oliphant along with the other State Court Defendants conspired to commit wire fraud, and either directly carried out the fraudulent acts or provided material support to the other State Court Defendants who carried out the acts.

69

293.    The actions of CAG and the Oliphant Entities in concert with the State Court Defendants between 2017 to 2023 to sell the unregistered securities to Plaintiffs were coordinated through electronic communications—text messages, and encrypted platforms—triggering the wire fraud statute.

294.    Further, CAG, HH and the Oliphant Entities violated 18 U.S.C. § 1341 which prohibits schemes to defraud others using the mail. Defendants intentionally and knowingly transmitted the marketing materials fraudulently describing the Commercial Lending Program through the Postal Service, other authorized depository for mail matter, or through private or commercial interstate carrier, for the purpose of defrauding Plaintiffs.

295.    Over 101 discrete transactions using mail fraud and wire fraud were transmitted in this pattern beginning in 2017 through 2024.

296.    CAG, HH and the Oliphant Entities violated 18 U.S.C. § 1956 which criminalizes the act of knowingly engaging in financial transactions involving proceeds from unlawful activity with the intent to conceal the origin, ownership, or control of those funds. The Ferrum Commercial Lending Program was a criminal enterprise created by CAG and Ferrum. After receiving investor funds through fraud, CAG, HH and Oliphant attempted to "clean" illicit money by funneling it through complex financial structures created by CAG, HH and the Oliphant Entities.

297.    CAG, HH and the Oliphant Entities engaged in a money laundering conspiracy under § 1956 by concealing profits derived from fraud. Proceeds from these illegal activities were laundered through shell companies, cash handoffs, and coordinated bank transfers to obscure their criminal origin.

298.    Pursuant to 11 U.S.C. § 502 and Federal Rules of Bankruptcy Procedure 3007(b) and 7001 the Plaintiffs object to below claims filed by Oliphant Inc., Oliphant Financial, LLC and Oliphant USA, LLC:

| Entity | POC # | Amount | Basis |
|--------|-------|--------|-------|
| Oliphant Inc. | 144 | $6,890.66 | Payment of Debtor's Licensing Fees |
| Oliphant Financial, LLC | 143 | $245,710.80 | Indemnification Expenses |
| Oliphant USA, LLC | 142 | $718,240.07 | Prepetition Servicing Fees |

299.    Based upon the fraud, theft and inequitable conduct of CAG and the Oliphant Entities described above, these claims against CAG, should be disallowed pursuant to 11 U.S.C. § 502(b)(1).  The Oliphant Entities looted CAG and misappropriated the funds that CAG received from the Plaintiffs through Ferrum Capital, LLC. The Oliphant Entities then spun CAG and HH off into separate defunct entities to hinder, delay and defraud Plaintiffs' collection efforts.  The Oliphant Entities caused harm to CAG and HH and their bankruptcy estates and should not receive any distribution from CAG's bankruptcy estate.

300.    In the alternative to disallowing the claims filed by Oliphant Inc., Oliphant Financial, LLC and Oliphant USA, LLC, the Court should equitably subordinate the claims to the claims of all other creditors of CAG and HH pursuant to 11 U.S.C. § 510(c)(1).

301.    Further, to the extent Oliphant Inc., Oliphant Financial, LLC and Oliphant USA, LLC are found liable for any of the transfers subject to avoidance and recovery as alleged herein, any claims they assert against CAG's bankruptcy estate must be disallowed unless and until they pay CAG's bankruptcy estate the amount of such liability.

4937-0635-5059, v. 2

### COUNT XXIII: TOLLING OF LIMITATIONS
### [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

302.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

303.     To the extent necessary to preserve their claims, Plaintiffs hereby affirmatively plead the tolling and accrual deferral doctrines of the discovery rule. The tortious acts set forth above were inherently undiscoverable but objectively verifiable such that the accrual of any applicable limitations period should be deferred. In the alternative, the tortious acts set forth above were actively concealed from discovery by Defendants such that Plaintiffs were not aware and could not have been aware of the existence of such torts.

304.     Plaintiffs did not discover, and through the exercise of reasonable care and diligence, would not have discovered, the existence of certain facts giving rise to their causes of action until shortly before the suit was filed. To the extent necessary, Plaintiffs plead the discovery rule for any and all claims because the injuries complained of were inherently undiscoverable and actively concealed by the Defendants.

305.     Plaintiffs further plead that any and all statutes of limitations for any and all claims are tolled by equitable doctrines including, but not limited to, equitable estoppel, continuing tort, and fraudulent concealment.

### COUNT XXIVI: APPLICATION FOR AUDITOR
### [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

306.     Plaintiffs repeat and incorporate by reference the facts and allegations set forth in the preceding paragraphs as if set forth fully herein.

