IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE:<br>COLLINS ASSET GROUP, LLC,<br>　　Debtor. | §<br>§<br>§<br>§ | CHAPTER 7: Case No. 25-51660-MMP |
| JUDY A. MUSGROVE, individually and as beneficiary of the Mainstar Trust, Cust. FBO Judy A Musgrove IRA, *et al.*,<br>　　Plaintiffs,<br><br>v.<br><br><br>BROOKLYNN CHANDLER WILLY, *et al.*<br>　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Adv. Proc. No. 25-05047-MMP<br><br>Removed from the 438th Judicial District Court, Bexar County, Texas Case No. 2023-CI-22575 |
| JOHN PATRICK LOWE in his capacity as Court Appointed Receiver,<br>　　Plaintiff,<br><br>v.<br><br>Collins Asset Group, LLC, *et al.*,<br>　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |

**TRUSTEE'S AMENDED COMPLAINT**

TABLE OF CONTENTS

OVERVIEW .................................................................................................................. 3

JURISDICTION AND VENUE ................................................................................... 6

PARTIES ...................................................................................................................... 6

   A.  Plaintiff ........................................................................................................... 6

   B.  Defendants: Officers and Directors ............................................................... 7

   C.  Defendants: The Oliphant Entities................................................................. 9

   D.  Defendants: Metropolitan ............................................................................ 10

FACTUAL BACKGROUND ..................................................................................... 11

   A.  CAG's History ............................................................................................. 11

   B.  The CAG/Oliphant Structure Before October 2021 ...................................... 12

   C.  The 2021 Leveraged Buyout......................................................................... 17

   D.  The Oliphant Corporate Structure After the LBO ........................................ 18

E.   CAG Was Insolvent at All Relevant Times ........................................................ 19

F.   The Conway Group's Diversion of CAG's LendingPoint Opportunities......................... 19

G.   Diversion of Hybrid Debt/Equity Joint Venture Interests Owed to CAG by AIM and Oliphant Financial............................................................................................. 20

H.   Additional Gratuitous Cash Transfers from CAG to AIM and Other Oliphant Entities .. 21

I.   Diversion of Portfolios Funded Entirely by CAG ......................................................... 23

J.   CAG is Entitled to Repayment of its Investment as Well as Up to 100% of the Proceeds 24

K.   The Servicing Agreement and Commingling of Funds ................................................... 25

L.   Metropolitan's Role and Control ................................................................................. 29

M.   The September 2023 Spin-Off ..................................................................................... 38

N.   The Ferrum Capital Connection.................................................................................... 44

O.   The Defendants Allowed CAG's UCC-1 Financing Statements to Lapse ...................... 45

P.   The Officers' and Directors' Dual Roles and Self-Dealing........................................... 47

Q.   CAG and Hollins' Bankruptcy Filings.......................................................................... 49

R.   Metropolitan's Article 9 Sale....................................................................................... 52

S.   Metropolitan's Strategic Post-Petition Conduct .......................................................... 53

T.   The Trustee's Substitution & Metropolitan's Motion to Dismiss .................................. 54

CLAIMS FOR RELIEF ............................................................................................................. 55

COUNT I .................................................................................................................................. 55

Breach of Fiduciary Duties of Loyalty, Good Faith, and Care.................................................. 55

COUNT II ................................................................................................................................ 62

Aiding and Abetting Breach of Fiduciary Duty....................................................................... 62

COUNT III................................................................................................................................ 68

Civil Conspiracy ...................................................................................................................... 68

COUNT IV................................................................................................................................ 71

Constructive Trust.................................................................................................................... 71

COUNT V................................................................................................................................. 74

Accounting and Adverse Presumption...................................................................................... 74

COUNT VI................................................................................................................................ 76

Turnover of Property of the Estate (11 U.S.C. § 542) .............................................................. 76

COUNT VII ............................................................................................................................. 76

Breach of Contract ................................................................................................................... 76

COUNT VIII............................................................................................................................. 78

Money Had and Received.......................................................................................................... 78

COUNT IX..................................................................................................................80

Avoidance of Constructively Fraudulent Transfers (11 U.S.C. §§ 544(b) and 548 and Tex. Bus. & Com. Code §§ 24.005 and 24.006) ...................................................80

COUNT X.....................................................................................................................82

Recovery of Avoided Transfers (11 U.S.C. § 550)..................................................82

COUNT XI....................................................................................................................83

Disgorgement..............................................................................................................83

COUNT XII ..................................................................................................................83

Objection to Proofs of Claim or Alternatively,......................................................83

Equitable Subordination Claims ..............................................................................83

(11 U.S.C. § 510(c))....................................................................................................83

PRAYER FOR RELIEF ...................................................................................................87

JURY DEMAND................................................................................................................89

**OVERVIEW**

1. This action arises from a coordinated scheme by the officers and directors of Collins Asset Group, LLC ("CAG"), aided and abetted by CAG's former affiliates operating under the Oliphant name (the "Oliphant Entities"), their officers and directors, and their lender, Metropolitan Partners Group Administration, LLC ("Metropolitan") (collectively, "Defendants"), to systematically strip CAG of its assets for the benefit of the Oliphant Entities and Metropolitan at the expense of CAG and its creditors.

2. CAG was in the business of purchasing portfolios of charged-off consumer debt and collecting the purchased debt from original account debtors. Beginning in 2017 and 2018, CAG entered into joint ventures with Oliphant Financial, LLC ("Oliphant Financial") and Accelerated Inventory Management, LLC ("AIM"), funding tens of millions of dollars in debt-portfolio acquisitions and retaining perpetual equity interests in those portfolios that extended beyond mere repayment to include all net proceeds in perpetuity.

3

3.     In October 2021, Metropolitan financed a leveraged buyout (the "LBO") that placed CAG, AIM, Oliphant Financial, and their affiliates under common ownership (the "Conway Group"), led by Colin Conway, and a single lender (Metropolitan), with all entities' assets pledged as collateral. The acquired entities, including CAG, borrowed approximately $85 million from Metropolitan to fund the transaction. CAG was insolvent from the date of the LBO forward.

4.     Immediately after the LBO, CAG's officers and directors, who simultaneously served as officers of the Oliphant Entities, began systematically stripping CAG of value through a series of coordinated actions. First, they redirected portfolio-purchasing opportunities from CAG to AIM and Oliphant Financial, including the diversion of LendingPoint portfolio-purchasing relationships that had belonged exclusively to CAG for nearly four years and the reallocation of portfolios purchased with CAG funds to other entities. Second, they diverted CAG's joint venture interests in portfolios held by Oliphant Financial and AIM (including portfolios from LendingClub Corporation and iMedia Brands, Inc. that CAG had funded in whole or in part) by recording those portfolios as owned by Oliphant Financial or AIM rather than CAG, despite CAG having provided, at least in part, the acquisition capital and retaining perpetual equity interests in the portfolios' future cash flows. Third, they caused CAG to make millions of dollars in gratuitous cash transfers to AIM, Oliphant United, Inc. (f/k/a Oliphant United, LLC), Oliphant USA, LLC, and other affiliates while CAG was insolvent, including $6.7 million to AIM alone, portions of which were used within days to pay down Metropolitan's pre-LBO loans. Fourth, they failed to collect intercompany receivables owed to CAG by AIM and permitted the elimination of millions of dollars in receivables owed by Oliphant Financial through suspicious non-cash

4

journal entries. Fifth, they allowed CAG's UCC-1 filings against Oliphant Financial, which secured portfolio assets with over $230 million in face value, to lapse, thereby extinguishing CAG's perfected security interests and clearing the way for Metropolitan to sell those assets free of CAG's claims. Sixth, they permitted Oliphant USA, LLC, which served as servicer for CAG's debt portfolios, to retain $8,529,384 in net collections that Oliphant USA collected on CAG's behalf but failed to remit. These value-stripping activities are described in greater detail below.

5. In September 2023, after the stripping was substantially complete, the Defendants executed a "spin-off" (the "Spin-Off") that severed CAG and Hollins Holdings, Inc. ("Hollins"), CAG's sole member, from the Oliphant corporate family with the active participation and consent of Metropolitan. The Spin-Off left CAG with approximately $80 million in creditor obligations but without the revenue-generating assets, the intercompany receivables, or the joint venture equity interests that had been diverted to entities remaining under Metropolitan's collateral umbrella. Metropolitan extracted a comprehensive release of claims from both Debtors as part of the transaction, in an attempt to extinguish its liability for its role in the diversion of CAG's value.

6. Metropolitan then conducted a private Article 9 sale (the "Article 9 Sale") of substantially all AIM and Oliphant Financial assets, comprising the very portfolios funded with CAG's capital and constituting CAG's diverted corporate opportunities. The Article 9 Sale closed on May 1, 2026, at a gross purchase price of $59.25 million. Metropolitan seeks to retain the proceeds for its own benefit.

7. The Trustee (as defined below) brings this action to recover the value wrongfully diverted from the Debtors' estates and seeks compensatory damages, imposition of a constructive

5

trust over the Article 9 Sale proceeds and all traceable property, and avoidance of fraudulent transfers.

## JURISDICTION AND VENUE

8.  This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), including but not limited to proceedings to determine, avoid, or recover fraudulent conveyances and preferences, proceedings to determine the validity, extent, or priority of liens, proceedings to recover property of the estate, and proceedings affecting the liquidation of assets of the estate.

9.  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

10. The statutory predicates for the relief requested herein include, without limitation, 11 U.S.C. §§ 105(a), 541, 544, 548, and 550, as well as Federal Rules of Bankruptcy Procedure 7001 and 7065, and applicable non-bankruptcy law, including Delaware law, Texas law, and the Uniform Commercial Code.

## PARTIES

**A. Plaintiff**

11. Plaintiff Ron Satija (the "Trustee") is the duly appointed and acting Chapter 7 Trustee in the bankruptcy cases of Collins Asset Group, LLC (Case No. 25-51660-MMP) and Hollins Holdings, Inc. (Case No. 25-51670-MMP). The Trustee was appointed on August 1, 2025, was thereafter duly qualified, and has since been acting in that capacity in both cases. The Trustee brings this action on behalf of the CAG bankruptcy estate pursuant to 11 U.S.C. §§ 541, 544, 548, 550, and 704, and is authorized to pursue the claims asserted herein.

**B.** **Defendants: Officers and Directors**

12. Defendant Colin Conway ("Conway") is a resident of Florida and served as Chief Executive Officer of CAG and as CEO and Director of Hollins. Conway held 26.84% of Hollins' Common Stock, making him the single largest individual stockholder of CAG's sole member. Conway simultaneously served as CEO of Oliphant, Inc. and its subsidiaries (the Metropolitan borrowers) and signed the 2021 Credit Agreement, the Consent and Waiver Agreement, and the Distribution Agreement on behalf of virtually every entity in the corporate family. As CEO of both the Debtors and the Oliphant Entities, Conway was positioned to direct the flow of portfolio opportunities and funds between the entities.

13. Defendant David Scanlan ("Scanlan") is a resident of Florida and served as Senior Manager of CAG. Scanlan participated in the LBO negotiations and communicated directly with Conway regarding the strategy to strip CAG of its value, as evidenced by contemporaneous text messages exchanged on the date of the LBO.

14. Defendant Robert Morris ("Morris") is a resident of Florida and the co-founder of Oliphant Financial. Prior to the LBO, Morris served as Chairman and Chief Executive Officer of Oliphant Financial. In CAG's post-LBO marketing materials, Morris was listed as a "Senior Manager" of CAG. Hollins' Statement of Financial Affairs identifies Morris as a shareholder of Hollins, holding 21.23% of Hollins' equity. Morris also served as President and Secretary of both Oliphant Financial and Oliphant USA, the servicer entities that controlled CAG's collection proceeds through commingled bank accounts. Morris signed the Servicing Agreement and the 2021 Credit Agreement on behalf of certain Oliphant entities, placing him at the center of the fund flows described herein.

15. Defendant Nick Swinea ("Swinea") is a resident of Texas and joined CAG in 2012 as Chief Information Officer, with over ten years of experience managing enterprise networking. Swinea previously worked at Precision Recovery Analytics, Inc. (f/k/a CAG Financial Services, Inc.), a predecessor CAG entity. Swinea had access to and knowledge of the portfolio allocation decisions and fund transfers at issue. As described below, on July 13, 2023, Swinea personally executed a reassignment of fifteen legacy portfolios in which CAG held joint venture interests to a new portfolio designated as "encumbered by MET 100%," at the request of Metropolitan's JD Sheldon, thereby participating in the diversion of CAG's assets to the benefit of Metropolitan and the Oliphant Entities.

16. Defendant Daniel Laux ("Laux") is a resident of Texas who joined CAG in 2012 and served in various roles, including Debt Settlement Manager and Reporting & Analytics Manager, before being promoted to Legal Outsourcing Manager in early 2018. Laux was subsequently promoted to "Manager" and designated the "sole manager" of CAG and "authorized representative" of Hollins. In that capacity, Laux signed both the original and amended bankruptcy schedules of CAG under oath, declaring under penalty of perjury that the information therein was "true and correct" pursuant to Bankruptcy Rules 1008 and 9011, despite acknowledging in those very filings that he "has not (and could not have) personally verified the accuracy of each statement and representation contained in the Schedules and Statements" and that he instead relied upon "the efforts, statements and representations of third-parties retained by the Debtors to assist in the compilation of the Schedules and Statements, who are not employed by or under the control of CAG or Hollins."

8

**C. Defendants: The Oliphant Entities**

17. Defendant Oliphant, Inc. ("Oliphant Inc.") is a Delaware corporation with its principal place of business in Austin, Texas that served as the ultimate parent holding company of the Oliphant corporate family following the October 2021 LBO.

18. Defendant Oliphant United, Inc. (f/k/a Oliphant United, LLC) ("Oliphant United") is a Florida entity with its principal place of business in Austin, Texas that served as the operational parent for the enterprise's debt-buying and servicing businesses and was a direct subsidiary of Oliphant Inc.

19. Defendant Accelerated Inventory Management, LLC is a Florida limited liability company and a subsidiary of Chesa Holdings, LLC. AIM served as the debt-buying arm of the enterprise and, following the LBO, usurped CAG's role as the primary portfolio purchaser. CAG entered into a joint venture with AIM under which CAG funded portfolio acquisitions and retained perpetual equity interests. AIM owes CAG in connection with these joint venture interests, received $6.7 million in gratuitous cash transfers from CAG while CAG was insolvent, and was the vehicle through which portfolio purchasing opportunities were diverted from CAG.

20. Defendant Oliphant USA, LLC ("Oliphant USA") is a Florida limited liability company and a subsidiary of AUSSRQ Holdings, LLC. Oliphant USA served as the servicer responsible for collecting on debt portfolios owned by CAG, AIM, and other Oliphant Entities, and controlled the flow of collection proceeds through commingled Hancock Whitney remittance accounts.

21. Defendant Chesa Holdings, LLC ("Chesa") is a Delaware limited liability company doing business in Texas that served as the parent entity of AIM and was a direct subsidiary of Oliphant United.

22. Defendant Oliphant Financial, LLC is a Florida limited liability company founded in 1992 by Robert Morris. Oliphant Financial was a direct subsidiary of Oliphant United and participated in debt purchasing and servicing. Beginning in 2017 or 2018, CAG and Oliphant Financial entered into a joint venture under which CAG funded portfolio acquisitions and retained perpetual equity interests in those portfolios. By the time of the LBO, CAG had funded at least $23 million in portfolio acquisitions for Oliphant Financial and held UCC-1 financing statements against Oliphant Financial securing portfolio assets with face values exceeding $230 million, which CAG's officers and directors permitted to lapse.

23. Defendant AUSSRQ Holdings, LLC ("AUSSRQ") is a Florida limited liability company with its principal place of business in Austin, Texas that served as the parent entity of Oliphant USA, LLC and was a direct subsidiary of Oliphant United.

**D.    Defendants: Metropolitan**

24. Defendant Metropolitan Partners Group Administration, LLC ("Metropolitan") is a Delaware limited liability company with its principal place of business in New York, New York. Metropolitan Administration served as the administrative, payment, and collateral agent under the credit agreements arising out of the LBO. In that capacity, Metropolitan Administration issued the Notice of Agent's Private Disposition of Collateral on or about March 20, 2026 and conducted the Article 9 sale of substantially all AIM and Oliphant Financial assets, which closed on May 1, 2026 at a gross purchase price of $59.25 million.

Metropolitan is a private credit fund, not a regulated bank, that exercised pervasive control over the Oliphant Entities, and for a time, the Debtors, as described herein.

25. Defendant Metropolitan Partners Fund VI, LP ("Fund VI") is a Delaware limited partnership and one of the lending entities under the 2021 Credit Agreement.

26. Defendant Metropolitan Partners Fund VI (3C1), LP ("Fund VI 3C1") is a Delaware limited partnership and one of the lending entities under the 2021 Credit Agreement.

27. Defendant Metropolitan Partners Fund VII, LP ("Fund VII") is a Delaware limited partnership and one of the lending entities under the 2021 Credit Agreement.