4937-0635-5059, v. 2

307.     Pursuant to Texas Rule of Civil Procedure 172 and 11 U.S.C. § 105, Plaintiffs request that the Court appoint an independent auditor to review the accounts and financial records of Defendants, as an investigation of accounts appears necessary for the purpose of justice for the Plaintiffs. Without such an auditor, Plaintiffs are left without knowledge on how, when, and where their investment funds were transferred. An auditor is integral to determining how this fraud took place and who wrongly benefited.

## COUNT XXV: DISGORGEMENT
## [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

308.     Plaintiffs request the Court issue an Order requiring Defendants jointly and severally, to disgorge all ill-gotten profits or proceeds that they have received as a result of the acts and/or courses of conduct complained of herein, with prejudgment and post judgment interest thereon.

## COUNT XXVI: ATTORNEYS' FEES
## [DEFENDANTS CAG, HH, WALT AND THE OLIPHANT ENTITIES]

309.     Plaintiffs have retained the law firm of Pulman Leflore Pullen & Reed, LLP to represent them in this action, and have agreed to pay the Firm's reasonable and necessary attorneys' fees. Pursuant to the Texas Securities Act, Texas Civil Practice and Remedies Code §§ 37.001 and 38.001, and Texas Business and Commerce Code § 24.013, an award of reasonable and necessary attorneys' fees to Plaintiffs is authorized for this action and is hereby requested.

## VI.          CONDITIONS PRECEDENT

310.     All conditions precedent to Plaintiffs' recovery, including demand for performance have occurred, have been performed, or have been waived.

73

## VII.        PRAYER

311.    **WHEREFORE, PREMISES CONSIDERED,** Plaintiffs request that Defendants be cited to appear and answer herein, and that Plaintiffs be awarded a judgment against the Defendants for the following:

a.    Actual damages against Defendants in the amount of at least **$28,127,091.25**.

b.    Statutory damages for violations of the TUFTA and the Texas Government Code in the amount of at least **$28,127,091.25**.

c.    Exemplary damages.

d.    Attorneys' fees and costs.

e.    Prejudgment and post judgment interest on all amounts awarded.

f.    Appointment of a Court Appointed Auditor over Defendants.

g.    Avoidance of the fraudulent transfers under Section 24.009 TUFTA or the value thereof, from Defendants as initial or subsequent transferees.

h.    Equitable relief in the form of disgorgement of fees and a constructive trust over the assets of Defendants.

i.    Disallowance of the claims of Oliphant Inc., Oliphant Financial, LLC and Oliphant USA, LLC.

j.    All other and further relief, both at law and in equity, to which Plaintiffs may show themselves to be justly entitled.

4937-0635-5059, v. 2

November 12, 2025,                          Respectfully submitted,

                                                   **PULMAN, CAPPUCCIO AND PULLEN, LLP**
2161 NW Military Highway, Suite 400
San Antonio, Texas 78213
www.pulmanlaw.com
Telephone: (210) 222-9494
Facsimile: (210) 892-1610

By: */s/ Randall A. Pulman*
    Randall A. Pulman
    Texas State Bar No. 16393250
    rpulman@pulmanlaw.com
    Shari P. Pulman
    Texas State Bar No. 16388100
    spulman@pulmanlaw.com
    Byron L. LeFlore
    Texas State Bar No. 12161070
    bleflore@pulmanlaw.com
    Kerry S. Alleyne-Simmons
    Texas State Bar No. 24066090
    kalleyne@pulmanlaw.com
    **ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on November ___, 2025, a true and correct copy of the above and foregoing instrument was served on all counsel of record via CM/ECF and on other interested parties via the method(s) indicated below:

*Via US First Class Mail and*
*Via email:*
 *Lynn.butler@hushblackwell.com*
Lynn Hamilton Butler
Hush Blackwell LLP
111 Congress Ave., Suite 1400
Austin, Texas 78701
***Bankruptcy Counsel for Debtor Collins Asset Group, LLC and***
***Debtor Hollins Holdings, LLC***

*Via US First Class Mail and*
*Via email: dbehrends@dykema.com;*
*ddouglas@dykema.com*
Danielle Rushing Behrends
Dominique Douglas
Dykema Gossett PLLC
112 E. Pecan St., Suite 1800
San Antonio, Texas 78205
***Counsel for Chapter 7 Trustee***

*Via US First Class Mail and*
*Via email: rsatija@haywardfirm.com*
Ron Satija
***Chapter 7 Trustee***
PO Box 660208
Austin, Texas 78766

*Via CM/ECF or email:*
*James.rose@usdoj.gov;*
*Aubrey.thomas@usdoj.gov*
James Rose
Aubrey Thomas
United States Trustee
615 E Houston St #533
San Antonio, TX 78205