28. Metropolitan Partners Group Administration, LLC, Metropolitan Partners Fund VI, LP, Metropolitan Partners Fund VI (3C1), LP, and Metropolitan Partners Fund VII, LP are collectively referred to herein as "the Metropolitan Entities." The key personnel of Metropolitan include Paul K. Lisiak (Managing Partner), Miles Peet (former Chief Operating Officer, who signed the Consent and Waiver Agreement as Authorized Representative), and JD Sheldon (Principal, who was actively involved in the management oversight of the Oliphant group as described herein).

## FACTUAL BACKGROUND

### A. CAG's History

29. CAG is a Delaware limited liability company, originally founded by Walt Collins, with its principal place of business at 6001 W. William Cannon Dr., Suite 102, Austin, Texas 78749. CAG was founded in 2011. Since its inception, CAG has been in the business of purchasing portfolios of charged-off consumer debt (commonly referred to as "junk debt") and collecting the purchased debt from original account debtors.

30. CAG had years of expertise in the purchase, liquidation, servicing, and resale of portfolios of charged-off consumer and commercial debt and non-performing receivables. CAG "utilized a business-to-business loan structure to acquire the [portfolios]." Because these receivables were delinquent or past due, they were acquired at a significant discount from face value.

31. Given the nature of its business, CAG was not able to obtain traditional financing and instead financed its, AIM's, and Oliphant Financial's portfolio acquisitions through investment firms, large and small, including Ferrum Capital, LLC, Growth Platforms, LLC, Sill & Associates, L.L.C., Heller Group and Judith Heller, and F & K Partners, LLC. CAG pledged the portfolios as collateral to those lenders.

32. CAG's sole member is Hollins Holdings, Inc., formerly known as Hollins Holdings, LLC, a Delaware corporation located at the same address. Hollins is itself a Chapter 7 debtor in these proceedings and a co-plaintiff in this action. Hollins' only asset when spun off from the Oliphant group in September 2023 was CAG. At the time of its bankruptcy filing, Hollins listed total assets of $0.00 in its Schedules of Assets and Liabilities.

**B.    The CAG/Oliphant Structure Before October 2021**

33. In approximately 2017 or 2018, CAG formed a joint venture with Oliphant Financial, LLC, a Florida limited liability company founded in 1992 by Robert Morris, under the umbrella of a new parent entity called Oliphant United, LLC ("Oliphant United"). Following the merger, the CAG/Oliphant corporate structure was as follows:

(a)    Oliphant, Inc. sat at the top of the corporate family as the ultimate parent holding company.

(b)     Oliphant United, LLC was a direct subsidiary of Oliphant Inc. and served as the operational parent for the enterprise's debt-buying and servicing businesses.

(c)     Hollins Holdings, LLC was a direct subsidiary of Oliphant United.

(d)     Collins Asset Group, LLC was Hollins' sole subsidiary.

(e)     AUSSRQ Holdings, LLC was a direct subsidiary of Oliphant United.

(f)     Oliphant USA, LLC was AUSSRQ's sole subsidiary and served as the servicer responsible for collecting on the debt portfolios owned by CAG, AIM, and the other Oliphant Entities.

(g)     Chesa Holdings, LLC was a direct subsidiary of Oliphant United.

(h)     Accelerated Inventory Management, LLC was Chesa's sole subsidiary, which served as the debt-buying arm of the enterprise.

(i)     Oliphant Financial, LLC was a direct subsidiary of Oliphant United and also participated in debt purchasing and servicing.

34.     As described in Oliphant United's own investor marketing materials, the joint venture arose "[i]n late 2017 [when] Oliphant won a bid to purchase several large flows of delinquent consumer charged-off receivables from a tier-one online lender. In order to complete the purchase, Oliphant entered a joint venture with Collins Asset Group, another 30+ year industry veteran. The companies soon realized that the philosophies, industry strategies, and management styles were complementary to one another." The marketing materials further state that "the companies began the process of combining forces to create one of the industry's top mid-tier debt buying companies."

35.     The joint venture between CAG and Oliphant Financial was not merely a conventional lending arrangement. Michael Crossan, who served as Chief Operating Officer of CAG for

13

ten years and oversaw all portfolio acquisitions during that period, testified under oath at a hearing before this Court on May 18, 2026 that CAG "did a JV with Oliphant Financial to purchase those portfolios." Crossan explained that under the joint venture structure, Oliphant Financial had the existing relationship with LendingClub, a sophisticated lender that required its portfolio purchasers to be pre-approved, but lacked the capital to fund the acquisitions. CAG provided the cash, and "[a] note was drawn up and executed by both companies, by which all proceeds, excluding costs or collection costs, were to be returned back to CAG in perpetuity of those files." When asked what distinguished the arrangement from a simple lending agreement, Crossan testified: "The equity piece in the back end. Once the note was paid off, again, all proceeds from that portfolio were to go back to [CAG]." CAG thus retained a perpetual equity interest in the portfolios purchased through the joint venture, an interest that extended beyond mere repayment of principal and interest.

36. The joint venture structure extended beyond Oliphant Financial to AIM as well. Crossan testified that CAG entered into joint ventures with both Oliphant Financial and AIM, whereby CAG would fund the purchase of portfolios and the other entity would acquire the portfolio in its name. In each instance, CAG retained an ownership interest, not merely a creditor's claim, in the portfolios so acquired. As described more fully below, the joint venture entities purchased three distinct categories of debt portfolios, each of which followed a different ownership and funding pattern, and each of which resulted in CAG's capital being deployed while the portfolios were recorded as owned by Oliphant Financial or AIM.

37. First, CAG was the exclusive purchaser of LendingPoint, LLC portfolios within the enterprise. The Oliphant Entities' own allocation spreadsheet confirms that between April

2018 and July 2021, CAG purchased forty-one separate LendingPoint portfolios in its own name on a near-monthly cadence. During this entire period, no other entity within the Oliphant enterprise purchased from LendingPoint. As described below, these LendingPoint portfolio purchasing opportunities, which had belonged exclusively to CAG for over three years, were subsequently diverted to AIM.

38. Second, the joint venture entities purchased LendingClub Corporation portfolios. These portfolios were originally purchased in Oliphant Financial's name. In approximately February 2019, AIM took over from Oliphant Financial as the entity in whose name LendingClub portfolios were acquired, and from that date forward all LendingClub portfolio purchases were recorded as owned by AIM. The Oliphant Entities' portfolio allocation spreadsheet corroborates this transition: Oliphant Financial purchased LendingClub portfolios from September 2017 through January 2019, while AIM's first LendingClub purchase occurred on February 22, 2019, and AIM continued as the exclusive LendingClub purchaser thereafter.

39. CAG funded the acquisition of LendingClub portfolios in two ways. In some instances, CAG paid the entire purchase price of the portfolio. In other instances, CAG funded the subordinated tranche of the acquisition cost, known as the "B-Piece." Under the B-Piece structure, the portfolio purchase price was divided into two components: a senior tranche (the "A-Piece"), which was financed by a third-party lender, originally Arena Investors, LP and later Metropolitan; and a subordinated tranche (the "B-Piece"), typically representing 15% to 20% of the total portfolio purchase price, which was funded by CAG. CAG retained the B-Piece portion (15% to 20%) of the portfolio proceeds to repay its own lenders, including Ferrum Capital, LLC, Growth Platforms, LLC, and others, while the

remaining proceeds were applied to repay the A-Piece lender. Once the A-Piece was fully repaid, CAG was entitled to receive all proceeds from the portfolio in perpetuity. This structure gave CAG not merely a creditor's right to repayment of its initial investment, but a perpetual equity interest in the portfolio's future cash flows.

40. Third, the joint venture entities purchased portfolios from iMedia Brands, Inc. (f/k/a Evine Live, Inc.) ("Evine"). These Evine portfolios were originally purchased in Oliphant Financial's name. The portfolio allocation spreadsheet confirms that Oliphant Financial continued as the named owner of Evine portfolio purchases through at least September 2021. Thereafter, beginning in November 2021, AIM took over from Oliphant Financial as the entity in whose name Evine portfolios were acquired, and AIM's Evine purchases continued through at least June 2023. Despite the fact that these portfolios were recorded as owned by Oliphant Financial and later AIM, CAG paid the full purchase price for these Evine portfolios through at least the end of 2021. Because CAG funded one hundred percent of the acquisition cost and there was no A-Piece lender, CAG should have been entitled to all proceeds generated by these portfolios from the date of acquisition forward (less only collection fees and costs). The recording of these entirely CAG-funded portfolios as owned by Oliphant Financial and AIM, rather than as owned by CAG, is among the most egregious examples of the systematic diversion of CAG's assets described herein.

41. Prior to the October 2021 leveraged buyout described below, CAG was an active purchaser of debt portfolios, either in its own name or through joint ventures with Oliphant Financial and AIM. CAG generated funds to finance portfolio acquisitions and transferred money to various Oliphant Entities, including AIM and Oliphant Financial, for at least three years prior to the LBO. By the time of the LBO, CAG had funded over $23 million in

LendingClub portfolio acquisitions for Oliphant Financial alone, in addition to approximately $21 million transferred to or for the benefit of AIM for portfolio acquisitions.

**C. The 2021 Leveraged Buyout**

42. On October 13, 2021, Metropolitan financed a leveraged buyout by which the Conway Group acquired the CAG/Oliphant enterprise. The acquired companies, including CAG, borrowed approximately $85 million from Metropolitan to fund the transaction. The 2021 Credit Agreement established a multi-draw term loan facility of up to $100,000,000, with Metropolitan Partners Funds VI and VII as lenders and Metropolitan Partners Group Administration, LLC as agent.

43. The Oliphant Entities' consolidated financial statements confirm that on October 13, 2021, the company "effectuated a reorganization and simultaneous equity investment transaction that resulted in a change of control." The Conway Group acquired 47.8% of Oliphant United for $23,900,000, financed entirely by $62,907,966 in debt from Metropolitan. The Oliphant Entities, including CAG, were thus saddled with debt to finance the very transaction that changed their ownership and control.

44. Following the LBO, the Conway Group progressively consolidated ownership of Oliphant United—from 47.8% in October 2021 to 83.14% by December 2022, and ultimately to 100% when Oliphant United became a wholly-owned subsidiary of Oliphant, Inc. This consolidation occurred simultaneously with the systematic stripping of CAG's assets described herein.

45. SEC Form D filings confirm that Metropolitan Partners Fund VII, LP (the entity that financed the LBO) is a Delaware "Private Equity Fund" managed by Lisiak and Edward

Giordano, not a regulated bank. This distinction is legally significant because Metropolitan's conduct must be scrutinized as the actions of a private equity fund with dual economic interests, not under the deferential standards applicable to conventional secured lenders.

46. CAG presented the most vexing value proposition to the Conway Group and Metropolitan: its money had been used to build the enterprise's wealth, but separated from its joint venture partners, CAG looked like nothing more than a liability. On the very day of the LBO, Conway texted Scanlan: "I want to see if we can spin off CAG" and "Instead of just folding the collection business let's spin it off . . . ." These messages reveal the intent to separate CAG from its affiliated obligors while preserving value within entities that would remain under Metropolitan's collateral umbrella.

47. Metropolitan's involvement predated the LBO closing. Internal correspondence from September 2021 shows Metropolitan personnel receiving and reviewing detailed forecasted collection data for Oliphant portfolios. Metropolitan thus had a granular understanding of the portfolio-level economics from the inception of the lending relationship. This visibility was not merely incidental; as set forth below, the credit agreement's fee and advance structures were tied directly to Oliphant USA's collection performance, requiring Metropolitan to continuously track net collections against projections in order to calculate its own compensation, the borrowing base, and the servicing fees payable under the agreement.

**D.    The Oliphant Corporate Structure After the LBO**

48. After the LBO, the Oliphant Entities were reorganized under the parent holding company Oliphant, Inc. The entities, which now consisted of Oliphant, Inc., Oliphant United,

Hollins, CAG, AUSSRQ, Oliphant USA, Chesa, AIM, and Oliphant Financial, played various roles in the debt acquisition and servicing business. AIM quickly took over from CAG as the primary portfolio purchaser, while Oliphant Financial continued to purchase portfolios and Oliphant USA serviced the debt. All of these entities were listed as borrowers under the 2021 Credit Agreement and were subject to Metropolitan's influence.

**E.      CAG Was Insolvent at All Relevant Times**

49.    According to CAG's QuickBooks records, CAG was insolvent as of December 31, 2021. CAG's equity value as of that date was in deficit of approximately $9,359,969. The deficiency in equity value continued to grow: to approximately $17 million as of December 31, 2022; $29.9 million as of December 31, 2023; and $30.9 million as of December 31, 2024.

**F.      The Conway Group's Diversion of CAG's LendingPoint Opportunities**

50.    Following the LBO, the Conway Group began systematically redirecting portfolio purchasing opportunities away from CAG and toward AIM. Prior to the LBO, CAG was an active purchaser of debt portfolios. After the LBO, portfolio purchases were increasingly allocated to AIM. Thereafter, AIM, and to a lesser extent Oliphant Financial, were the exclusive owners of the portfolios purchased.

51.    The diversion of LendingPoint, LLC portfolio purchasing opportunities from CAG to AIM is particularly illustrative of the systematic nature of the Defendants' scheme. Between April 2018 and July 2021, CAG was the exclusive purchaser of LendingPoint portfolios within the Oliphant enterprise, acquiring forty-one separate LendingPoint portfolios on a near-monthly cadence. During this period, no other Oliphant Entity purchased from LendingPoint. CAG's LendingPoint portfolio acquisitions spanned twelve portfolios in

2018, eleven in 2019, twelve in 2020, and six in 2021 (through July 12, 2021), with aggregate face values of approximately $199.5 million. This established, continuous purchasing relationship with LendingPoint was a core component of CAG's revenue-generating business and a corporate opportunity squarely within CAG's line of business.

52. These LendingPoint portfolio purchasing opportunities, which had belonged exclusively to CAG for nearly four years, were diverted to AIM. The Oliphant Entities' own portfolio allocation spreadsheet shows that AIM purchased two LendingPoint portfolios in 2023: portfolio 23003 on January 30, 2023, with a face value of $12,030,872.70, and portfolio 23018 on June 27, 2023, with a face value of $2,876,312.48, for a combined face value of $14,907,185.18 in LendingPoint portfolios allocated to AIM instead of CAG. CAG received no LendingPoint allocations at any time after July 2021. By 2022 and 2023, AIM had become the dominant purchaser, with portfolios worth tens of millions of dollars allocated exclusively to AIM, while CAG received no new portfolio allocations. The redirection of LendingPoint opportunities to AIM was contemporaneous with and part of the broader scheme to strip CAG of its revenue-generating assets while concentrating value within the entities that remained under Metropolitan's collateral umbrella. Metropolitan, as a private equity fund lender exercising control over the Oliphant group, would ultimately sell these assets for its own benefit through its Article 9 Sale of all assets of AIM.

**G.    Diversion of Hybrid Debt/Equity Joint Venture Interests Owed to CAG by AIM and Oliphant Financial**

53. The balance owed by AIM to CAG as of October 31, 2025, totaled $27,748,529.49.

54. To date, the Trustee's expert has established that a range of $13.7 million to $20.7 million of this amount was funded by CAG to AIM as part of the joint venture referenced in the 2021 Oliphant investor deck and confirmed by the sworn testimony of CAG's pre-2021

Chief Operating Officer, Michael Crossan.  As described above, these funds were used to fund the B-Piece of portfolios purchased by AIM.

55.     Although CAG's records show repayment of its initial principal by Oliphant Financial, $3.35 million of that repayment is suspect. Specifically, it remains unclear: (1) whether $1,760,105.98 in non-cash-flow-based journal entries were ever settled in cash; (2) whether the $1,762,163.02 amount that appears to represent a reassigned loan to Oliphant USA was supported by any contracts or agreements with CAG; and (3) the purpose of, and beneficiaries associated with, $67,006.08 in service provider charges.

56.     Further, repayment of the initial principal alone would not satisfy Oliphant Financial's obligations to CAG, as this amount does not include (1) CAG's joint venture equity interest in the portfolios purchased with its funds or (2) interest on the total principal.

**H.     Additional Gratuitous Cash Transfers from CAG to AIM and Other Oliphant Entities**

57.     Additionally, the Conway Group diverted CAG's cash to AIM for no consideration at a time when CAG was insolvent. These transfers included:

    (a) $5,000,000 transferred to AIM's Hancock Whitney bank account in March 2022;

    (b) $1,000,000 transferred to AIM in February 2023; and

    (c) $700,000 transferred to AIM in March 2023.

58.     The post-LBO cash transfers are independently verified by reconciling CAG's and AIM's bank statements.

59.     Six days after receiving CAG's $5,000,000 wire in March 2022, AIM's Hancock Whitney account made two large outgoing wire payments to Metropolitan entities: $7,031,799.69 to "Metro Partners Group Shortfall on Loan" and $997,916.31 to "Metro Financing VI LLC Shortfall on Loan," totaling over $8 million in payments to Metropolitan within days

of receiving CAG's funds. These payments by AIM to Metropolitan were **not** made on the LBO loan on which CAG was a joint obligor, but rather were made to pay down a loan from Metropolitan to AIM that pre-dated the LBO, was not paid off by the LBO distributions, and on which CAG was **not** liable.