*Via CM/ECF: jbinford@krcl.com*
*arogers@krcl.com*
Jason Bradley Binford
Abigail Rogers
Kane Russell Coleman Logan
401 Congress Avenue #2100
Austin, TX 78701
***Counsel for Defendants Accelerated Inventory Management LLC,***
***Oliphant Financial, LLC; and Oliphant USA, LLC***

*Via CM/ECF: mridulfo@krcl.com*
Michael P. Ridulfo
Kane Russell Coleman Logan
5151 San Felipe, Suite 800
Houston, TX 77056
***Counsel for Defendants Accelerated Inventory Management LLC,***
***Oliphant Financial, LLC; and Oliphant USA, LLC***

*Via CM/ECF:*
*jfrost@lubbocklawfirm.com*
Josh Frost
Field Manning Stone Aycock
2112 Indiana Ave
Lubbock, TX 79410
***Counsel for Defendants Ferrum Capital, LLC, Ferrum IV, LLC; and Joshua Allen***

*Via CM/ECF:*
*ahartry@themoralesfirm.com*
Allison Sarah Hartry
The Morales Firm, P.C.
6243 IH-10 West, Suite 132
San Antonio, TX 78201
***Counsel for Defendant Yvette Barrera***

76

***Via US First Class Mail and***
***Via email:***
 *lawrence@themoralesfirm.com*
Lawrence Morales
The Morales Firm, P.C.
6243 IH-10 West, Suite 132
San Antonio, TX 78201
***Counsel for Defendant Yvette Barrera***

***Via CM/ECF:***
*ybajwa@sandersbajwa.com;*
*lstricker@sandersbajwa.com*
Yusuf A. Bajwa
Lad Stricker
Sanders Bajwa LLP
919 Congress Suite 1305
Austin, TX 78701
***Counsel for Defendant Walt Collins***

***Via CM/ECF:***
 *jonathan.robbin@jrobbinlaw.com*
Jonathan M. Robbin
J. Robbin Law
200 Business Park Drive
Armonk, NY 10504
***Counsel for Defendant Walt Collins***

***Via CM/ECF:***
 *david.whittlesey@aoshearman.com*
David Philip Whittlesey
Allen Overy Shearman Sterling US LLP
300 W. 6th Street Ste 2250
Austin, TX 78701
***Counsel for Defendant Walt Collins***

***Via CM/ECF: xmartin@mgl.law***
Eugene Xerxes Martin, IV
Martin Golden et al.
8750 N. Central Expressway
NorthPark Central, Suite 1850
Dallas, TX 75231
***Counsel for Defendant Collins Asset***
***Group LLC***

***Via CM/ECF: evan.miller@saul.com***
Evan T. Miller
Saul Ewing LLP
1201 N. Market Street, Suite 2300
PO Box 1266
Wilmington, DE 19801
***Counsel for Delaware Chapter 7 Trustee***

***Via CM/ECF: royal@royallealaw.com***
Royal B. Lea, III
Royal Lea Law Office PLLC
1901 NW Military Hwy Ste. 218
San Antonio, TX 78213
***Counsel for John Patrick Lowe, State***
***Court Receiver***

***Via US First Class Mail and***
***Via email: ecano@jeffersoncano.com;***
*wdavidson@jeffersoncano.com*
Emma Cano
William S. Davidson
Jefferson Cano
112 E. Pecan St., Suite 1650
San Antonio, TX  78205
***Counsel for MLC Financial, Inc. dba***
***MLC Financial Services, Inc. and***
***MKMH Interest LLC***

***Via email:***
*Brooklyn_chandler@icloud.com*
Brooklyn Chandler Willy and
Queen B Advisors, LLC
Address unknown
***(Defendants)***
***PRO SE***

***Via email:***
*robert@ryanprojectfunding.com*
Robert Ryan and
Ryan Project Funding LLC
1050 Connecticut Ave. NW #500
Washington DC  20036
***(Defendants)***
***PRO SE***

4937-0635-5059, v. 2

***Via US First Class Mail***
Allen Financial Agency, Inc.
c/o Joshua L. Allen
4415 66th Street, Ste. 107
Lubbock, TX 79414
***Pro Se Defendant***

***Via US First Class Mail***
Lehman Duane Allen
dba L. Duane Allen, C.P.A.
4415 66th Street, Ste. 107
Lubbock, TX 79414
***Pro Se Defendant***

***Via US First Class Mail***
Landzacha Holdings, Ltd.
c/o  Joshua L. Allen
4415 66th Street, Suite 101
Lubbock, Texas 7941
***Pro Se Defendant***

*/s/ Randall A. Pulman*
Randall A. Pulman

4937-0635-5059, v. 2