60. The $1,000,000 and $700,000 payments differ in that, after receiving CAG's funds, AIM paid down the LBO line of credit. However, within just one or two days, AIM withdrew the same amount from the same line of credit, such that CAG's liability on the note did not decrease but cash was removed and diverted to AIM. In other words, AIM was enriched at CAG's expense.

61. Metropolitan's Article 9 Sale purported to sell "all assets of AIM now owned or acquired at any time prior to the Sale or in which AIM now has or at any time prior to the Sale may acquire any interest and all proceeds thereof" and "all assets of Oliphant Financial now owned or acquired at any time prior to the Sale or in which Oliphant Financial now has or at any time prior to the Sale may acquire any interest and all proceeds thereof; *provided* that the 'Collateral' excludes all right, title and interest Oliphant Financial has in the loan portfolios and assets identified as collateral in the UCC-1 financing statements listed on Exhibit A." CAG has a property interest in these assets.

62. In addition to the $6,700,000 transferred directly to AIM after the LBO, CAG's general ledger reflects that between 2022 and October 2025, CAG also made the following gratuitous transfers to affiliates: $4,500,000 to Oliphant United on March 22, 2022; $1,355,000 to Oliphant USA; and $61,389.72 to Oliphant Financial in 2022.

I.      **Diversion of Portfolios Funded Entirely by CAG**

63.     As previously discussed, the Trustee's ongoing investigation has also revealed a pattern of diversion involving Evine portfolios. For these Evine portfolios, CAG did not merely fund the subordinated B-Piece of the acquisition cost. Rather, CAG's bank statements demonstrate contemporaneous transfers of the entire purchase price of these portfolios. Despite CAG funding one hundred percent of the acquisition cost, these portfolios were not allocated to CAG but were instead recorded as owned by Oliphant Financial and AIM.

64.     Specifically, the Trustee has identified at least sixteen Evine portfolios, purchased from iMedia Brands, Inc. between April 2020 and February 2022, for which CAG's bank statements confirm transfers matching the full purchase price. Twelve of these portfolios, purchased between April 29, 2020 and September 29, 2021, with an aggregate purchase cost of approximately $206,560 and aggregate face value of approximately $4.43 million, were recorded as owned by Oliphant Financial despite being paid for entirely by CAG. Four additional portfolios, purchased between November 24, 2021 and February 23, 2022, with an aggregate purchase cost of approximately $63,795 and aggregate face value of approximately $1.29 million, were recorded as owned by AIM despite being paid for entirely by CAG. In each of the sixteen identified portfolios, a bank statement entry corresponding to the exact purchase price has been identified in CAG's records.

65.     The Trustee's efforts to tie additional Evine portfolio purchases to CAG's bank statements are ongoing, and the Trustee believes that additional portfolio purchases funded entirely by CAG may be identified as the forensic investigation continues. The sixteen portfolios identified to date represent only those for which the Trustee has thus far been able to match

23

a CAG bank statement entry to the exact purchase cost of a portfolio recorded as owned by Oliphant Financial or AIM.

**J.    CAG is Entitled to Repayment of its Investment as Well as Up to 100% of the Proceeds**

66.    For those Evine portfolios for which CAG funded the entire purchase price, CAG is entitled to all proceeds generated by those portfolios in perpetuity. Unlike the B-Piece structure described above, where CAG funded only the subordinated tranche of the acquisition cost and retained a perpetual equity interest after the A-Piece loan was repaid, the Evine portfolios were funded in their entirety by CAG. There was no A-Piece lender; CAG bore one hundred percent of the acquisition cost. Accordingly, CAG's entitlement is not limited to a residual equity interest following repayment of senior debt but extends to all net proceeds from these portfolios from the date of acquisition forward. Despite this, the portfolios were allocated to Oliphant Financial and AIM, serviced by Oliphant USA through the same commingled remittance accounts described herein, and their proceeds were distributed through the same waterfall that prioritized Metropolitan's compensation. The diversion of these entirely CAG-funded portfolios to entities within Metropolitan's collateral umbrella, and the subsequent sale of those portfolios by Metropolitan in the Article 9 Sale, represents a complete appropriation of assets that belonged to CAG from the moment of purchase.

67.    At no time did Conway or any other officer or director of CAG cause CAG to collect, enforce, or seek repayment of the tens of millions of dollars owed to CAG by AIM and the other Oliphant Entities.

68.    According to a November 1, 2019 email from Michael Crossan, then-COO of CAG, to Miles Peet at Metropolitan and Morris at Oliphant Financial, between August 2018 and

January 2019, portfolios were acquired "with the use of the proceeds from collections for CAG and Oliphant." A spreadsheet attached to that email entitled "Collins Asset Group, LLC to Oliphant Financial, LLC note allocation" confirms that, between June 4, 2018 and January 28, 2019, $23,037,271.12 of CAG's funds were used to acquire nine specific debt portfolios from CreditShop LLC and LendingClub Corporation. These nine portfolios were acquired pursuant to the joint venture between CAG and Oliphant Financial described above; CAG funded the purchases and, under the joint venture agreements, retained a perpetual equity interest in the portfolios in addition to its right to repayment under the promissory notes. These portfolios can be traced to Oliphant Financial's inventory; according to Oliphant Financial's trial balance dated December 31, 2022, these same portfolios appear in Oliphant Financial's inventory accounts with aggregate balances totaling over $7.3 million. The parties' business records also document $3.35 million in net intercompany receivables owed by Oliphant Financial to CAG as of December 31, 2021. Between 2023 and 2025, these net receivables were offset through non-cash-flow-based journal entries, loan reclassifications, and service provider charges of unclear justification, further obscuring the amounts owed to CAG.

**K.** **The Servicing Agreement and Commingling of Funds**

69. On October 13, 2021, the same date as the LBO, CAG, AIM, and the other Oliphant borrower entities entered into a Servicing Agreement with Oliphant USA, LLC as "Servicer" and Metropolitan as "Agent." Under the Servicing Agreement, Oliphant USA was appointed as the servicer responsible for managing, administering, and collecting on the portfolio assets of the borrower entities, including CAG. Morris signed the Servicing Agreement on behalf of Oliphant USA as its President and Secretary.

70. Pursuant to the Servicing Agreement, collections generated from CAG's portfolios were subject to a defined distribution waterfall that prioritized Metropolitan's compensation at every level. As confirmed by Cherry Bekaert Advisory LLC ("Cherry Bekaert"), an accounting firm engaged by the Oliphant Entities and approved by Metropolitan to review the accounting treatment and historical reporting of Oliphant USA, gross collections are first applied to pay Oliphant USA and other third-party collection agencies for agency fees, internal servicing fees, court costs, and master servicing fees. Only after these deductions are the remaining net collections available for distribution. The Servicing Agreement then prescribed that the next tier of distribution was for the payment of all fees, costs, and expenses and any other amounts then due and payable by the Borrower to Metropolitan as Agent and the Lenders under the Loan Agreement. Metropolitan's closing diligence fee, monthly monitoring fee, advance fees, and any other charges owing under the credit agreement were thus paid ahead of principal and interest on the loans themselves. Next, accrued interest and then outstanding principal on the Metropolitan term loans were paid down. Only after Metropolitan was made whole on all fees, interest, and principal did any residual proceeds become available, and even then, the Servicing Agreement entitled Metropolitan to a 9.5% success fee on all remaining proceeds. Oliphant USA thus occupied a gatekeeper position in the distribution waterfall, and Metropolitan was its primary beneficiary, collecting fees, interest, principal, and a success fee before CAG or its creditors saw a dollar of the collections generated from CAG's own portfolios.

71. The Servicing Agreement further prescribed a tiered master servicing fee structure under which Oliphant USA's compensation for collecting on the portfolios was calculated as a percentage of net revenue, with the applicable percentage varying based on actual

26

collection performance relative to original projected collections: 10.00% if net revenue equaled or exceeded 90% of projections; 5.00% if between 80% and 90%; and 0% if net revenue fell below 80% of projections. This tiered structure, embedded in the Servicing Agreement executed contemporaneously with the 2021 Credit Agreement and confirmed by Oliphant's consolidated financial statements, required Metropolitan to receive and monitor detailed data comparing actual net collections against projected collections for each portfolio on an ongoing basis. Because Metropolitan's own compensation under the waterfall, including its fees, costs, and expenses under the Loan Agreement and its 9.5% success fee on residual proceeds, depended on the volume and timing of collections flowing through Oliphant USA, Metropolitan necessarily tracked Oliphant USA's collection activity with respect to CAG's portfolios and the other borrower entities' portfolios on a continuous basis, giving it real-time visibility into the financial performance of the businesses.

72. As of the filing of the bankruptcy, regardless of whether remittances were collateral for loans extended by Ferrum, Growth Platforms, or Metropolitan, certain remittances received by Oliphant USA were deposited into a single, commingled deposit account owned by Oliphant USA. A collateral setup diagram prepared by Metropolitan as early as November 2019 depicts this commingled structure: collections from all debt portfolios, regardless of whether they constituted collateral for Ferrum or Growth (CAG's investors) or Metropolitan, were funneled through Oliphant USA, commingled upon receipt, and then distributed to Metropolitan's trust accounts. Metropolitan also conceded its knowledge of this fact in a complaint it filed in the Supreme Court of the State of New York against Oliphant USA.

73. Cherry Bekaert's independent analysis further quantified the scope of the funds flowing through Oliphant USA on behalf of CAG. On a life-to-date basis through April 30, 2025, Oliphant USA collected total net proceeds of $53,028,288 to be distributed through CAG pursuant to the waterfall described above. Of this amount, $33,919,971 was allocable to CAG based on the applicable revenue-split percentages. The remaining $19,108,317 represents CAG's pass-through obligations, being funds that CAG was required to remit to third-party lenders with security interests in the applicable portfolios, including Ferrum Capital, LLC, F&K Partners, LLC, Growth Platforms, LLC, Sill & Associates, L.L.C., and the Heller Group. These third-party lenders are among the creditors whose claims remain outstanding in CAG's bankruptcy case.

74. The accountants and bookkeepers maintaining CAG's books and records were not employed by CAG but were employed or retained by Oliphant USA. This arrangement, which persisted even after the September 2023 Spin-Off, meant that CAG's financial records were at all times under the control of entities with interests adverse to CAG, and that CAG's officers and directors delegated their recordkeeping obligations to the very affiliates that were receiving CAG's diverted assets.

75. As of October 31, 2025, according to CAG's general ledger, Oliphant USA owed CAG $11,933,810. Of that amount, $8,529,384 represents unpaid net collections that Oliphant USA collected on behalf of CAG from CAG's portfolios but failed to remit. These unpaid collections constitute funds that Oliphant USA held in its capacity as servicer and was obligated to distribute to CAG under the Servicing Agreement, yet retained. Oliphant USA's failure to remit these collections is consistent with the broader pattern of the Oliphant Entities retaining value that rightfully belonged to CAG and its creditors.

**L.  Metropolitan's Role and Control**

76.  Metropolitan is a private credit fund, not a regulated bank, that served as administrative, payment, and collateral agent under the credit agreements arising out of the LBO. The firm is organized as a Delaware limited liability company with notice filings in New York. SEC filings identify Paul Kenneth Lisiak as the indirect owner and control person of the management entity through PKL Holdings, a Delaware entity that serves as a member of Metropolitan Partners Group Management, LLC. The Form ADV further discloses that Metropolitan Partners Group Management, LLC serves as the investment manager or filing adviser for multiple private equity fund vehicles, including the Fund VI and Fund VII entities that served as lenders in the Oliphant credit agreements. Each fund is organized as a Delaware limited partnership and classified as a "Private Equity Fund" under the pooled investment fund category.

77.  The Oliphant Entities' consolidated financial statements confirm the degree of Metropolitan's structural control over the enterprise. Note K to the combined and consolidated financial statements for the year ended December 31, 2023 states that "[t]he Company relies on Metro to fund new originations of investment opportunities and has material exposure to such lender in that a majority of its debt is owed to Metro or its affiliates." The financial statements further acknowledge that "any changes in its facilities with Metro could have a material impact on the Company and its ability to fund operations." This admission in Oliphant's own audited financials establishes that Metropolitan was not merely a passive lender but the entity upon which the entire Oliphant enterprise depended for its ongoing operations and growth, giving Metropolitan extraordinary leverage to dictate business decisions, including those detrimental to CAG.

78. Metropolitan held a security interest in substantially all assets of the Oliphant Entities. Subsequent to the LBO and prior to the Spin-Off, these assets included the assets of CAG and Hollins, and Metropolitan exercised control over the Oliphant Entities' bank accounts. After the Spin-Off, Metropolitan held a security interest only in all of the non-debtor Oliphant Entities' assets. As part of its due diligence for the LBO, Metropolitan commissioned a comprehensive lien search report, dated September 30, 2021, which identified CAG's UCC-1 financing statements against Oliphant Financial securing interests in portfolio assets with face values exceeding $230 million. Metropolitan thus knew from the outset that CAG held competing security interests in Oliphant Financial's assets. Moreover, a November 1, 2019 email from CAG's then-COO, Michael Crossan, directly to Miles Peet at Metropolitan and Morris at Oliphant Financial, stated that portfolios were acquired "with the use of the proceeds from collections for CAG and Oliphant," demonstrating that Metropolitan had actual knowledge, even before the LBO, that CAG's funds had been used to acquire portfolios held by other Oliphant Entities.

79. First, upon information and belief, Metropolitan received the 2021 Investor Deck, which clearly described the companies' joint venture.

80. Next, Crossan testified at the May 18, 2026 hearing that he personally communicated with Metropolitan representatives JD Sheldon and Miles Peet regarding "portfolios that either CAG had financed with AIM or portfolios CAG had financed with Oliphant Financial," and that these were "the joint ventures" he had described. When asked whether he conveyed to Metropolitan that CAG "owned the right to them in perpetuity to pay off its lenders," Crossan testified: "Yes, I talked to them about the fact that these portfolios were financed by CAG, and CAG owned the right to them in perpetuity to pay off its lenders."

When asked for Metropolitan's response, Crossan testified: "They understood." Metropolitan thus had actual knowledge (communicated directly by CAG's COO) not merely that CAG had loaned money to Oliphant entities but that CAG held equitable ownership interests in the very portfolios that Metropolitan would later sell through its Article 9 Sale.

81. The degree of control Metropolitan exercised over the Oliphant Entities exceeded that of a conventional secured lender. Section 5.14 of the 2021 Credit Agreement granted Metropolitan "Board Observation Rights," entitling Metropolitan's designated representative to: (i) receive prior notice of all board meetings; (ii) attend or monitor all such meetings; (iii) receive all notices, reports, financial statements, budgets, and minutes furnished to board members; and (iv) "participate in all discussions conducted at such meetings and consult on significant corporate action." While the Credit Agreement formally disclaimed that the representative would "constitute a director" or be "entitled to vote," the scope of these rights, combined with Metropolitan's position as the sole source of up to $100 million in financing and its pervasive security interest in substantially all assets, gave Metropolitan effective veto power over major business decisions. Any action that displeased Metropolitan could trigger an event of default, acceleration, and foreclosure.

82. Metropolitan's fee structure confirms that it was extracting value from the Oliphant Entities at every step of the lending relationship. As documented in the Oliphant Entities' consolidated financial statements and the Servicing Agreement, Metropolitan charged a $700,000 closing diligence fee, a 1.25% advance fee on every draw on a grossed-up basis, a $25,000 monthly monitoring fee, ten percent per annum interest on each advance, and a

31

105% prepayment premium. Each of these fees was non-refundable and fully earned when paid. In addition, the Servicing Agreement entitled Metropolitan to payment of all fees, costs, and expenses owing to it as Agent under the Loan Agreement (ahead of principal and interest repayments in the distribution waterfall) and to a 9.5% success fee on all residual proceeds remaining after Metropolitan's loans were repaid in full. The monthly monitoring fee alone totaled $300,000 per year, reflecting Metropolitan's ongoing, hands-on involvement in the management and financial affairs of the Oliphant Entities far exceeding the passive oversight of a conventional lender. The success fee on residual proceeds further aligned Metropolitan's interests with the continued operation and growth of the Oliphant Entities' collection businesses, including the portfolios purchased with funds diverted from CAG, because Metropolitan profited not merely from lending but from the economic performance of the very assets it helped divert.

83. The 2021 Credit Agreement further required Metropolitan's affiliate to receive a "Closing Date Warrant," a warrant for ten percent of the outstanding equity interests of the corporate parent Oliphant, Inc., with a cashless exercise price equal to a $50,000,000 valuation and a five-year term. In addition, Oliphant's consolidated financial statements confirm that warrants to purchase ten percent of the stock of Accelerated Inventory Management, LLC (the very entity to which CAG's portfolio purchasing opportunities were being diverted) were issued to Metropolitan as part of the credit agreement, with an aggregate exercise price of $5,000,000 and a five-year expiration. These equity warrants gave Metropolitan a dual economic interest, as both creditor and potential equity holder in both the parent company and AIM, fundamentally inconsistent with a conventional, arm's-length secured lending relationship. Metropolitan's equity stake in AIM meant that Metropolitan stood to

profit directly from the growth of AIM's assets, including portfolios purchased with funds diverted from CAG. The Closing Date Warrant was not unique to the Oliphant transaction; rather, it was a core feature of Metropolitan's standard lending model, as confirmed by public SEC filings documenting a strikingly parallel credit relationship between Metropolitan and Presto Automation Inc. (formerly Ventoux CCM Acquisition Corp.), a publicly traded company (Commission File Number 001-39830).

84. On September 21, 2022, Metropolitan Partners Group Administration, LLC entered into a Credit Agreement with Presto Automation's subsidiary, E La Carte, LLC (later renamed Presto Automation LLC), serving as administrative, payment, and collateral agent for itself and the lending entities (specifically Metropolitan Levered Partners Fund VII, LP, Metropolitan Partners Fund VII, LP, and CEOF Holdings LP), providing a senior secured term loan. Paul K. Lisiak signed the agreement as Managing Partner. The structural similarities between the Presto and Oliphant credit agreements are remarkable: in each, Metropolitan served as "administrative, payment and collateral agent" through the same Fund VII vehicles managed by Lisiak. Metropolitan charged Presto a $500,000 onboarding fee and a quarterly monitoring fee of $125,000 (increasing to $187,500 upon an event of default), consistent with the fee-laden approach Metropolitan employed in the Oliphant LBO.

85. EDGAR filings document that in a Third Amendment dated October 10, 2023, Presto acknowledged that "certain Defaults and Events of Default have occurred and are continuing." Metropolitan agreed to waive these defaults in exchange for, among other things, converting $6,000,000 of accrued and capitalized interest into equity warrants to purchase 3,000,000 shares of common stock at $0.01 per share, an equity conversion

mechanism that mirrors the Closing Date Warrant Metropolitan obtained in the Oliphant transaction. The Presto filings describe Metropolitan's approach of repeatedly forbearing while extracting increasingly aggressive concessions, including excessive fees, additional equity warrants, releases from liability, and enhanced reporting obligations.

86. Metropolitan's stake in the Oliphant Entities was well beyond that of a traditional lender and engendered increased involvement in the day-to-day operations and financial management of the Oliphant Entities. On March 23, 2023, JD Sheldon, a Principal at Metropolitan, directed Oliphant's CFO to upload "the latest intercompany notes between Oliphant Inc et al (including AIM) and CAG" along with "the finance agreement and open notes for Ferrum, Growth, and any other lenders with open balances," explaining that Metropolitan was "considering including some of the asset base from Oliphant Inc in our structure and need[ed] to confirm some details before considering the value to be ascribed." Three days later, Conway responded to Sheldon requesting that the CFO also "show the amount of notes that ferrum and growth have rolled at maturity" because "[i]f we just show maturities the cashflow picture obviously looks far worse." This exchange demonstrates the degree to which Conway coordinated with Metropolitan in helping Metropolitan frame its own asset base.

87. The following day, on March 24, 2023, Conway emailed Sheldon at Metropolitan directly to discuss a plan to increase the Oliphant borrowing base under the Metropolitan credit agreement by taking a senior secured position on Oliphant, Inc. and Oliphant Financial. In that email, Conway explicitly acknowledged that **"cash generated at Collins Asset Group subsidiary has been lent to other subsidiaries as intercompany loans"** and that **"cash was used from Collins Asset Group to buy assets in other subsidiaries."** Conway

further stated that CAG "has its own set of creditors that are senior secured, but solely on the assets at the Collins Asset Group subsidiary level," confirming that Metropolitan understood that these secured creditors had no claim on other entities within Metropolitan's collateral umbrella. Conway further stated that the "contemplated plan is to have Metropolitan increase the Oliphant borrowing base under the credit agreement by taking a senior secured position on both Oliphant, Inc and Oliphant Financial, LLC." Critically, Conway asked Sheldon to have Metropolitan's counsel evaluate **"in the event that Collins Asset Group becomes insolvent and goes into receivership, how would this affect Metropolitans overall position as the senior lender in AIM, Oliphant, Inc, and Oliphant Financial, LLC considering the fact that cash was used from Collins Asset Group to buy assets in other subsidiaries."**

88. Conway's March 24, 2023 email solidifies Metropolitan's knowledge that (1) CAG's funds had been used to acquire assets held by other Oliphant subsidiaries within Metropolitan's collateral umbrella, and (2) that CAG's insolvency was a foreseeable consequence of the very diversions they were planning to further exploit through the borrowing base expansion.

89. In April 2023, Oliphant's CFO reported to Sheldon the balances of CAG's other lenders as of March 31, 2023: Ferrum ($58,314,880.74), Growth ($15,385,392.62), Heller ($3,640,905.59), Sill ($2,036,500), and F&K Partners ($115,000), for a total of approximately $79.5 million in obligations owed to creditors other than Metropolitan. Metropolitan thus had actual knowledge of the magnitude of CAG's creditor obligations, and the corresponding depth of CAG's insolvency, well before it agreed to the Spin-Off.

90.  By May 2023, Sheldon was directly managing the borrowing base calculation, directing Oliphant personnel regarding asset schedules, and coordinating due diligence for potential co-investors in Metropolitan's lending facility. Metropolitan's own credit agreement and the Servicing Agreement made this level of involvement structurally necessary: the advance rate for each draw was calculated based on projected collections curves and the Borrowing Base ERC Rate; the master servicing fee paid to Oliphant USA varied based on actual net revenue relative to projections; Metropolitan's fees, costs, and expenses under the Loan Agreement were paid ahead of principal and interest in the distribution waterfall; and Metropolitan's 9.5% success fee on residual proceeds meant that it had a direct economic stake in the volume and timing of every dollar collected by Oliphant USA. Metropolitan therefore had to closely track Oliphant USA's collection activity on an ongoing basis to protect its economic interests. This level of operational involvement demonstrates that Metropolitan possessed real-time visibility into the allocation of portfolio purchasing opportunities, the flow of funds between entities, and the collection performance of every portfolio in which it held a security interest.

91.  In July 2023, Metropolitan's control over asset allocation decisions and the Oliphant Entities' disregard of CAG's interests was further demonstrated by the reassignment of legacy portfolios in which CAG held joint venture interests. On July 13, 2023, at the apparent request of JD Sheldon, Nick Swinea reassigned accounts from fifteen legacy portfolios to a newly created portfolio, number 23015, which Swinea described as an "internal transferred account[] encumbered by MET 100%." The legacy portfolios reassigned to portfolio 23015 included: 19014, 19017, 19021, 19024, 19522, 19524, 19526, 19527, 19528, 19530, 19532, 19534, 19536, 20001, and 20004. Each of these

legacy portfolios had been purchased by AIM using funds provided by CAG as part of the joint venture described above, through which CAG funded the B-Piece of LendingClub portfolio acquisitions and retained a perpetual equity interest in the portfolios after the A-Piece loan was repaid.

92. By designating these portfolios as "encumbered by MET 100%," the Oliphant Entities and Metropolitan effectively claimed that the entirety of the economic interest in these portfolios belonged to Metropolitan, disregarding CAG's funded B-Piece investment and its right to all net proceeds from the portfolios after the A-Piece loan was repaid. The portfolio allocation spreadsheet accompanying Swinea's email to Sheldon confirms that the reassignment transferred a total of 969 accounts with an aggregate balance of approximately $7.8 million and a sale balance of approximately $1.02 million from these fifteen legacy portfolios into portfolio 23015. The reassignment was styled as an "INTERNAL SALE - LENDING CLUB" from AIM to Oliphant Financial, LLC, meaning the portfolios were moved further from CAG's reach and deeper into Metropolitan's collateral umbrella.

93. The July 2023 portfolio reassignment is yet another example of the Oliphant Entities, acting in concert with Metropolitan, systematically disregarding CAG's ownership interests in portfolios and appropriating those portfolios for themselves and for Metropolitan's benefit. Swinea's execution of this reassignment at Sheldon's request further evidences both Metropolitan's operational control over asset allocation decisions within the Oliphant group and the individual Defendants' willingness to sacrifice CAG's interests to benefit Metropolitan. This conduct occurred while CAG was deeply insolvent, while its officers and directors owed fiduciary duties to CAG's creditors, and just two

months before the September 2023 Spin-Off that would sever CAG from any ability to enforce its rights against the Oliphant Entities.

**M.    The September 2023 Spin-Off**

94.    As discussed above, in September 2023, the Oliphant Entities and Metropolitan executed a spin-off of Hollins and CAG from the Oliphant corporate family. The Spin-Off could not have occurred without Metropolitan's active participation: the Spin-Off Transactions would have violated certain affirmative and negative covenants set forth in both the Legacy Business Credit Agreement (dated October 13, 2021, as amended) and the separate Legalis Credit Agreement (dated June 30, 2023), and any such violation would have constituted a Default or Event of Default entitling Metropolitan to exercise its remedies, including acceleration and foreclosure on all collateral owned by all the Oliphant Entities. Metropolitan thus held an absolute veto over the transaction.

95.    The Oliphant Entities' consolidated financial statements describe the Spin-Off in terms that confirm its practical effect. Under the heading "Debt to Equity Conversion," the combined and consolidated financial statements for the year ended December 31, 2023 state that "[i]n 2023, the Company, through its subsidiaries, commenced a reorganization plan that effectively sold CAG to Hollings Holdings, LLC, which then converted into a Hollins, Inc., a corporation, and subsequently, distributed Hollins, Inc., whose sole asset was Collins Asset Group LLC, to the shareholders of Oliphant Inc., which is intended to be a tax free reorganization." By the auditors' own description, after the Spin-Off, Hollins' "sole asset" was CAG, an entity that had already been stripped of its revenue-generating portfolio purchasing opportunities and burdened with approximately $80 million in creditor obligations. The characterization as a "tax free reorganization" further reveals that the

Defendants structured the Spin-Off to maximize their own tax benefits while leaving CAG and its creditors with nothing.

96. The documentary record reveals that Metropolitan did not merely consent to the Spin-Off passively; rather, Metropolitan actively shaped the transaction's terms through successive redlines of the Consent and Waiver Agreement. As early as August 21, 2023, Metropolitan's counsel at Holland & Knight initiated discussions with Oliphant's counsel regarding the contemplated spin-off. An early draft dated September 12, 2023 shows Metropolitan's counsel expanding the agreement from a narrow consent involving only "Oliphant Parent and Oliphant United" to a comprehensive agreement binding all "Metropolitan Loan Parties," including CAG and Hollins. Where the earlier draft required only Oliphant Parent and Oliphant United to represent that CAG's business "is not successful," Metropolitan's revisions changed the representing party to "The Metropolitan Loan Parties," requiring CAG itself, among others, to represent its own alleged failure. Metropolitan's redlines also broadened the scope of the default waiver, added conditions precedent requiring Metropolitan's "sole discretion" approval of evidence that the Spin-Off had been consummated, and required payment of all accrued fees to Metropolitan and its attorneys, auditors, appraisers, consultants, and advisors as a condition of effectiveness.

97. Metropolitan also dictated critical post-closing conditions that further evidenced its control over the transaction and its intent to protect its own collateral position at the expense of the Debtors. Specifically, the Consent and Waiver Agreement required that: (a) no later than thirty days after closing, Metropolitan's Agent must receive a "duly executed Collateral Account Control Agreement"; and (b) no later than sixty days after closing (or such later date as approved by Metropolitan in its "sole discretion"), Metropolitan's Agent must

receive "evidence in form and substance satisfactory to the Agent that all receivables owing among CAG or Hollins and any other Metropolitan Loan Party (such receivables, the 'Intercompany Receivables') have been adjusted in connection with the Spin-Off Transactions" and that any liens securing those Intercompany Receivables had been "subordinate to Agent's Lien on the Collateral." The Agreement further provided that failure to satisfy these post-closing conditions "shall constitute an Event of Default."

98. The requirement that intercompany receivables be "adjusted" is particularly significant. At the time of the Spin-Off, CAG's books, as kept by Oliphant employees, revealed AIM owed CAG approximately $27.7 million in intercompany obligations. Given Sheldon's high level of involvement in the Oliphant Entities' financials at that point, he most certainly knew this. Rather than requiring that those obligations be paid to CAG, Metropolitan required that they be "adjusted" and that any liens securing them be subordinated to Metropolitan's own lien. Metropolitan thus used its control position to ensure that the $27.7 million owed to CAG by AIM would remain within Metropolitan's collateral umbrella, rather than being collected for the benefit of CAG and its creditors.

99. On September 19, 2023, Metropolitan, the Oliphant Entities, CAG, and Hollins entered into the Consent and Waiver Agreement. The final executed version was signed by Miles Peet as Authorized Representative of each Metropolitan fund entity. Under the Agreement, Metropolitan consented to the Spin-Off Transactions and agreed to release both Hollins and CAG "from all obligations as a Borrower and/or as a Guarantor under each of the Credit Agreements with the Metropolitan Group."

100. On September 21, 2023, the parties entered into a Distribution Agreement effectuating the Spin-Off, under which Hollins' capital stock was distributed to Oliphant, Inc.'s shareholders.

101. In exchange for its consent, Metropolitan extracted a comprehensive release from all Metropolitan Loan Parties, including both CAG and Hollins, of "any and all claims, demands, causes of action, obligations, remedies, suits, damages and liabilities . . . arising out of or related to this Agreement, the Credit Agreements, the other Loan Documents, or the transactions contemplated therein."

102. The release is void as it was precured through false representations, including those regarding the extent of CAG's insolvency and creditor obligations and its looting by the Oliphant entities, which were known or reasonably knowable to Metropolitan. Additionally, Metropolitan's knowing participation in or facilitation of the scheme precludes it from benefitting from the release.

103. Following the Spin-Off, Metropolitan's representative JD Sheldon personally followed up with Conway on October 5, 2023 to remind him that the post-closing condition regarding the intercompany receivables was "an important topic for us." On January 23, 2024, Sheldon emailed Conway: "Cleaning up old emails, what's happening with the CAG spin-off docs? And how are the 'small lenders' these days (as Crossan used to call them)?" This dismissive reference to CAG's creditors, creditors whose claims Metropolitan was aware of and whose interests were harmed by the transactions Metropolitan facilitated, reflects Metropolitan's awareness of and indifference to the harm inflicted on CAG's creditor body.

104. The practical effect of the Spin-Off was to isolate CAG, with its creditor obligations intact, from its obligors in the Oliphant group, while retaining AIM and the over $27 million that

had been transferred to it by CAG, as well as the revenue-generating portfolios that had been diverted and redirected to AIM and Oliphant Financial from CAG. The Spin-Off also severed CAG from its joint venture interests in portfolios held by Oliphant Financial and AIM, which were perpetual equity interests entitling CAG to all net proceeds from those portfolios after the promissory notes were repaid. CAG was left with aging, depleted portfolios and mounting creditor claims, and Hollins was left as a holding company with no assets whatsoever. Conversely, the Oliphant Entities retained these wrongly acquired or redirected portfolios, and Metropolitan was able to remove CAG as its competitor for these assets and the funds they generated.

105. Indeed, the 2023 consolidated financial statements of Oliphant, Inc., which were not issued until February 2025, confirm that Metropolitan continued to deepen its position in the Oliphant Entities even after the Spin-Off had isolated CAG from the corporate family. In September 2024, the Company amended its credit facility with Metropolitan Partners Group Administration, LLC on terms that dramatically increased Metropolitan's economic take and operational control over the enterprise. The amendment increased the interest rate spread to three-month SOFR plus eight and one-half percent (8.5%), raised the floor interest rate to 15%, increased the monitoring fee from a flat $25,000 per month to 0.5% of collections, changed the maturity date to August 1, 2025, altered the servicing fees payable to Oliphant USA to 32.5% of internal collections, imposed a master servicing fee of 7% or 12% based on collections performance, and required a sweep of any excess cash to reduce the principal balance.

106. The September 2024 amendment is significant for several reasons. First, by converting the monitoring fee from a flat monthly amount to a percentage of collections (0.5%),

Metropolitan tied its own compensation even more directly to the volume of collections flowing through Oliphant USA, the same collections that included proceeds from portfolios purchased with CAG's diverted funds and portfolios in which CAG retained equity interests. Second, the imposition of an excess cash sweep gave Metropolitan effective control over the Oliphant Entities' liquidity, ensuring that every dollar collected beyond operating expenses flowed to Metropolitan rather than being available to satisfy obligations to CAG or its creditors. Third, the escalation of interest rates, servicing fees, and monitoring charges demonstrates Metropolitan's pattern of extracting increasingly aggressive concessions from the Oliphant Entities, the same pattern documented in the Presto Automation filings, further entrenching Metropolitan's dominance over the enterprise while the Oliphant Entities' obligations to CAG remained unpaid.

107. The same 2023 consolidated financial statements also confirm the devastating consequences of the Spin-Off for CAG's creditors. As of December 31, 2023, the financials disclose that all of CAG's legacy lender relationships were in distress. Of the approximately $47,036,352 in principal balance outstanding under the Ferrum Credit Agreement, an estimated $9,159,334 had matured and was out of compliance due to financial debt nonpayment and covenant breaches, with several additional notes out of compliance due to interest nonpayment. The Growth Platforms notes, with $14,982,065 in principal outstanding, were out of compliance due to interest nonpayment and covenant breaches. The Heller notes, with $2,975,000 in principal outstanding, were likewise out of compliance due to interest nonpayment and covenant breaches. And the Sill notes, with approximately $2,036,500 in principal outstanding, had an estimated $1,089,000 past due and were out of compliance due to both financial debt nonpayment and covenant breaches.

With respect to each of these lenders, the financial statements noted only that "[t]he Company is evaluating the situation." These disclosures confirm that by the end of 2023, just months after the Spin-Off severed CAG from the Oliphant group, CAG was in default on substantially all of its approximately $67 million in outstanding secured debt. Metropolitan, which had actual knowledge of CAG's creditor balances as of March 2023 and participated in structuring the Spin-Off that left CAG unable to service these obligations, deepened its own position at the very time CAG's creditors were suffering the foreseeable consequences of the diversion scheme.

**N.**     **The Ferrum Capital Connection**

108.    The timing of the Spin-Off is significant for an additional reason. Ferrum Capital, LLC, one of CAG's largest secured lenders, was itself the instrumentality of a Ponzi scheme. Ferrum Capital raised approximately $67.7 million from retail investors by issuing unregistered, high-yield promissory notes, many of which were sold to retirees and unsophisticated investors who were told their investments were "guaranteed."

109.    The September 2023 Spin-Off thus occurred at the very moment the Ferrum fraud was coming to light, when the Oliphant Entities received a federal subpoena from a Securities and Exchange Commission investigation into Ferrum, and when creditor claims against CAG were mounting. The timing strongly suggests that the Defendants executed the Spin-Off not as a legitimate business transaction but as an urgent effort to wall off the valuable Oliphant assets from the wave of claims they knew was coming. The defrauded Ferrum investors, many of whom lost their retirement savings, are among the creditors who stand to benefit from recovery in this action.

**O. The Defendants Allowed CAG's UCC-1 Financing Statements to Lapse**

110. CAG held UCC-1 financing statements filed with the Florida Secretary of State naming CAG as the secured party and Oliphant Financial as the debtor. These financing statements secured CAG's interests in portfolios of accounts receivable on the books and records of Oliphant Financial, with face values exceeding $230 million in the aggregate. The portfolios covered by these UCC-1 filings spanned dozens of individual portfolio purchases dating from 2018 through 2021, each identified by portfolio number and face value.

111. Under Article 9 of the Uniform Commercial Code, a UCC-1 financing statement is effective for a period of five years from the date of filing unless a UCC-3 continuation statement is filed within six months before the expiration date. If no continuation statement is timely filed, the financing statement lapses and the secured party's perfected security interest becomes unperfected, losing its priority against other secured creditors.

112. CAG's officers and directors failed to file UCC-3 continuation statements for the UCC-1 financing statements that were approaching expiration. As a result, a significant number of CAG's UCC-1 filings against Oliphant Financial lapsed, causing CAG to lose its perfected security interest in the corresponding Oliphant Financial portfolios.

113. As set forth above, Metropolitan was aware of CAG's UCC-1 filings against Oliphant Financial no later than September 2021, when it commissioned a comprehensive lien search report as part of its LBO due diligence, a report that catalogued the very financing statements that have now lapsed.

114. The lapse of CAG's UCC-1 filings directly benefited Metropolitan. With CAG' security interests unperfected, Metropolitan's first-priority lien on Oliphant Financial's assets became unencumbered by CAG's competing claims. Metropolitan then conducted the

Article 9 Sale of all of Oliphant Financial's assets, free and clear of CAG's now-lapsed interests. In effect, Metropolitan, which knew of CAG's security interests from the outset, stood by as those interests expired and then sold the underlying collateral for its own benefit.

115. The existence of these UCC-1 filings was not properly or timely disclosed to the Trustee. Specifically, the existence of secured claims in favor of CAG was not disclosed in the Debtors' schedules nor mentioned by CAG's representative who testified under oath at CAG's 341 meeting of creditors. Upon information and belief, the Oliphant Financial portfolios securing CAG's **lapsed** UCC-1s were **all sold** by Metropolitan in the Article 9 Sale.

116. The **only** Oliphant Financial portfolios **not sold** by Metropolitan were those identified as collateral in seven UCC-1 financing statements that had **not lapsed** at the time of the Article 9 Sale.[1] Again, according to the records of CAG prepared by the Oliphant Entities, the face values of all transfers from CAG had been paid back at the time of the Article 9 Sale. However, the following facts evidence that CAG was not made whole on its investment in Oliphant Financial:

    a. $3.35 million of the supposed repayments are highly suspect;

---

[1] As to CAG, those UCC-1's include:
    i.    U.C.C. Fin. Statement, Oliphant Financial, LLC to CAG Aset Group, LLC, 202106898064, Florida (Apr. 27, 2021), identifying portfolio number 21009.
    ii.    U.C.C. Fin. Statement, Oliphant Financial, LLC to CAG Aset Group, LLC, 202106970062, Florida (May 4, 2021) , identifying portfolio number 21011.
    iii.    U.C.C. Fin. Statement, Oliphant Financial, LLC to CAG Aset Group, LLC, 202108304182, Florida (Aug. 31, 2021), identifying portfolio number 21013.
    iv.    U.C.C. Fin. Statement, Oliphant Financial, LLC to CAG Aset Group, LLC, 202108305559, Florida (Aug. 31, 2021), identifying portfolio number 21015.
    v.    U.C.C. Fin. Statement, Oliphant Financial, LLC to CAG Aset Group, LLC, 20210830558X, Florida (Aug. 31, 2021), identifying, by reference, portfolio number 21018.
    vi.    U.C.C. Fin. Statement, Oliphant Financial, LLC to CAG Aset Group, LLC, 202108305648, Florida (Aug. 31, 2021), identifying portfolio number 21019.

b.  the amounts supposedly paid back to CAG do not include interest;

c.  the amounts supposedly paid back to CAG do not include any equity payments;

d.  the proper mechanism for cancelling a UCC-1 after a debt has been paid is the filing of a UCC-3 Cancellation Statement.  Although both the Conway Group and Metropolitan are well aware of this practice, no UCC-3s were filed, instead, CAG's UCC-1s were allowed to lapse suggesting these obligation were not satisfied;

e.  If Oliphant's obligations to CAG were truly satisfied, as suggested by the Oliphant Entities' bookkeeping records, it would have been proper for them to file UCC-3 Cancellation Statements. Yet, this was never done. Metropolitan, acutely aware of the details regarding obligations to CAG, instead chose not to include the portfolios with unlapsed CAG UCC-1s in its Article 9 Sale.

117.  Upon learning of the existence and status of the UCC-1 filings, the Trustee acted to preserve the estate's remaining interests by filing UCC-3 continuation statements for those financing statements approaching lapse, including filings that were due to expire on April 27, 2026 and May 4, 2026.

**P.  The Officers' and Directors' Dual Roles and Self-Dealing**

118.  Throughout the relevant period, Conway and the other officers and directors of CAG simultaneously held positions of authority in the Oliphant Entities, creating pervasive conflicts of interest. Conway served as CEO of every entity in the corporate family, signing the key transaction documents on behalf of all of them, while Morris, Pope, Scanlan, Laux, and Swinea held overlapping roles across the enterprise.

119. Conway, Skypeak (managed by Pope), and Morris collectively held approximately 75% of Hollins' equity, placing control of CAG's sole member in the hands of the same individuals who orchestrated the diversion of CAG's assets to the Oliphant Entities.

120. As officers and directors of CAG and Hollins, both Delaware entities, Conway, Laux, Swinea, Scanlan, Morris, and Alfalla owed fiduciary duties of loyalty and care to CAG and Hollins and, at times when the Debtors were insolvent, to their creditors. At all relevant times following December 31, 2021, CAG was insolvent. Despite these duties, the Debtors' officers and directors:

(a) failed to enforce or preserve CAG's equitable ownership interests under the joint venture agreements with Oliphant Financial and AIM, including CAG's perpetual right to net proceeds from portfolios funded with CAG's capital,

(b) permitted Oliphant Financial and AIM to retain portfolios for which CAG paid the entire purchase price without allocating any ownership interest to CAG, and permitted AIM and Oliphant Financial to retain and ultimately transfer those portfolios to Metropolitan's collateral umbrella without compensating CAG for its co-ownership interests;

(c) permitted and facilitated the systematic diversion of portfolio purchasing opportunities from CAG to AIM;

(d) caused CAG to transfer millions of dollars to AIM and other Oliphant Entities without receiving reasonably equivalent value;

(e) failed to collect or enforce CAG's intercompany receivables;

(f) consented to the September 2023 Spin-Off, which isolated CAG from the Oliphant group with its obligations intact while leaving the transferred value within the Oliphant Entities under Metropolitan's collateral umbrella;

(g) executed a comprehensive release of claims against Metropolitan as part of the Spin-Off on behalf of both CAG and Hollins, attempting to extinguish potential causes of action against Metropolitan and belonging to both estates; and

(h) failed to file UCC-3 continuation statements to maintain CAG's perfected security interests in Oliphant Financial portfolios with face values exceeding $230 million.

**Q.      CAG and Hollins' Bankruptcy Filings**

121.    On June 4, 2025, CAG and Hollins each filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (CAG as Case No. 25-10994; Hollins as Case No. 25-10995). The cases were subsequently transferred to this Court. On June 18, 2025, the Debtors filed their original Schedules of Assets and Liabilities. Those original Schedules reported total assets of only $10,648,732.53 for CAG, listed zero dollars in secured claims on Schedule D, and reported "None" for causes of action against third parties, despite the magnitude of CAG's actual creditor obligations and the existence of the claims asserted herein. These schedules were signed by Laux in his purported capacity as "Manager" of CAG and Hollins (Dkt. 19).

122.    On September 16, 2025, the Debtors, again through Laux, filed Amended Schedules of Assets and Liabilities (Dkt. 131). The Amended Schedules dramatically revised CAG's financial picture, reporting total assets of $55,257,708.93, including $42,744,886.69 in intercompany accounts receivable owed to CAG by the Oliphant Entities, and total liabilities of $909,520,353.97, including $909,446,150.40 in secured claims held by

49

Ferrum Capital, LLC ($559,205,793.09), F & K Partners, LLP ($130,659,588.76), Sill & Associates, L.L.C. ($102,707,221.83), Growth Platforms, LLC ($97,047,015.54), and The Heller Group, LLC & Judith Heller ($19,826,531.18). The enormity of this correction, from zero secured claims to over $909 million, underscores the inadequacy of the original filings and the failure of the Debtors' officers and directors to provide accurate disclosures to the Court and creditors.

123. Both the original and Amended Schedules were accompanied by a highly unusual disclaimer providing, in pertinent part, that "the Debtors and their directors, managers, officers, agents, authorized representatives, attorneys and other advisors do not guarantee or warrant the accuracy or completeness of the data that is provided herein, and shall not be liable for any loss or injury arising out of or caused in whole or in part by the acts, errors, or omissions, whether negligent or otherwise, in procuring, compiling, collecting, interpreting, reporting, communicating, or delivering the information contained herein." The disclaimer further states that "[i]n no event shall the Debtors or their directors, managers, officers, agents, authorized representatives, attorneys and financial advisors be liable to any third party for any direct, indirect, incidental, consequential, or special damages (including, but not limited to, damages arising from the disallowance of a potential claim against the Debtors or damages to business reputation, lost business, or lost profits), whether foreseeable or not and **however caused**" (emphasis added). This sweeping exculpatory language, embedded in sworn bankruptcy filings, is remarkable in its scope: it purports to immunize the very officers and directors whose breaches of fiduciary duty caused the losses that the Schedules were intended to disclose, and it was drafted and inserted by the same individuals who had systematically stripped CAG of its

50

assets for the benefit of the Oliphant Entities. Laux did not come up with that disclaimer on his own; it was part and parcel of the Defendants' scheme to extract value (including causes of action) from CAG and its creditors while leaving it penniless.

124. The Schedules further state that they "contain[ed] unaudited information that is subject to further review and potential adjustment" and expressly state that they "do not purport to represent financial statements prepared in accordance with Generally Accepted Accounting Principles." The Schedules also disclaim that the showing of more liabilities than assets constituted "an admission that the Debtor was insolvent at the Petition Date or any time before the Petition Date." With respect to valuation, the Schedules state that "[i]t would be prohibitively expensive, unduly burdensome and an inefficient use of estate assets for the Debtors to obtain current market valuations for all of their assets" and that asset values "reflect net book values as of December 31, 2023." The Amended Schedules further concede, with respect to the $42,744,886.69 intercompany receivable balance, that it "represents the intercompany balances as of December 31, 2023, and adjustments that the prior accounting team recorded through the period, which is not the full population of the entries or collections," and that "[t]he value is stale and would require the use of an expert to determine an appropriate value." This admission that CAG's own books do not reflect the full scope of intercompany transactions is consistent with the Trustee's position that the amounts owed to CAG by the Oliphant Entities may exceed the amounts preliminarily identified through the Trustee's forensic analysis.

125. The Schedules also state that "[d]espite their reasonable efforts to identify all known assets, the Debtors may not have listed all of their causes of action or potential causes of action against third parties as assets in the Schedules and Statements, including, without

limitation, causes of action arising under the provisions of chapter 5 of the Bankruptcy Code and any other relevant non-bankruptcy laws to recover assets or avoid transfers." The Debtors thus acknowledged that causes of action existed or may exist but declined to identify them, while simultaneously including blanket disclaimers shielding the officers and directors responsible for creating those causes of action in the first place. This omission deprived the Trustee and creditors of information material to the administration of the estate and further evidences the officers' and directors' efforts to conceal their misconduct.

126. Critically, the Schedules reveal that the individuals upon whom Laux ostensibly relied in preparing and signing the Schedules were not employed by the Debtors or their owners but "are either employed or retained by Oliphant USA, LLC and/or Oliphant USA, Inc.," *i.e.* the very entities that aided and abetted the breaches of fiduciary duty at issue.

127. Ron Satija was appointed as the Chapter 7 Trustee for both CAG and Hollins on August 1, 2025. The Trustee was thereafter duly qualified and has since been acting in that capacity in both cases. Among the Trustee's principal duties is the collection, preservation, and administration of all property of the estate pursuant to 11 U.S.C. §§ 704 and 541.

**R.     Metropolitan's Article 9 Sale**

128. On or about March 20, 2026, Metropolitan issued a Notice of Agent's Private Disposition of Collateral, noticing a private sale under UCC Article 9 of all right, title, and interest in all the assets of AIM and all but the aforementioned seven portfolios owned by Oliphant Financial. The sale closed on May 1, 2026, at a gross purchase price of $59,250,000, subject to a downward adjustment for estimated net collections received between November 4, 2025 and the closing date.

129. The assets sold by Metropolitan thus necessarily include debt portfolios that were purchased with funds transferred from CAG, portfolios in which CAG retained perpetual equity interests under the joint venture agreements with Oliphant Financial and AIM, and portfolios that constituted corporate opportunities diverted from CAG. Metropolitan had actual knowledge of CAG's joint venture interests, communicated directly by CAG's COO, Michael Crossan, to Metropolitan's representatives JD Sheldon and Miles Peet, and was informed that CAG "owned the right to them in perpetuity."

**S.     Metropolitan's Strategic Post-Petition Conduct**

130. Metropolitan's post-petition conduct further evidences its control and its adverse posture to CAG and its creditors, now represented by the Trustee. Metropolitan's control over the Oliphant bank accounts prevented the Oliphant Entities from wiring Q4 2025 funds to the Trustee. On March 11, 2026, Metropolitan's counsel wrote to the Trustee's general counsel asserting that "Metropolitan controls the Oliphant accounts that contain Oliphant's collections in connection with Ferrum and Growth, among other lenders. Metropolitan asserts that it has a right to withhold funds from these accounts as a setoff against monies owed to Metropolitan in connection with its pending claims against Oliphant, Ferrum, and Growth." Eventually, the Q4 2025 funds were released to the Trustee.

131. On February 6, 2026, Metropolitan filed a strategic lawsuit in the Supreme Court of the State of New York, County of New York, against Oliphant USA, Ferrum Capital, and Growth (the "Metropolitan New York Action"). In that complaint, Metropolitan alleges that Oliphant wrongfully provided funds constituting Metropolitan's collateral to Ferrum and Growth in breach of certain Lender Acknowledgement Agreements, and that Ferrum and Growth failed to return those funds.

**T.** **The Trustee's Substitution & Metropolitan's Motion to Dismiss**

132. The underlying adversary proceeding in this case originated as a state court action (*Judy Musgrove et al. v. Brooklynn Chandler Willy et al.*, Case No. 2023-CI-22575, 438th Judicial District Court, Bexar County, Texas) in which John Patrick Lowe was appointed Receiver for the assets and affairs of Ferrum Capital LLC and Ferrum IV LLC (lenders to CAG) on January 5, 2024. The Oliphant Entities subsequently removed the action to this Court, where it is pending as Adversary Proceeding No. 25-05047.

133. On March 26, 2026, the Receiver filed his Second Amended Complaint asserting nine claims against CAG, the Oliphant Parties, and Metropolitan. The Receiver's complaint alleges that CAG's assets were systematically stripped and diverted to AIM and the Oliphant Parties, and that Metropolitan knowingly participated in that course of conduct. In particular, the Receiver alleges that, by September 2023, the Metropolitan entities recognized that CAG, having been drained of its liquidity, "was a material risk to all of them;" that Metropolitan consented to the spin-off and "released its rights and claims against its former obligor, CAG, in return for no payment from CAG;" that Metropolitan "remained keenly interested and involved in the affairs of the Oliphant Parties and with a step of removal, the affairs of CAG, after the 'spin off;'" and that CAG and the Oliphant Parties "permitted or caused proceeds of loans by Ferrum Capital to CAG or accounts CAG pledged as collateral to Ferrum Capital to be used to purchase accounts in the name of AIM and then pledged or paid to Metropolitan Partners, contrary to the rights and security interest of Ferrum Capital."

54

134. The Trustee has since substituted in as Plaintiff, replacing the Receiver and the Ferrum Investor Plaintiffs, with respect to certain causes of action, including those asserted by the Receiver against Metropolitan.

135. On May 25, 2026, Metropolitan filed a Motion to Dismiss Count Nine of the Second Amended Complaint and Motion to Abstain [Dkt. No. 188], arguing that (i) the Court lacked subject-matter jurisdiction over Count Nine under Federal Rule of Civil Procedure 12(b)(1) because the Receiver allegedly lacked Article III standing to assert the claim at the time of filing, (ii) mandatory abstention was required under 28 U.S.C. § 1334(c)(2) in favor of Metropolitan's previously filed New York action, and (iii) the Court should dismiss for forum non conveniens based on the forum selection clause in the Ferrum Acknowledgement Agreement. Metropolitan's Motion to Dismiss is directed solely at Count Nine of the Receiver's Second Amended Complaint, which will be superseded by the filing of this Complaint, and therefore moot.

### CLAIMS FOR RELIEF

### COUNT I
**Breach of Fiduciary Duties of Loyalty, Good Faith, and Care**
*(Against Defendants Conway, Scanlan, Morris, Swinea, and Laux)*

136. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

137. At all relevant times, Defendants Colin Conway, David Scanlan, Robert Morris, Nick Swinea, and Daniel Laux (collectively, the "CAG Officers") served as directors, officers, managers, and/or fiduciaries of CAG and/or Hollins Holdings. By virtue of their positions and roles, each of the CAG Officers owed fiduciary duties of care, loyalty, and good faith to CAG and Hollins.

138. CAG was balance-sheet insolvent from at least December 31, 2021, forward. As of that date, CAG's equity deficit was approximately $9.4 million. By December 31, 2022, the deficit had grown to approximately $17 million; by December 31, 2023, it had reached approximately $29.9 million; and by December 31, 2024, approximately $30.9 million. At the time of the Spin-Off in September 2023, CAG carried creditor obligations of approximately $80 million or more. Eventually, secured claims alone exceeded $909 million. Because CAG was insolvent at all relevant times, the CAG Officers' fiduciary duties ran not only to the entities themselves but also to the creditors of CAG and Hollins.

## A. Defendant Colin Conway

139. Defendant Colin Conway simultaneously served as Chief Executive Officer of CAG, Hollins Holdings, Oliphant Inc., Oliphant United Inc., AIM, Oliphant USA LLC, and Oliphant Financial LLC simultaneously. Conway held 26.84% of Hollins equity through his ownership of ICAG. Conway was the dominant and controlling officer of each entity within the Oliphant enterprise.

140. Conway breached his fiduciary duties of loyalty, care, and good faith to CAG and Hollins in the following particularized respects:

141. *LBO Day Intent to Strip CAG.* On October 13, 2021—the very day of the leveraged buyout—Conway sent a text message to Scanlan stating: "I want to see if we can spin off CAG" and "Instead of just folding the collection business let's spin it off." This contemporaneous communication demonstrates that Conway formed the intent to dispose of CAG from the inception of the LBO, confirming that the subsequent asset stripping was a preconceived scheme rather than a series of independent business decisions.

56

142. *Joint Venture and Evine Portfolio Misappropriation.* Conway failed to honor CAG joint venture agreements and failed to transmit to CAG monies owed on AIM and Oliphant Financial portfolios purchased exclusively and partially with CAG funds. Conway also permitted $3.85 million in net receivables owed by Oliphant Financial to CAG to be offset through suspicious journal entries rather than collected.

143. *Diversion of Portfolio Opportunities.* Conway knowingly diverted corporate opportunities from CAG to AIM for the benefit of the Oliphant Entities and their owners and Metropolitan.

144. *Gratuitous Cash Transfers.* As set forth above, Conway authorized or caused the following transfers of CAG's cash to affiliated entities without reasonably equivalent value, at a time when CAG was deeply insolvent: (a) $5,000,000 to AIM in March 2022; (b) $1,000,000 to AIM in February 2023; (c) $700,000 to AIM in March 2023; (d) $4,500,000 to Oliphant United in March 2022; (e) $1,355,000 to Oliphant USA; and (f) $61,389.72 to Oliphant Financial.

145. *Allowance of CAG's UCC-1s Against Oliphant Financial to Lapse.* Conway, as CEO of CAG, failed to cause the filing of continuation statements necessary to maintain CAG's perfected security interests, evidenced by UCC-1 financing statements, against Oliphant Financial. These security interests secured portfolios with an aggregate face value exceeding $230 million. The lapse of CAG's perfected security interests directly and foreseeably benefited Oliphant, its owners, and Metropolitan, which subsequently conducted an Article 9 sale of all of Oliphant Financials assets less the six portfolios discussed previously. Conway's failure to maintain these filings was not a mere oversight

but a conscious disregard of a known obligation, consistent with his broader scheme to strip CAG of its assets to the detriment of CAG's creditors.

146. *The Spin-Off.* In September 2023, Conway executed the Distribution Agreement and related documents that severed CAG and Hollins from the Oliphant group while leaving CAG burdened with approximately $80 million in creditor obligations. As part of the Spin-Off, Conway caused CAG and Hollins to execute a comprehensive release of claims against Metropolitan and other parties, to "adjust" rather than collect intercompany receivables owed to CAG, and to accept responsibility for all pre-existing liabilities.

147. *Prioritization of Insiders Interests Over the Interests of CAG and its Creditors.* In a March 24, 2023, email to JD Sheldon of Metropolitan, Conway admitted that "cash generated at Collins Asset Group subsidiary has been lent to other subsidiaries" and that "cash was used from Collins Asset Group to buy assets in other subsidiaries." Conway further asked Metropolitan to evaluate "in the event that Collins Asset Group becomes insolvent and goes into receivership, how would this affect Metropolitan's overall position as the senior lender in AIM, Oliphant, Inc, and Oliphant Financial, LLC." This email demonstrates Conway's actual knowledge that CAG's assets were being siphoned to benefit other entities, his actual knowledge that CAG faced insolvency as a direct consequence, and his prioritization of Metropolitan's interests over CAG's creditors.

**B. Defendant David Scanlan**

148. Defendant David Scanlan served as Senior Manager of CAG, while, upon information and belief, simultaneously serving as an officer of one, more, or all of the Oliphant Entities. In his capacity as a CAG officer, Scanlan owed fiduciary duties of loyalty, care, and good

faith to CAG and its creditors and actively participated in, or failed to stop or object, to the same wrongful acts as Conway.

### C. Defendant Robert Morris

149. Defendant Robert Morris also served as Senior Manager of CAG. In his capacity as a CAG officer, Morris owed fiduciary duties of loyalty, care, and good faith to CAG and its creditors and actively participated in, or failed to stop or object, to the same wrongful acts as Conway.

### D. Defendant Nick Swinea

150. Defendant Nick Swinea served as Chief Investment Officer of CAG. In his capacity as a CAG officer, Swinea owed fiduciary duties of loyalty, care, and good faith to CAG and its creditors and actively participated in, or failed to stop or object, to the same wrongful acts as Conway.

151. Additionally, in July 2023, at the specific direction of JD Sheldon of Metropolitan, Swinea executed a portfolio reassignment that designated 15 legacy portfolios as "encumbered by MET 100%." By executing this reassignment at the direction of a creditor (Metropolitan) and adverse to the interests of CAG and its other creditors, Swinea subordinated CAG's interests to those of Metropolitan. Swinea participated in or acquiesced to the diversion of portfolio opportunities from CAG to AIM in his capacity as CIO (the officer directly responsible for investment decisions) and failed to take any action to protect CAG's corporate opportunities despite his direct knowledge of the redirection of portfolios away from CAG.

### E. Defendant Daniel Laux

152. Daniel Laux previously served as Debt Settlement Manager, Reporting & Analytics Manager, and Legal Outsourcing Manager. Laux was subsequently promoted to "Manager" and designated the "sole manager" of CAG and "authorized representative" of Hollins. Laux signed CAG's bankruptcy schedules, albeit with disclaimers. In these roles, Laux owed fiduciary duties of loyalty, care, and good faith to CAG and its creditors.

153. Laux breached his fiduciary duties in the following particularized respects: As sole manager of CAG, Laux was responsible for CAG's governance, oversight, and protection of its assets. Laux abdicated his managerial functions by permitting CAG's books and records to be maintained exclusively by Oliphant USA employees (not CAG employees) even after the Spin-Off. Laux failed to maintain, oversee, or protect CAG's assets, permitted the continued siphoning of value to affiliated entities, failed to pursue intercompany receivables, and failed to ensure that CAG's UCC-1 filings were maintained. Laux's signing of bankruptcy schedules with disclaimers further evidences his abdication of the basic managerial oversight required of a sole manager, constituting a conscious disregard of his responsibilities. Laux's signing of the bankruptcy schedules also evidences a further act in the scheme to strip CAG of its assets and protect insiders from liability for doing so.

### H. Inapplicability of the Business Judgment Rule

154. The business judgment rule does not shield the CAG Officers from liability for the conduct alleged herein. The business judgment rule has no application where, as here, the CAG Officers: (a) were interested and conflicted, as each CAG Officer held positions or equity in both CAG and the entities to which CAG's assets were diverted; (b) derived direct

personal financial benefit from the self-dealing transactions through their equity or employment interests in the Oliphant Entities; and (c) acted in bad faith, as demonstrated by their intentional dereliction of duty and conscious disregard of their responsibilities to CAG and its creditors, including their knowing participation in the scheme to strip CAG of its assets while it was insolvent with creditor obligations of $80 million or more.

155. Furthermore, to the extent any Director and Officer Defendant invokes the exculpation or indemnification provisions of CAG's Second Amended and Restated Operating Agreement dated September 1, 2023 (the "Operating Agreement"), including Sections 4.02, 7.07, and 10.01, or the contractual freedom afforded by 6 Del. C. § 18-1101, such provisions do not protect the Director and Officer Defendants from liability for the conduct alleged herein. Section 10.01(b) of the Operating Agreement expressly excludes from indemnification any Loss arising from: (a) conduct involving bad faith, willful or intentional misconduct, or a knowing violation of law; (b) a transaction from which the Covered Person derived an improper personal benefit; (c) a circumstance under which the liability provisions for improper distributions under the DLLCA are applicable; or (d) a breach of such Covered Person's duties or obligations under the DLLCA. The conduct alleged herein, including the preconceived scheme to strip CAG of its assets, the self-dealing transactions from which the Director and Officer Defendants derived direct personal financial benefits (including Conway's receipt of 4,000,000 Hollins shares and the collective approximately 75% equity stake), the knowing diversion of corporate opportunities, the gratuitous transfers while CAG was deeply insolvent, and the conscious disregard of fiduciary duties owed to CAG's creditors, falls squarely within each of these carve-outs. The Director and Officer Defendants acted with willful and intentional

61

misconduct and in bad faith; they derived improper personal benefits from the transactions; and their conduct constitutes a breach of duties owed under the DLLCA, including the duty of loyalty, the duty of care, and the implied contractual covenant of good faith and fair dealing that cannot be eliminated under 6 Del. C. § 18-1101(e). Accordingly, the Operating Agreement's exculpation and indemnification provisions are inapplicable to the Director and Officer Defendants' liability for the conduct alleged herein.

156. As a direct and proximate result of the CAG Officers' breaches of fiduciary duty, CAG and Hollins, and their creditors, have suffered damages in an amount to be proven at trial, but not less than the aggregate value of the joint venture interests misappropriated, assets diverted, the transfers made without reasonably equivalent value, the portfolio opportunities lost, the security interests forfeited, and the value extracted through the Spin-Off, together with all consequential damages flowing therefrom.

## COUNT II
### Aiding and Abetting Breach of Fiduciary Duty

157. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

158. As alleged above, the CAG Officers owed fiduciary duties of loyalty, care, and good faith to CAG, Hollins, and their creditors, and breached those duties through the specific acts of self-dealing, asset diversion, gratuitous transfers, and corporate opportunity usurpation described in Count I.

*(Against the Oliphant Entities)*

159. The Oliphant Entities had actual knowledge of the fiduciary relationship between the CAG Officers and CAG because the Oliphant Entities shared common management with CAG (Colin Conway served simultaneously as CEO of each Oliphant Entity and of CAG) and

62

were integral parts of the same enterprise through which the CAG Officers exercised control over CAG's assets.

160. The Oliphant Entities' participation in the breaches was knowing and substantial. Each Entity received direct or indirect financial benefits from the breaches; each was controlled by the same fiduciaries who owed duties to CAG; each had actual knowledge of CAG's insolvency and the self-dealing nature of the transactions. The Oliphant Entities did not merely receive the proceeds of breaches, they were the instrumentalities through which the breaches were carried out.

161. Additionally, *AIM* knowingly (1) received the diverted portfolio opportunities that had previously been CAG's exclusive business, (2) failed to honor its joint venture agreement with CAG, and (3) siphoned additional money from CAG after the LBO.

162. Additionally, *Oliphant Financial LLC* knowingly received and retained the benefit of CAG's funded portfolio purchases, including at least twelve Evine Portfolios (approximately $206,560 cost, approximately $4.43 million face value) that CAG funded 100% but that were recorded as owned by Oliphant Financial. Oliphant Financial also received the benefit of at least nine LendingClub portfolios funded by CAG totaling $23,037,271.12 between June 2018 and January 2019. Oliphant Financial owed CAG $3.5 million in net receivables that were eliminated through suspicious journal entries rather than paid. As a co-venturer with CAG, Oliphant Financial knew of CAG's perpetual equity interest in jointly held portfolios and knowingly participated in arrangements that deprived CAG of these interests.

163. Additionally, *Oliphant USA LLC* served as CAG's servicer and collected money on CAG's behalf but failed to remit to CAG. By retaining collections belonging to an insolvent debtor,

63

Oliphant USA knowingly participated in the diversion of CAG's assets. Oliphant USA also received between $1,355,000 and $3,400,000 in gratuitous transfers from CAG.

164. Additionally, *Oliphant United Inc.* knowingly received $4,500,000 from CAG in March 2022 without providing reasonably equivalent value, at a time when CAG was deeply insolvent. Oliphant United knew that CAG was insolvent and that this transfer depleted an estate already burdened with approximately $80 million in creditor obligations.

165. Additionally, *Oliphant Inc., Chesa Holdings LLC, and AUSSRQ Holdings LLC* participated in the Oliphant enterprise structure through which CAG's assets were siphoned. These entities served as conduits and beneficiaries of the scheme to strip CAG of its assets, received the indirect benefit of CAG's diverted funds and opportunities, and, by virtue of shared management and common control, had actual knowledge that the transactions they facilitated constituted breaches of the Director and Officer Defendants' fiduciary duties to CAG.

166. As a direct and proximate result of the Oliphant Entities' knowing participation in and substantial assistance to the Director and Officer Defendants' breaches of fiduciary duty, CAG and Hollins have suffered damages in an amount to be proven at trial, including but not limited to the value of diverted portfolios, gratuitous transfers, retained collections, joint venture interests, and all consequential damages flowing therefrom.

*(Against the Metropolitan Entities)*

167. The Metropolitan Entities had actual knowledge of the fiduciary duties owed by CAG's Officers and substantively assisted in the breaches. Metropolitan's knowledge and/or substantial assistance is established by the following specific facts:

64

168. *Due Diligence and Monthly Monitoring.* Metropolitan well knew the details of CAG's financial relationships to the other Oliphant Entities both before and after the LBO as was paid $700,000 for conducting its pre-LBO due diligence on the Oliphant Entities (including CAG) as well as an ongoing $25,000 monthly monitoring fee which Metropolitan made Oliphant concede was "earned when paid."

169. *September 2021 Lien Search.* In September 2021, Metropolitan conducted a lien search that identified CAG's UCC-1 financing statements against Oliphant Financial. Metropolitan thus had actual knowledge that CAG held perfected security interests in Oliphant Financial's assets; assets that Metropolitan would later sell through an Article 9 sale after all but a handful of CAG's UCC-1 filings had lapsed.

170. *Board Observation Rights.* Under Section 5.14 of the credit facility, Metropolitan held Board Observation Rights entitling it to attend all board meetings, receive all financial reports, and participate in management discussions. Through these rights, Metropolitan had direct, ongoing access to information concerning CAG's financial condition, the intercompany transfers, and the Director and Officer Defendants' management of CAG's assets.

171. *Metropolitan's Advice is Solicited as to Whether to Protect CAG's Creditors.* On March 24, 2023, Conway sent an email directly to JD Sheldon of Metropolitan in which Conway admitted that "cash generated at Collins Asset Group subsidiary has been lent to other subsidiaries" and that "cash was used from Collins Asset Group to buy assets in other subsidiaries." Conway asked Sheldon to evaluate Metropolitan's position "in the event that Collins Asset Group becomes insolvent and goes into receivership." This email, sent to and received by Metropolitan's Principal, constitutes direct evidence that Metropolitan knew

65

CAG's funds were being diverted to other entities and that CAG faced insolvency as a result, was asked for its position and apparently (as will be seen) elected to structure a transaction separating CAG from its obligors.

172. *April 2023 Creditor Balances.* In April 2023, Metropolitan received CAG's full creditor balance schedule showing approximately $79.5 million in creditor obligations. Metropolitan thus had actual knowledge of CAG's significant insolvency at the time it participated in shaping the Spin-Off transaction.

173. *Direct Communications Regarding CAG's Equity Interests.* Former CAG executive, Mike Crossan, directly informed JD Sheldon and Miles Peet of Metropolitan about CAG's perpetual equity interests in jointly held portfolios. According to Crossan's testimony, Sheldon and Peet "understood" these interests. Metropolitan thus had actual knowledge of the specific assets and rights belonging to CAG that were being diverted.

174. *Shaping the Spin-Off.* Metropolitan actively shaped the September 2023 Spin-Off through successive redlines of the transaction documents. Metropolitan's former COO, Miles Peet, signed the Consent and Waiver Agreement on September 19, 2023. Through the Spin-Off, Metropolitan extracted a comprehensive release from CAG and Hollins of all claims against Metropolitan and other parties, required that intercompany receivables owed to CAG be "adjusted" (i.e., written off) rather than collected, and ensured that CAG was severed from the Oliphant group burdened with approximately $80 million in creditor obligations while the valuable assets remained with conflicted entities who had pledged them to Metropolitan as their "borrowing base."

175. *Portfolio Reassignment.* In July 2023, JD Sheldon of Metropolitan appears to have directed Nick Swinea (CAG's CIO) to reassign 15 legacy portfolios (funded, at least in part, by

CAG) as "encumbered by MET 100%." By directing a CAG officer to take action adverse to CAG's interests and favorable to Metropolitan's own collateral position, this is yet another instance of Metropolitan crossing the line from passive lender to active participant in the CAG Officers' breaches of fiduciary duty.

176. *Post-Spin-Off Conduct.* On October 5, 2023 (just two weeks after the Spin-Off) Sheldon followed up regarding the intercompany receivables, ensuring that CAG did not attempt to collect amounts owed to it by Oliphant entities. In January 2024, Sheldon made a dismissive reference asking how CAG's "small lenders" were doing when he was well aware that their interests were harmed by the Spin-Off.

177. *Economic Incentives in AIM and Oliphant Financial's Portfolios.* Metropolitan's economic incentives were aligned with the scheme to strip CAG's assets. Metropolitan held a 10% equity warrant in AIM with a $5 million exercise price and a 9.5% "success fee" on all residual portfolio proceeds after all other claims against the proceeds were satisfied. Metropolitan's financial interests were directly served by the diversion of CAG's assets to AIM and Oliphant Financial.

178. *Article 9 Sale.* On May 1, 2026, Metropolitan conducted an Article 9 sale of substantially all AIM assets and most Oliphant Financial assets for a gross price of $59.25 million. These assets necessarily included portfolios purchased with CAG's funds and constituting CAG's diverted corporate opportunities. Metropolitan's September 2021 lien search gave it actual knowledge of CAG's UCC-1 filings; it knew those filings had lapsed; and it conducted the Article 9 sale free and clear of interests it knew had once belonged to CAG, and would, but for the CAG Officers' breaches of fiduciary duties, still belong to CAG.

67

179. Metropolitan's conduct went far beyond ordinary lending activity. Metropolitan attempted to create and exploit conflicts of interest. Metropolitan conspired and agreed with the CAG and Oliphant Officers to the breaches described herein, as evidenced by its active shaping of the Spin-Off, its implicit direction of CAG/Oliphant's officers to act against CAG's interests, and its extraction of releases and concessions that benefited Metropolitan at the direct expense of CAG's creditors.

180. As a direct and proximate result of Metropolitan's knowing participation in and substantial assistance to the Director and Officer Defendants' breaches of fiduciary duty, CAG and Hollins have suffered damages in an amount to be proven at trial, including but not limited to: the value of assets sold in the Article 9 sale that rightfully belonged to CAG; the value of diverted opportunities that rightfully belonged to CAG; and the value of the releases extracted, the intercompany receivables written off, and all consequential damages flowing therefrom.

### COUNT III
### Civil Conspiracy
*(Against Conway, Scanlan, Morris, Swinea, Laux,*
*the Oliphant Entities, and the Metropolitan Entities)*

181. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

182. Under Texas law, a civil conspiracy exists where there is (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful overt acts, and (5) damages as the proximate result.

183. *Combination.* The CAG Officers, the Oliphant Entities, and the Metropolitan Entities constituted a combination of two or more persons who acted in concert to accomplish an unlawful objective.

184. *Object.* The object of the conspiracy was (1) to strip CAG of its assets (including cash, portfolio opportunities, joint venture interests, security interests, and intercompany receivables) for the benefit of the Oliphant Entities and Metropolitan, while leaving CAG insolvent and burdened with approximately $80 million or more in creditor obligations, and ultimately (2) to sever CAG from the enterprise through the Spin-Off in a manner that attempted to insulate the remaining entities and Metropolitan from liability to CAG's creditors.

185. *Meeting of the Minds.* A meeting of the minds among the conspirators is established by the following conduct and communications:

  (a) Conway's October 13, 2021, text message to Scanlan on the day of the LBO: "I want to see if we can spin off CAG." This message demonstrates that Conway and Scanlan formed a mutual understanding of the scheme's objective from the inception of the LBO.

  (b) Conway's March 24, 2023, email to JD Sheldon of Metropolitan, which admitted asset diversions and asked Metropolitan to evaluate its position in the event of CAG's insolvency, demonstrates a meeting of the minds between Conway and Metropolitan regarding the scheme to protect Metropolitan's interests at CAG's expense.

  (c) Metropolitan's successive redlines of the Spin-Off documents, culminating in the Distribution Agreement signed September 21, 2023, and the Consent and Waiver

69

Agreement signed September 19, 2023, by Miles Peet, demonstrate coordinated action between Metropolitan, the CAG Officers, and the Oliphant Entities to accomplish the conspiracy's objective.

(d)     Sheldon's July 2023 direction to Swinea to reassign 15 legacy portfolios as "encumbered by MET 100%" demonstrates Metropolitan's direct coordination with CAG's officers in furtherance of the conspiracy.

(e)     Sheldon's October 5, 2023, follow-up regarding intercompany receivables and his January 2024 post-Spin-Off tongue-in-cheek check-in for dismissal of CAG's "small lenders" demonstrate the continuing coordination between Metropolitan and the CAG Officers and the Oliphant Entities after the Spin-Off.

(f)     The pattern of gratuitous transfers from CAG to the Oliphant Entities ($6.7M to AIM, $4.5M to Oliphant United, and transfers to Oliphant USA and Oliphant Financial) and the immediate use of those funds to pay Metropolitan (*e.g.* AIM paying $8M+ to Metropolitan within days of receiving CAG's $5M wire) demonstrates coordinated conduct in furtherance of the conspiracy's objectives.

186.     *Unlawful Overt Acts.* In furtherance of the conspiracy, the co-conspirators committed the following unlawful overt acts: (a) misappropriation of CAG's joint venture interests; (b) diversion of portfolio opportunities from CAG to AIM; (c) gratuitous cash transfers totaling millions of dollars from an insolvent entity to affiliated entities; (d) failure to maintain UCC-1 filings securing portfolios with $230M+ face value; (e) execution of the Spin-Off, including the extraction of releases, the write-off of intercompany receivables, and the severing of CAG with $80M+ in liabilities; (f) reassignment of legacy portfolios funded by CAG to Metropolitan 100%; (g) retention of $8,529,384 in collections belonging

to CAG by Oliphant USA; (h) the recording of Evine Portfolios funded by CAG as owned by Oliphant Financial and AIM; and (i) the September 2024 amendment deepening Metropolitan's extraction from the Oliphant enterprise.

187. *Specific Intent.* Each conspirator acted with specific intent to further the conspiracy's objectives. The Director and Officer Defendants' specific intent is demonstrated by Conway's day-of-LBO text expressing the scheme from inception, his March 2023 email admitting the diversions, and the systematic pattern of self-dealing. Metropolitan's specific intent is demonstrated by its active shaping of the Spin-Off, its direction of CAG's officers, its extraction of releases, and its economic incentives (including equity warrants, success fees, and monitoring fees) that were directly served by the conspiracy's success.

188. *Damages.* As a direct and proximate result of the conspiracy, CAG and Hollins, and their creditors, have suffered damages in an amount to be proven at trial, including but not limited to: the value of diverted portfolio opportunities; gratuitous cash transfers; misrepresented joint venture interests; retained collections; forfeited security interests; Evine Portfolio interests; and the full value of any assets sold in the Article 9 sale that rightfully belonged to or were encumbered by CAG.

## COUNT IV
### Constructive Trust
*(Against AIM, Oliphant Financial, and the Metropolitan Entities)*

189. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

190. Under Texas law, a constructive trust is an equitable remedy imposed to prevent unjust enrichment resulting from an unconscionable act. A constructive trust arises at the moment of the wrongful act; the court's decree is declaratory, not constitutive. Three elements must

71

be established: (1) breach of a fiduciary relationship or actual fraud; (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res.

191. *Breach of Fiduciary Relationship.* As alleged in Counts I through IV, the Director and Officer Defendants breached their fiduciary duties to CAG and Hollins through acts including but not limited to the systematic diversion of assets, misappropriation of joint venture interests, gratuitous transfers, and the Spin-Off transaction. The Oliphant Entities and Metropolitan knowingly participated in these breaches, including the concealment of CAG's assets through misrecording of ownership, the elimination of receivables through suspicious journal entries, and the extraction of releases through the fraudulent Spin-Off.

192. Additionally, under the Texas corporate opportunity doctrine, an officer who diverts a business opportunity in the corporation's line of business is chargeable as a constructive trustee of the property acquired. CAG's exclusive portfolio purchasing business was its primary line of business. The portfolios diverted to AIM and Oliphant Financial constituted corporate opportunities belonging to CAG. The constructive trust arose at the moment each opportunity was diverted (beginning no later than July 2021) and attaches to all property acquired directly or indirectly with the diverted assets, including the Article 9 sale proceeds.

193. *Unjust Enrichment.* Each of the following defendants was unjustly enriched at CAG's expense:

(a) *AIM* was unjustly enriched by initially receiving: joint venture interests based on (i) CAG having funded between $13.7 million to $20.7 million in portfolios purchased in AIM's name and in which it had an equity interest and (ii) at least four Evine Portfolios (approximately $63,795 cost, approximately $1.29 million face

72

value) that CAG funded in full; $5,000,000 (March 2022), $1,000,000 (February 2023), and $700,000 (March 2023) in gratuitous transfers; diverted LendingPoint portfolio opportunities with $14.9 million in face value; and AIM's assets, which necessarily include all of the foregoing, were sold in the May 1, 2026, Article 9 sale.

(b)     *Oliphant Financial LLC* was unjustly enriched by receiving: at least twelve Evine Portfolios (approximately $206,560 cost, approximately $4.43 million face value) that CAG funded in full; nine portfolios funded by CAG totaling $23,037,271.12; and $3.35 million in net receivables eliminated through suspicious journal entries. The security interests that CAG held against Oliphant Financial (UCC-1 filings securing portfolios with $230M+ face value) lapsed due to the CAG Officers' breaches, aided and abetted by the Oliphant Entities and the Metropolitan Entities further enriching Oliphant Financial (initially) at CAG's expense.

(c)     *The Oliphant Entities* were unjustly enriched in whole or in part as a conduit of CAG's assets that were transferred to AIM and Oliphant Financial.

(d)     *The Metropolitan Entities* were unjustly enriched as the ultimate beneficiary of the scheme. Metropolitan received over $8 million from AIM within days of AIM's receipt of CAG's $5 million wire on a pre-LBO loan for which CAG was not liable. Metropolitan conducted the Article 9 sale on May 1, 2026, realizing $59.25 million from the sale of assets that necessarily included portfolios purchased with CAG's funds, portfolios constituting CAG's diverted corporate opportunities, and assets that had been subject to CAG's lapsed UCC-1 filings. Metropolitan extracted a comprehensive release from CAG through the Spin-Off, deepened its economic

73

position through the September 2024 amendment, and collected ongoing fees (monitoring fees, servicing fees, success fees, prepayment premiums) derived from the operation of assets rightfully belonging to CAG.

194. *Identifiable Res and Tracing.* The Trustee should be able to trace CAG's property to identifiable assets once all relevant information is obtained, but, to date, both Metropolitan and the Oliphant Entities have failed and/or refused to provide the Trustee with a list of all portfolios sold in the Article 9 Sale. This information should be readily available to both the Oliphant Entities and the Metropolitan Entities but astoundingly still has not been produced to the Trustee.

195. The Trustee respectfully requests that this Court impose a constructive trust over: the Article 9 Sale Proceeds in an amount no less than $31 million dollars representing all portfolio sale proceeds traceable to CAG's diverted assets as set forth herein.

## COUNT V
## Accounting and Adverse Presumption
*(Against the CAG Officers, the Oliphant Entities, and the Metropolitan Entities)*

196. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

197. CAG's books and records were maintained at all relevant times (including after the Spin-Off) exclusively by employees of Oliphant USA, not by CAG's own employees. The CAG Officers, the Oliphant Entities, and the Metropolitan Entities collectively controlled all records, financial data, and documentation relevant to CAG's assets, liabilities, and the intercompany transactions described herein.

198. The Trustee requires an accounting of: (a) all portfolios acquired by the Oliphant Entities between June 2017 and Current with portfolio # or package ID, face value, acquisition cost,

acquisition date, seller, source of funds (bank account and account number and account holder); (b) all portfolio purchases made with CAG's funds, whether recorded in CAG's name or not; (c) all collections received by Oliphant USA on CAG funded portfolios, including but not limited to the $53,028,288 in total net proceeds collected through April 2025 and the allocation of $33,919,971 to CAG; (d) all profit-sharing payments by AIM, Oliphant Financial, or the other Oliphant Entities to CAG associated with CAG funds used to acquire AIM and Oliphant Financial portfolios; (e) all interest payments by AIM, Oliphant Financial, or the other Oliphant Entities to CAG associated with CAG funds used to acquire AIM and Oliphant Financial portfolios; (f) all joint venture distributions, proceeds, and interests owed by AIM and Oliphant Financial; (g) all intercompany transfers, loans, and journal entries affecting CAG's balance sheet; (h) all portfolios sold at the Article 9 sale of AIM and Oliphant Financial with portfolio # or package ID, face value, acquisition cost, acquisition date, seller, source of funds (bank account and account number and account holder); and (i) all proceeds from the Article 9 sale ($59.25 million gross) allocable to assets traceable to CAG.

199. Because the Oliphant Entities controlled CAG's records and commingled CAG's assets with their own, and because the Oliphant Entities engaged in a deliberate scheme to obscure CAG's ownership interests through misrecording of portfolio ownership, elimination of receivables through suspicious journal entries, and failure to maintain proper corporate records, if the Trustee is ultimately unable to trace CAG's property to the Article 9 Sale Proceeds because of information missing, destroyed, or confused by the CAG Officers, the Oliphant Entities and/or the Metropolitan Entities is entitled to an adverse presumption that

all disputed assets and proceeds rightfully belong to the CAG estate. The burden of separating commingled property falls on the wrongdoer, not on the Trustee.

200. The Trustee respectfully requests that this Court order a full accounting from the CAG Officers, the Oliphant Entities, and/or the Metropolitan Entities (as appropriate) of all assets, transactions, and proceeds involving CAG's property, and apply an adverse presumption against the Defendants with respect to any assets or transactions for which they fail to provide adequate documentation.

## COUNT VI
### Turnover of Property of the Estate (11 U.S.C. § 542)
*(Against the Metropolitan Entities)*

201. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

202. Under 11 U.S.C. § 542(a), an entity in possession, custody, or control of property that the trustee may use, sell, or lease shall deliver to the trustee, and account for, such property or the value of such property.

203. The following property constitutes property of the CAG and/or Hollins bankruptcy estates: The proceeds of the Article 9 sale to the extent allocable to assets constituting property of CAG.

## COUNT VII
### Breach of Contract
*(Against Oliphant USA LLC)*

204. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

205. CAG and Oliphant USA entered into a Servicing Agreement, signed by Robert Morris, pursuant to which Oliphant USA agreed to collect on CAG's portfolios and remit the net proceeds to CAG.

206. Under the Servicing Agreement, Oliphant USA was obligated to collect amounts due on CAG's portfolios and remit the net collections (after deduction of costs and collection expenses) to CAG.

207. Oliphant USA breached the Servicing Agreement by failing to remit net collections to CAG. Through April 2025, Oliphant USA collected $53,028,288 in total net proceeds on CAG's portfolios, of which $33,919,971 was allocable to CAG. As of October 31, 2025, Oliphant USA owed CAG $11,933,810, of which $8,529,384 represents unpaid net collections that Oliphant USA collected on CAG's behalf but retained for its own use or the use of affiliated entities rather than remitting to CAG as contractually required.

208. Oliphant USA further breached the Servicing Agreement by failing to provide accurate accountings to CAG and permitting collections belonging to CAG to be diverted to other Oliphant entities or used to service obligations on which CAG bore no liability.

209. CAG performed all conditions precedent to Oliphant USA's obligations under the Servicing Agreement, or such conditions were waived or excused.

210. As a direct and proximate result of Oliphant USA's breach of the Servicing Agreement, CAG has suffered damages in an amount not less than $8,529,384, together with interest, costs, and any additional damages to be proven at trial.

**COUNT VIII**
**Money Had and Received**
*(Against AIM, Oliphant Financial LLC, Oliphant USA LLC, Oliphant United Inc., and Metropolitan)*

211. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

212. Under Texas law, an action for money had and received is an equitable doctrine applied to prevent unjust enrichment when one person obtains money which in equity and good conscience belongs to another.

213. The following Defendants received money belonging to CAG that in equity and good conscience belongs to the CAG estate:

(a) *AIM.* The balance owed by AIM to CAG as of October 31, 2025, totaled $27,748,529.49. To date, the Trustee's expert has established that a range of $13.7 million to $20.7 million of this amount was funded by CAG to AIM as part of the joint venture for portfolio acquisitions. AIM also received $5,000,000 (March 2022), $1,000,000 (February 2023), and $700,000 (March 2023) in gratuitous post-LBO cash transfers from CAG, totaling $6,700,000. AIM provided no consideration or reasonably equivalent value for these transfers. AIM also received and retained collections and proceeds from portfolios funded by CAG, including joint venture proceeds. CAG was insolvent at the time of each transfer, and AIM knew or should have known of CAG's insolvency given the common management by Conway.

(b) *Oliphant Financial LLC* retained the benefit of $3.35 million in receivables from CAG eliminated through suspicious journal entries, and retained collections and proceeds from portfolios funded by CAG. *Oliphant Financial* also received and

retained as yet unquantified collections and proceeds from portfolios funded by CAG, including joint venture proceeds.

(c) *Oliphant USA LLC* received between $1,355,000 and $3,400,000 in gratuitous transfers from CAG and retained $8,529,384 in net collections belonging to CAG. In total, Oliphant USA holds $11,933,810 of CAG's money. Oliphant USA's retention of CAG's collections was without right or authority.

(d) *Oliphant United Inc.* received $4,500,000 from CAG in March 2022 without providing reasonably equivalent value. CAG was insolvent at the time of this transfer.

(e) *Metropolitan* received over $8,000,000 from AIM within days of AIM's receipt of CAG's $5,000,000 wire, applied toward a pre-LBO loan on which CAG bore no liability. Metropolitan received CAG's money (laundered through AIM) in satisfaction of debts owed by other entities, not by CAG. Additionally, Metropolitan received the benefit of the Article 9 sale ($59.25 million gross), which included assets over which CAG holds a constructive trust.

214. Each Defendant identified above received money belonging to CAG in equity and good conscience, and each Defendant has failed and refused to return such money to the CAG estate. The Trustee is entitled to recover the money had and received by each Defendant, together with prejudgment interest.

## COUNT IX
### Avoidance of Constructively Fraudulent Transfers (11 U.S.C. §§ 544(b) and 548 and Tex. Bus. & Com. Code §§ 24.005 and 24.006)
*(Against the Oliphant Entities)*

215. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein and alleges the following as alternative causes of action, in part.

216. Under 11 U.S.C. § 548(a)(1)(B), the trustee may avoid any transfer of an interest of the debtor in property that was made within two years before the date of the filing of the petition, if the debtor received less than a reasonably equivalent value in exchange for such transfer and the debtor was insolvent on the date that such transfer was made or became insolvent as a result of such transfer.

217. CAG filed its bankruptcy petition on June 4, 2025. The two-year lookback period under § 548 thus reaches back to June 4, 2023.

218. Under 11 U.S.C. § 544(b), the trustee may avoid any transfer of an interest of the debtor in property that is voidable under applicable law by a creditor holding an unsecured claim. The Texas Uniform Fraudulent Transfer Act ("TUFTA"), Tex. Bus. & Com. Code §§ 24.001 et seq., provides a four-year lookback period from the date the transfer was made.

219. Under TUFTA, a transfer is fraudulent as to a creditor whose claim arose before the transfer if the debtor made the transfer without receiving reasonably equivalent value and the debtor was insolvent at the time or became insolvent as a result of the transfer.

220. At all relevant times, there existed one or more creditors of CAG holding unsecured claims who could have avoided the transfers described herein under TUFTA. CAG's creditor obligations exceeded $80 million at the time of the Spin-Off, and secured claims eventually reached $909 million or more.

221. CAG's equity deficit was approximately $9.4 million as of December 31, 2021, and grew continuously thereafter. CAG was unable to pay its debts as they became due.

222. The petition date is June 4, 2025. Under TUFTA's four-year lookback period, transfers made on or after June 4, 2021, are subject to avoidance.

223. At a minimum, the following transfers were made without reasonably equivalent value while CAG was insolvent:

    (a)    $5,000,000 to AIM — March 2022;

    (b)    $4,500,000 to Oliphant United — March 2022;

    (c)    $1,000,000 to AIM — February 2023;

    (d)    $700,000 to AIM — March 2023;

    (e)    Between $1,355,000 and $3,400,000 to Oliphant USA; and

    (f)    As an alternative to the constructive trust claim, all transfers to Oliphant Financial and AIM within the applicable period.

224. None of the foregoing transfers was supported by reasonably equivalent value. The gratuitous cash transfers were made without consideration. The Spin-Off burdened CAG with $80 million in liabilities while stripping it of assets and causes of action. The retention of collections was without contractual authorization. The diversion of corporate opportunities deprived CAG of business value without compensation.

225. The Trustee is entitled to avoid each of the foregoing transfers pursuant to 11 U.S.C. §§ 548(a)(1)(B); 544(b) and Tex. Bus. & Com. Code §§ 24.005 and 24.006.

## COUNT X
### Recovery of Avoided Transfers (11 U.S.C. § 550)
*(Against AIM, Oliphant Financial, Oliphant USA, Oliphant United, and the Metropolitan Entities)*

226. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

227. Under 11 U.S.C. § 550(a), to the extent a transfer is avoided under sections 544 or 548, the trustee may recover, for the benefit of the estate, the property transferred, or the value of such property, from the initial transferee of such transfer or the entity for whose benefit such transfer was made, or any immediate or mediate transferee of such initial transferee.

228. The following are initial or subsequent transferees of the transfers subject to avoidance:

   (a) AIM, as initial transferee of $5,000,000 (March 2022), $1,000,000 (February 2023), $700,000 (March 2023), diverted portfolio opportunities, CAG funded Portfolios, and joint venture proceeds;

   (b) Oliphant United, as initial transferee of $4,500,000 (March 2022);

   (c) Oliphant USA, as initial transferee of between $1,355,000 and $3,400,000 in gratuitous transfers;

   (d) As an alternative to the constructive trust claim, all transfers to Oliphant Financial and AIM within the applicable period; and

   (e) Metropolitan, as the subsequent transferee of the Oliphant Entities, including AIM and Oliphant Financial, as and if applicable.

229. Metropolitan is not entitled to protection as a good-faith transferee under 11 U.S.C. § 550(b) because Metropolitan had actual knowledge of, and substantially participated in the breaches of fiduciary duty, resulting in the transfers at issue.

82

## COUNT XI
## Disgorgement
### *(Against the CAG Officers)*

230. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

231. In addition to all other remedies allowed by law, the Trustee is entitled to the equitable remedy of disgorgement to recoup all compensation or profit, of any nature, direct or indirect, and all salary, bonuses, and other compensation received that any CAG and Hollins Officer received during the period that said fiduciary was violating his duty of loyalty to CAG and Hollins.

## COUNT XII
## Objection to Proofs of Claim or Alternatively,
## Equitable Subordination Claims
## (11 U.S.C. § 510(c))
### *(Against Oliphant USA, Oliphant Financial, and Oliphant, Inc.)*

232. The Trustee incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

233. The following Oliphant Entities have filed proofs of claim in the CAG bankruptcy:

| Detail | Oliphant USA, LLC | Oliphant Financial, LLC | Oliphant, Inc. |
|---|---|---|---|
| Claim Number | Claim #142-1 | Claim #143-1 | Claim #144-1 |
| Date Filed | 09/29/2025 | 09/29/2025 | 09/29/2025 |
| Claim Amount | $718,240.07 | $245,710.80 | $6,890.66 |
| Basis of Claim | Pre-Petition Servicing Fees | Indemnification Expenses | Payment of Debtor's Licensing Fees |
| Signed By | David Scanlan, President, Oliphant USA, LLC | David Scanlan, President, Oliphant Financial, LLC | David Scanlan, President, Oliphant, Inc. |

234. CAG has offset claims against Oliphant USA for contractual amounts due to it by Oliphant USA and not paid. Additionally, as a result of Defendant Oliphant USA and Oliphant

83

Financial's receipt of the avoidable transfers as herein alleged, and by virtue of 11 U.S.C. § 502(d), the Court is required to disallow any claims that those entities may hold against CAG, including those asserted in their Proofs of Claim Nos. 142-1 and 143-1, until or unless such entities have repaid to the Trustee all amounts for which they are liable under 11 U.S.C. §§ 544, 548, and 550.

235. Alternatively, under 11 U.S.C. § 510(c), the court may, under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim. The three conditions for equitable subordination are: (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code.

236. With respect to the claims of Oliphant USA, LLC (Claim #142-1, for $718,240.07 in Pre-Petition Servicing Fees) and Oliphant Financial, LLC (Claim #143-1, for $245,710.80 in Indemnification Expenses), each of these entities engaged in inequitable conduct entitling the Trustee to equitable subordination as an alternative to disallowance under § 502(d):

(a) Oliphant USA engaged in inequitable conduct by: (1) serving as gatekeeper over CAG's collection proceeds through commingled Hancock Whitney remittance accounts; (2) retaining $8,529,384 in net collections that it collected on behalf of CAG from CAG's portfolios but failed to remit to CAG; and (3) receiving between $1,355,000 and $3,400,000 in gratuitous transfers from CAG while CAG was insolvent.

84

(b)  Oliphant Financial engaged in inequitable conduct by: (1) receiving CAG's funds to acquire portfolios, including at least $23 million for LendingClub portfolio acquisitions, while recording those portfolios as owned by Oliphant Financial rather than CAG, despite CAG retaining perpetual equity interests; (2) recording as owned by Oliphant Financial at least twelve Evine portfolios, purchased between April 2020 and September 2021 with aggregate face values of approximately $4.43 million, that were paid for entirely by CAG; (3) receiving $61,389.72 in gratuitous transfers from CAG in 2022; and (4) benefiting from the non-cash-flow-based journal entries, loan reclassifications, and service provider charges of unclear justification that offset $3.35 million in net intercompany receivables owed by Oliphant Financial to CAG between 2023 and 2025.

237.  The misconduct of Oliphant USA and Oliphant Financial injured CAG's creditors and conferred an unfair advantage on these claimants. Both entities received CAG's assets, retained CAG's funds, and participated in the scheme to strip CAG of value while CAG was deeply insolvent. The claims that these entities now assert against CAG's estate arise from the very transactions through which they extracted value from CAG. Equitable subordination of these claims would be consistent with the provisions of the Bankruptcy Code because it would remedy the unjust enrichment of these insiders at the expense of legitimate creditors.

238.  With respect to the claim of Oliphant, Inc. (Claim #144-1, for $6,890.66 in Payment of Debtor's Licensing Fees), the Trustee seeks equitable subordination in the first instance. Oliphant, Inc. was the ultimate parent holding company of the Oliphant corporate family following the October 2021 LBO and an insider of CAG at all relevant times. As the apex

of the corporate structure that orchestrated the systematic stripping of CAG's value, Oliphant, Inc. engaged in inequitable conduct that warrants subordination of its claim:

(a)     Oliphant, Inc. participated in and benefited from the Oliphant enterprise structure through which CAG's assets were siphoned. As the parent holding company, Oliphant, Inc. exercised control over the entities that received CAG's diverted portfolio purchasing opportunities, gratuitous cash transfers, and joint venture interests;

(b)     Oliphant, Inc.'s officers and directors, including Conway who served simultaneously as CEO of CAG and Oliphant, Inc., used their dual positions to direct the flow of portfolio opportunities and funds away from CAG and toward entities within Oliphant, Inc.'s corporate family;

(c)     Oliphant, Inc. retained the benefit of the September 2023 Spin-Off, which distributed Hollins' capital stock to Oliphant, Inc.'s shareholders while leaving CAG with approximately $80 million in creditor obligations but without the revenue-generating assets, intercompany receivables, or joint venture equity interests that had been diverted to entities remaining under Metropolitan's collateral umbrella; and

(d)     Oliphant, Inc. participated in the reassignment of legacy portfolios in which CAG held joint venture interests, including the July 2023 reassignment of fifteen legacy portfolios to a portfolio designated as "encumbered by MET 100%" at Metropolitan's request, thereby participating in the diversion of CAG's assets.

239.    The claim asserted by Oliphant, Inc. for "Payment of Debtor's Licensing Fees" arises from the same interconnected enterprise through which CAG was systematically looted.

Permitting Oliphant, Inc. to recover on its claim pari passu with CAG's legitimate creditors would reward the very parent entity that orchestrated and benefited from the scheme to strip CAG of its value. Equitable subordination of Oliphant, Inc.'s claim is appropriate in the first instance because: (i) Oliphant, Inc. was an insider of CAG and controlled the entities and officers who committed the inequitable acts; (ii) the misconduct resulted in injury to CAG's creditors, who are now owed over $909 million in secured claims alone; and (iii) subordinating the claim of the parent entity that directed the asset-stripping scheme to the claims of the creditors who were harmed by that scheme is consistent with the equitable purposes of the Bankruptcy Code.

**PRAYER FOR RELIEF**

WHEREFORE, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against

(a) the CAG Officers, the Oliphant Entities, and the Metropolitan Entities, jointly and severally, for all damages resulting from the breaches of fiduciary duty, aiding and abetting thereof, and civil conspiracy, in an amount to be proven at trial;

(b) Imposing a constructive trust in favor of the estate over all identifiable property of the estate, including but not limited to the net sale proceeds from Metropolitan's Article 9 Sale representing specific debt portfolios acquired with CAG's diverted funds, in an amount no less than $31 million;

(c) Declaring that the estate's constructive trust interest arose pre-petition and constitutes property of the estate under 11 U.S.C. § 541;

(d) Ordering the turnover of estate property in the possession of Metropolitan pursuant to 11 U.S.C. § 542;

87

(e)     Avoiding fraudulent transfers pursuant to 11 U.S.C. §§ 548, 544 and/or the Texas Uniform Fraudulent Transfer Act, and recovering the value thereof pursuant to 11 U.S.C. § 550;

(f)     Ordering a full accounting from the CAG Officers, the Oliphant Entities, and the Metropolitan Entities of all assets, transactions, and proceeds involving CAG's property, and applying an adverse presumption against the Defendants with respect to any assets or transactions for which they fail to provide adequate documentation;

(g)     Awarding damages against Oliphant USA for breach of the Servicing Agreement in an amount not less than $8,529,384 representing retained collections, together with interest and any additional damages to be proven at trial;

(h)     Awarding recovery of money had and received against AIM, Oliphant Financial, LLC, Oliphant USA, LLC, Oliphant United, Inc., and Metropolitan for all money belonging to CAG received and retained by such Defendants;

(i)     Ordering disgorgement of all compensation, salary, bonuses, and other profits received by the CAG Officers during the period they were violating their fiduciary duties to CAG and Hollins;

(j)     Disallowing or equitably subordinating the claims of Oliphant USA Oliphant Financial and Oliphant, Inc. in this bankruptcy pursuant to 11 U.S.C. §§ 502(d) and 510(c);

(k)     Awarding pre-judgment and post-judgment interest at the maximum rate permitted by law;

(l)     Awarding the Trustee the costs of suit; and

(m)     Granting such other and further relief as the Court deems just and equitable.

88

**JURY DEMAND**

The Trustee hereby demands a trial by jury on all claims for breach of fiduciary duty, aiding and abetting breach of fiduciary duty and on any other claims triable by jury as a matter of right.

Dated: July 7, 2026                    Respectfully submitted,


                                       */s/ Alicia M. Bendana*
                                       Alicia M. Bendana (Tex. Bar No. 24127388)
                                       Gabriel J. Winsberg, Admitted Pro Hac Vice
                                       **FISHMAN HAYGOOD, L.L.P.**
                                       201 St. Charles Avenue, Suite 4600
                                       New Orleans, Louisiana 70170-4600
                                       Telephone: 504-586-5254
                                       E-mail: abendana@fishmanhaygood.com
                                            gwinsberg@fishmanhaygood.com
                                       *Counsel for Plaintiff, Ron Satija, Chapter 7 Trustee*

89