**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: August 21, 2026**

**MICHAEL M. PARKER**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **COLLINS ASSET GROUP, LLC,** | § | **CASE NO. 25-51660-MMP** |
| | § | |
| **DEBTOR.** | § | **CHAPTER 7** |
| | § | |
| | § | |
| **JUDY A. MUSGROVE, ET AL.,** | § | |
| | § | |
| **PLAINTIFFS,** | § | |
| | § | |
| **V.** | § | **ADVERSARY NO. 25-05047-MMP** |
| | § | |
| **COLLINS ASSET GROUP, ET AL.,** | § | |
| | § | |
| **DEFENDANTS.** | § | |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PARTIAL MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The Court considered the *Plaintiffs' Motion for Partial Summary Judgment Against Defendant Collins Asset Group, LLC for Violation of Texas Securities Act — Registration*

*Violations* (ECF No. 85, "***Partial MSJ***") and the docket in the above-captioned case and determined the *Partial MSJ* should be granted in part and denied in part.

The Musgrove Parties ask the Court to resolve pretrial one of the twenty-six claims they raise in this adversary proceeding. *See* ECF No. 64 (*Plaintiffs' Third Amended Complaint*). The *Partial MSJ* presents two limited questions (1) whether Collins Asset Group, LLC ("**CAG**") is liable to the Musgrove Parties under the Texas Securities Act for the non-registration of notes the Musgrove Parties received from Ferrum Capital, LLC ("**Ferrum Capital**"), which will be referred to as the **FC/Investor Notes**; and (2) whether CAG is liable to the Musgrove Parties under the Texas Securities Act for the non-registration of notes issued from CAG to Ferrum Capital (the "**CAG/FC Notes**"), which were later assigned to the Musgrove Parties.

Throughout the Musgrove Parties' *Partial MSJ* and in oral argument, they repeatedly collapse these two notes into the same securities offering. But there is insufficient evidence in the summary judgment record to conclusively establish this was factually the case or that it should be legally deemed the case, and this Opinion and Order endeavors to keep the two notes separate.

The parties do not contest that the FC/Investor Notes are securities that should have been but were not registered, and the Court finds no issue of material fact exists that the CAG/FC Notes are securities. However, the Court finds factual issues remain as to whether the CAG/FC Notes were limited private offerings exempt from the Texas Securities Act's registration requirements. Likewise, there remain material fact issues as to whether CAG is liable to the Musgrove Parties as a primary seller or as an aider and abettor of Ferrum Capital's Texas Securities Act violation. Therefore, the Musgrove Parties are not entitled to summary judgment against CAG on the alleged Texas Securities Act violations.

## II. <u>Jurisdiction and Venue</u>

The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, and the Standing Order of Reference of the United States District Court for the Western District of Texas dated October 4, 2013. Venue is proper under 28 U.S.C. § 1409. The Musgrove Parties have consented to this Court's entry of final orders. ECF No. 284. The Chapter 7 Trustee "consents to entry of final orders and a final judgment in this adversary proceeding on all claims and issues over which the Bankruptcy Court has constitutional and statutory authority to enter final judgment." ECF No. 280 ¶ 12.[1] This Opinion and Order serves as this Court's findings of fact and conclusions of law under Federal Rules of Bankruptcy Procedure 7052 and 9014.

## III. <u>Facts</u>

Some CAG affiliates (Oliphant, Inc., Oliphant United, Inc., Oliphant Financial, LLC, Oliphant USA, LLC, and Accelerated Inventory Management, LLC (the "**<u>Oliphant Entities</u>**"))[2] and the Chapter 7 Trustee representing CAG's bankruptcy estate oppose the *Partial MSJ*. *See* ECF Nos. 91, 96. They do not, however, offer any alternative facts or controverting evidence, or disagree with the underlying documents governing and characterizing the relationship between the parties, such as the FC/Investor Notes, the CAG/FC Notes, or the Commercial Loan Illustrations. They only disagree on the effect these undisputed facts have on this discrete matter.

Though there are roughly eighty-five Musgrove Parties in this adversary, evidence was only presented concerning four. Pls.' Exs. 2–4, 10, 11. The Court may infer from the proffered evidence that each of the Musgrove Parties were largely given the same material documents and

---

1 For what its worth as it pertains to this Opinion and Order, the Oliphant Entities have consented to the Court ruling on their objection to the Musgrove Parties' claims but do not consent to the Court ruling on non-core matters or actions against them. ECF Nos. 109, 229.

2 Oliphant acquired CAG sometime in 2023 or 2024 and retained at least one partner in the transition: Walt Collins. Pls.' Ex. 9, p. 22; Pls.' Ex. 11 ¶¶ 5–10.

received the same material representations. Any deviations will be acknowledged below. These material documents included:

- a Commercial Loan Illustration (Pls.' Ex. 2, pp. 30–34; Pls.' Ex. 3, pp. 46–50);
- a Lending Relationship Agreement (Pls.' Ex. 2, pp. 35–43; Pls.' Ex. 3, pp. 52–60);
- a Commercial Lending Program Terms and Conditions (Pls.' Ex. 2, pp. 44–61; Pls.' Ex. 3, pp. 60–78);
- a FC/Investor Note (Pls.' Ex. 2, pp. 18–22; Pls.' Ex. 3, pp. 19–23); and
- a copy of a CAG/FC Note (Pls.' Ex. 2, pp. 22–27; Pls.' Ex. 3, pp. 28–44).

Before or contemporaneous with the execution of the FC/Investor Notes, each Plaintiff received a Commercial Loan Illustration outlining the relationship of all parties—the Musgrove Parties, Ferrum Capital, and CAG. Pls.' Ex. 2, pp. 18, 30–34 (Musgrove's note executed November 2019 and Commercial Loan Illustration dated October 2019); Pls.' Ex. 3, pp. 19, 46–50 (Sparkses' note and Commercial Loan Illustration both dated September 2020). The Commercial Loan Illustration identifies CAG as the "borrower" and "summarizes the terms of Loan Agreements for a series of Loans entered into by and between [Ferrum Capital] and [CAG]." Pls.' Ex. 2, p. 32; Pls.' Ex. 3, p. 48. The Commercial Loan Illustration says the loan will pay out at 10% or 8% interest depending on if the investor chose a fixed repayment (full sum due upon maturity) or income repayment (partial quarterly payments after the first year). *E.g.*, Pls.' Ex. 2, p. 18. It describes CAG's business enterprise as "consumer and commercial distressed debt collection . . . which makes investments in current and delinquent commercial and consumer receivables." ***Id.*** at 18–19. Translation: CAG's business model was buying discounted accounts receivable in hopes of collecting a high enough percentage of such receivable to turn a profit.

The FC/Investor Notes were promissory notes the Musgrove Parties (as purported investors) received from Ferrum Capital in exchange for different sums of money. *See* Pls.' Ex. 1 (listing some Musgrove Parties and their alleged claim amount); Pls.' Ex. 2, pp. 18–22 (Musgrove's note from Ferrum Capital); Pls.' Ex. 3, pp. 19–23 (Sparkses' note from Ferrum Capital). The FC/Investor Notes were to carry 10% interest, be secured by a first priority lien in undefined collateral,[3] and be fully repaid four years after the CAG/FC Note maturity date. *E.g.*, Pls.' Ex. 2, pp. 18–19. The FC/Investor Notes explained that Ferrum Capital manages a Commercial Lending Program where it facilitates loans between "Lender Members" and "Borrower Members." *E.g.*, Pls.' Ex. 3, p. 19. The sole "Borrower Member" identified in the FC/Investor Notes is CAG. ***Id.*** at 20. And the CAG/FC Note is identified as the "Dependent Loan" funded by Ferrum Capital through the FC/Investor Notes. ***Id.*** ("Principal in [the CAG/FC Note] is being funded by Ferrum Capital from the Indebtedness provided by the Lender in this Agreement."). The FC/Investor Notes explicitly say repayment is "limited to, and entirely dependent on, Ferrum Capital's collection or recovery of Principal, Interest, or other payments due on the [CAG/FC Note]." ***Id.***

The CAG/FC Notes are promissory notes between CAG and Ferrum Capital executed in January 2020 (Pls.' Ex. 2, p. 22) and February 2023 (Pls.' Ex. 3, p. 28).[4] The 2020 CAG/FC Note paid out at 10% interest and the 2023 CAG/FC Note paid out at 8%, both over a four-year term, and, like the FC/Investor Notes, were secured by undefined collateral. Pls.' Ex. 2, pp. 22, 26; Pls.'

---

[3] Though the FC/Investor Notes do not define the term "collateral," the Commercial Loan Illustration suggests the (also undefined) "Loan is collateralized by Senior Secured Loans ('SSL') or Asset Backed Securities ('ABS')." *E.g.*, Pls.' Ex. 3, p. 49. The Lending Relationship Agreement between the Sparkses and Ferrum Capital executed along with the Sparkses' FC/Investor Note identifies the collateral as an assignment of assets pledged by CAG to Ferrum Capital. ***Id.***, p. 53. CAG pledged assets to Ferrum Capital in the CAG/FC Notes. ***Id.***, p. 28.

[4] The CAG/FC Notes mention a Loan Agreement between Ferrum Capital and CAG that purportedly governs some of the terms of the CAG/FC Notes, Pls.' Ex. 3, p. 28, including what is defined as collateral in the CAG/FC Notes. But that 2017 agreement does not appear anywhere in the record. It was not offered as an exhibit by the Trustee or the Oliphant Entities and was not among the Musgrove Parties' exhibits.

Ex. 3, pp. 28, 32. The 2023 CAG/FC Note required CAG to pay accrued interest every three months after one year (*e.g.*: if the effective date was January 17, 2018, the quarterly payments on interest would begin on February 15, 2019 and continue on May 15, 2019). Pls.' Ex. 3, pp. 28–29. Ferrum Capital received a 10% origination fee and 1.5% service fee from investor money used to purchase the CAG/FC Notes. ***Id.*** at 28. The CAG/FC Notes include a non-recourse provision stating Ferrum Capital could only recover from undefined collateral for repayment and that CAG would not be personally liable for any indebtedness. ***Id.*** at 32.

Like the Commercial Loan Illustration, two other documents accompanied the FC/Investor Notes: a Lending Relationship Agreement and a Commercial Lending Program Terms and Conditions. Pls.' Ex. 3, pp. 52, 60, 61, 78. These additional documents further characterize the relationship of the parties and describe Ferrum Capital's Commercial Lending Program. ***Id.*** at 52–60. Under the Commercial Lending Program, Ferrum Capital pools funds from investors, such as the Musgrove Parties, to lend to CAG. ***Id.*** at 52–53, 62–65, 70. CAG then uses the money in its consumer and commercial distressed debt collection business. *E.g.*, ***id.*** at 20. The Lending Relationship Agreement refers to the CAG/FC Notes as "Dependent Loans." *E.g.*, ***id.*** at 53. The Commercial Lending Program Terms and Conditions reinforces the dependent relationship. For example, it says: "We [Ferrum Capital] make Payments to our lenders [investors like the Musgrove Parties] pursuant to a Lending Relationship Agreement. Such Payments are solely dependent on the payments of Principal, Interest, or other payments made to us by our borrowers [CAG] under a corresponding Loan Agreement [the CAG/FC Notes]." ***Id.*** at 63; *see also* ***id.*** at 70–72. This document also laid out eligibility requirements for the purchasers of the FC/Investor Notes: "[that] the lender (a) has adequate means of providing for his/her/its current needs and personal contingencies and has no need for liquidity; and (b) [the investors] overall commitment . . . is not

disproportionate to his/her/its net worth and its Indebtedness will not cause such overall commitment to become excessive." *E.g.*, ***id.*** at 67. The Lending Relationship Agreement added other requirements: that the investor be eighteen years old or older and have a bank account and social security number. ***Id.*** at 57.

Walt Collins, a partner at CAG said he had an open-door policy with Ferrum Capital investors and that, although rare, some investors would attend CAG company meetings. Pls.' Ex. 9, pp. 23–24, 26–27. This partner also may have met with some Ferrum Capital investors. ***Id.*** at pp. 23–24; *see also* Pls.' Ex. 10 ¶ 6 (Doolittle Declaration). This same partner said he knew Ferrum Capital had "clients" (his term) and that was how Ferrum Capital generated capital to fund the CAG/FC Notes. Pls.' Ex. 9, pp. 14–16. In late 2021, one Plaintiff, Brent Couch, after already purchasing FC/Investor Notes, was invited by Ferrum Capital's manager to meet with CAG representatives. Pls.' Ex. 11 ¶¶ 5–10.

By inference, eighty-five people have purchased FC/Investor Notes and, by assignment, CAG/FC Notes, from Ferrum Capital. Pls.' Ex. 1.

## IV. ANALYSIS

### a. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. ***Alabama v. North Carolina***, 560 U.S. 330, 344 (2010) (quoting FED. R. CIV. P. 56(c) and citing ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322 (1986)). A summary judgment movant

> bears the initial responsibility of demonstrating the absence of an issue of material fact with respect to those issues on which the movant bears the burden of proof at trial. . . . However, where the non-movant bears the burden of proof at trial, the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.

***Lindsey v. Sears Roebuck and Co.***, 16 F.3d 616, 618 (5th Cir. 1994).

Therefore, although the Musgrove Parties bear the ultimate burden at trial of many of these matters, it is the Trustee's and Oliphant Entities' burden to present competent summary judgment evidence that creates a genuine, material factual dispute for any affirmative defense for which they bear the burden of proof at trial and to rebut any presumptions raised in favor of the Musgrove Parties. FED. R. CIV. P. 56(a); ***Lindsey***, 16 F.3d at 618.

**b. THE PARTIES' ARGUMENTS**

The Musgrove Parties say the FC/Investor Notes were investment contracts that CAG issued "to the unsuspecting public," and that the "CAG/FC Notes were an integral part of the offering" of the FC/Investor Notes. ECF No. 85 ¶¶ 2–3; *see also* ***id.*** ¶ 50 ("The CAG/FC Notes were the first link in the chain."). The Musgrove Parties say Ferrum Capital transferred the proceeds of the FC/Investor Notes to CAG and CAG returned to each investor (through Ferrum Capital) a senior secured loan in proportion to the amount given and shared "with the other investors in the same tranche of debt." ***Id.*** ¶ 25. They also say the FC/Investor Notes and the CAG/FC Notes are securities under the Texas Securities Act. ***Id.*** ¶¶ 32–49, 54–55.

The Oliphant Entities and the Trustee say the CAG/FC Notes and the FC/Investor Notes are two completely different transactions. ECF No. 91 ¶¶ 1, 23–24; ECF No. 96, p. 2. They say CAG did not offer or issue securities to the Musgrove Parties. ECF No. 91 ¶¶ 19–26; ECF No. 96 ¶¶ 20–25. They also say the CAG/FC Notes are commercial loans not subject to regulation under the Texas Securities Act. ECF No. 91 ¶¶ 27–38; ECF No. 96 ¶¶ 17–19. The Trustee further argues that the CAG/FC Notes, if securities, are limited private offerings exempt from the Texas Securities Act's registration requirements. ECF No. 96 ¶¶ 26–27.

### c. THE TEXAS SECURITIES ACT IN GENERAL

Texas Government Code § 4008.051 creates a private right of action for buyers of unregistered securities against their sellers:

> A person who offers or sells a security in violation of the following is liable to a person who buys the security from the offeror or seller: (1) Section 4003.001(a) [requiring securities to be registered], 4004.051 [requiring sellers of securities to be registered] . . . .

Texas Government Code § 4001.068 provides a non-exhaustive list of what a security is under Texas law, including a note, evidence of indebtedness, and an investment contract.

"[T]he Texas Securities Act's definition of 'securities' must be construed broadly to maximize the protection it provides to investors." ***Life Partners, Inc. v. Arnold***, 464 S.W.3d 660, 681 (Tex. 2015); *see also* ***SEC v. Edwards***, 540 U.S. 389, 393 (2004) ("[Congress] enacted a broad definition of security, sufficient to encompass virtually any instrument that might be sold as an investment.") (internal quotations omitted). In defining a security, courts place substance over form and consider the economic realities of the transaction(s) or situation "regardless of any labels or terminology." ***Life Partners***, 464 SW.3d at 681; ***SEC v. Arcturus Corp.***, 928 F.3d 400, 409 (5th Cir. 2019).

"[B]ecause of the obvious similarities between the Texas Securities Act and the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas act." ***Campbell v. C.D. Payne and Geldermann Sec., Inc.***, 894 S.W.2d 411, 417 (Tex. App.—Amarillo 1995, writ denied).[5] Whether an instrument is a security is a matter

---

[5] *See also* ***In re Westcap Enters.***, 230 F.3d 717, 726 n.12 (5th Cir. 2000) (citing ***Beebe v. Compaq Comput. Corp.***, 940 S.W.2d 304 (Tex. App.—Houston [1st] 1997, no writ) (suggesting cases interpreting the federal securities act provide persuasive authority)); ***Christie v. Hahn***, No. 05-20-01045-CV, 2022 WL 3572690, at *3 (Tex. App.—Dallas Aug. 19, 2022, no pet.) (same); ***Aubrey v. Barlin***, 159 F. Supp. 3d 752, 755 (W.D. Tex. 2016) (same); ***Thomas v. State***, 65 S.W.3d 38, 42 (Tex. Crim. App. 2001) (same); ***Grotjohn Precise Connexiones Int'l, S.A. v. JEM Fin., Inc.***, 12 S.W.3d 859, 868 (Tex. App.—Texarkana 2000, no pet.) (same); ***Star Supply Co. v. Jones***, 665 S.W.2d 194, 196 (Tex. App.—San Antonio 1984, no writ) (same).

of law and not fact. ***SEC v. Thompson***, 732 F.3d 1151, 1160 (10th Cir. 2013); ***McNabb v. SEC***, 298 F.3d 1126, 1130 (9th Cir. 2002); ***SEC v. Life Partners, Inc.***, 87 F.3d 536, 541 (D.C. Cir. 1996); ***Thompson v. Anchor Cap. GP***, No. 25-BC01B-0038, 2026 WL 1910345, at *4 (Tex. Bus. Ct. July 1, 2026); *see also* ***SEC v. Life Partners Holdings***, 41 F. Supp. 3d 550, 556 (W.D. Tex. 2013) (ruling on a motion for summary judgment that viatical and life settlement transactions were securities as a matter of law).

Under the family resemblance test, all notes are presumptively securities. ***Reves v. Ernst & Young***, 494 U.S. 56, 65 (1990); ***Trust Co. of La. v. N.N.P. Inc.***, 104 F.3d 1478, 1489 (5th Cir. 1997); ***Grotjohn Precise Connexiones Int'l***, 12 S.W.3d at 868. Likely because the federal and Texas securities acts include "note" in their definitions of "security." 15 U.S.C. § 77b(a)(1); TEX. GOV'T CODE § 4001.068(a)(1)(J).

But ***Reves*** recognized that certain notes fall outside the definition of securities, such as consumer financing notes, mortgage notes, short-term small business secured notes, short-term notes secured by an assignment of accounts receivable, "character" bank notes, and "a note which simply formalizes an open-account debt incurred in the ordinary course of business." ***Reves***, 494 U.S. at 65. ***Reves*** also recognized that the presumption may be rebutted by showing a transaction more closely resembles non-security notes by looking at four factors: (1) the motivation of the parties, (2) the plan of distribution, (3) public perception, and (4) the presence of risk reducing factors. ***Id.*** at 65–67; ***Aubrey***, 159 F. Supp. 3d at 755–57; ***Trust Co. of La.***, 104 F.3d at 1489; ***Grotjohn Precise Connexiones Int'l***, 12 S.W.3d at 868. "The Supreme Court's adoption of this four-factor test illustrates a commitment of the Supreme Court to regulate securities transactions for the protection of investors, while not overburdening the business community." ***LeBrun v. Kuswa***, 24 F.Supp.2d 641, 646 (E.D. La. 1998); *see also* **Gustafson v. Alloyd Co.**,

513 U.S. 561, 575 (1995) (saying that determining whether a note is a security should "be understood against the background of what Congress was attempting to accomplish in enacting the Securities Acts").

**d. Both Sets of Notes are Securities**

The Trustee concedes that the FC/Investor Notes are securities subject to the Texas Securities Act. ECF No. 96 ¶ 17 n.4. And the Oliphant Entities do not challenge that the FC/Investor Notes are securities. Instead, both focus on whether the CAG/FC Notes are securities.

As notes, the FC/Investor Notes are presumptively securities. Therefore, the non-movants have the burden to present a genuine, material fact issue that the FC/Investor Notes are non-security notes. *See* ***Exchange Nat'l Bank of Chicago v. Touche Ross &Co.***, 544 F.2d 1126, 1137–38 (2d Cir. 1976) ("A party asserting that a note . . . is not within the anti-fraud provisions of the [federal securities act] has the burden of showing that.") (footnote omitted). With no evidence suggesting otherwise,[6] the Court, like Judge Mullin in a nearly identical case, concludes the FC/Investor Notes are securities. *See generally* Pls.' Ex. 6; ***Musgrove v. Cox (In re Cox)***, Case No. 24-50037-mxm, Adv. No. 24-05002-mxm (Bankr. N.D. Tex. April 25, 2025) (slip op.).

The Oliphant Entities and the Trustee argue that the CAG/FC Notes are "commercial loans," not "investment notes." ECF No. 91¶ 29; ECF No. 96 ¶ 17. Because the CAG/FC Notes are presumptively securities, the Musgrove Parties need only point to a lack of evidence rebutting the "notes are securities" presumption to succeed on their *Partial MSJ*. The Trustee and Oliphant

---

[6] The Supreme Court recently reversed a decision by the Fourth Circuit because it violated the party-presentation principle by deciding a case based on an issue not raised by the parties. ***Margolin v. Nat'l Ass'n of Immigr. Judges***, 146 S.Ct. 1285, 1288 (2026). The party-presentation principle can be summed up as: "points not argued will not be considered." ***Id.*** (quoting ***United States v. Burke***, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in judgment)). With nobody contesting if the FC/Investor Notes are securities, the Court assumes and concludes the FC/Investor Notes are securities.

Entities need only present some summary judgment evidence rebutting the "notes are securities" presumption to defeat the *Partial MSJ*. *See*, *e.g.*, ***Lindsey***, 16 F.3d at 618.

Commercial loans are non-security notes exempt from Securities Act liability. ***Bellah v. First Nat'l Bank of Hereford***, 495 F.2d 1109, 1114 (5th Cir. 1974); *see also* ***Reves***, 494 U.S. at 65 (appearing to agree that commercial loans are generally not securities). The ***Bellah*** court differentiated between investment notes and commercial notes. ***Bellah***, 495 F.2d at 1113 (saying the bank's note "merely intended to aid the Bellahs in the operation of their livestock business" and not "to profit from the successful operation of th[e] enterprise"); *see also* ***Kirschner v. JP Morgan Chase Bank***, 79 F.4th 290, 310–11 (2d Cir. 2023) (holding commercial bank loans are non-security notes). While commercial notes ordinarily involve underlying transactions that are not of an investment nature, investment notes have "investment overtones" such as being offered to the general public and exchanging "investment assets, directly or indirectly," for notes. ***McClure v. First Nat'l Bank of Lubbock***, 497 F.2d 490, 493–94 (5th Cir. 1974).

Ferrum Capital's and CAG's motivations for executing the CAG/FC Notes can be gleamed from the notes themselves and the numerous documents shared with the Musgrove Parties before investing with Ferrum Capital. The overwhelming thrust of the transactions shows that the Musgrove Parties were investing not just in Ferrum Capital, but in CAG. Any repayment on the Musgrove Parties' investment was dependent on CAG's success. The CAG/FC Notes have "investment overtones" when viewed in context with Walt Collins's deposition and the documents Ferrum Capital shared with the Musgrove Parties. Ferrum Capital invested in CAG's business and in return received high-interest notes tied to the success of CAG's business. CAG issued the notes to Ferrum Capital with the understanding they were freely transferrable and that Ferrum Capital intended to raise funds from third-party investors to fund its obligations under the CAG/FC Notes.

### 1. THE PARTIES' MOTIVATIONS

In analyzing the first factor, the Court must look at (i) whether CAG's motivation in executing the CAG/FC Notes was to raise money for its general business operations or finance investments, or to fund the purchase of a minor asset or consumer good or correct cash flow issues;[7] and (ii) whether Ferrum Capital's motivation was to profit from the income expected to be generated by the note. *E.g.*, ***Reves***, 494 U.S. at 66; *see also* ***Delgado v. Ctr. on Child., Inc.***, No. 10-2753, 2012 WL 2878622, at *3 (E.D. La. July 13, 2012) ("In a nutshell, the Court must determine whether profit was the motivating factor behind the transaction.").

According to the Commercial Loan Illustration and Walt Collins's deposition testimony, CAG's motivation was to raise money to purchase distressed receivables. Pls.' Ex. 2, p. 19 ("Collins intends to use the proceeds of the loan to (a) purchase portfolios of charged-off consumer and commercial accounts and loans receivables at steep discounts . . . ."); Pls.' Ex. 9, p. 17:1–4.

Like the Co-Op in ***Reves***, the shell corporations in ***Trust Company of Louisiana***, the commercial real estate developers in ***Aubrey***, the children's center in ***Delgado***, and the appliance filter manufacturer in ***LeBrun***, the borrower/seller of the note—CAG—executed the CAG/FC Notes to raise money for its business operations: to purchase speculative receivables at discounted rates hoping to collect a high enough percentage to turn a profit. ***Reves***, 494 U.S. at 67; ***Trust Co. of La.***, 104 F.3d at 1481–82, 1489; ***Aubrey***, 159 F. Supp. 3d at 755; ***Delgado***, 2012 WL 2878622, at *3–4; ***LeBrun***, 24 F. Supp. 2d at 642, 647. CAG did not intend to use the proceeds from the CAG/FC Notes to pay outstanding debt or issue shareholder distributions like the urine testing company in ***Kirschner***, 79 F.4th at 306, or the ex-husband in ***McClure***, 497 F.2d at 491, 493–94.

---

[7] These motivations are not mutually exclusive. Judge Ezra previously found that a borrower's dual motivation to raise money generally for its real estate development business enterprise *and* specifically to finance substantial investments caused the first factor to favor classifying the notes as securities. ***Aubrey***, 159 F. Supp. 3d at 755.

And like the purchasers in ***Reves*** and ***Trust Company of Louisiana***, and the investors in ***Aubrey***, ***Delgado***, and ***LeBrun***, Ferrum Capital intended to profit off of the higher interest rate the CAG/FC Notes carried and share those profits with its investors, the Musgrove Parties in this case, while slicing a handsome origination and service fee. ***Reves***, 494 U.S. at 67–68; ***Trust Co. of La.***, 104 F.3d at 1489; ***Aubrey***, 159 F. Supp. 3d at 755; ***Delgado***, 2012 WL 2878622, at *4; ***LeBrun***, 24 F. Supp. 2d at 647. At least one of the CAG/FC Notes included mandatory quarterly pre-payments and full repayment of the higher interest rate at the maturity date and was wholly dependent on CAG's success. *See* ***Khoury v. Tomlinson***, 518 S.W.3d 568, 582 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (involving quarterly payments based on net profits); ***LeBrun***, 24 F. Supp. 2d at 647 (involving quarterly interest payments based on sales).

The Oliphant Entities say: "the notes function as commercial loan instruments, which courts have held are not securities," and then point to one court's decision: ***Kirschner***. ECF No. 91 ¶ 31. The Oliphant Entities would have this Court look at whether Ferrum Capital "obtained any ownership interest in CAG, any right to share in CAG's profits, or any participation in the enterprise beyond repayment of principal and interest." ***Id.*** But this question is too narrow, and this framing is not even supported by the case the Oliphant Entities offered.

The true question this Court must ask, as articulated by ***Reves***, is whether Ferrum Capital intended to earn "a valuable return" on the money it lent CAG. ***Reves***, 494 U.S. at 68 n.4. ***Kirschner*** reinforces this conception: "the lenders' motivation was investment because the lenders expected to profit from their purchase of the Notes." ***Kirschner***, 79 F.4th at 306. The Second Circuit in ***Kirschner*** said the lenders' investment motivations were apparent from the quarterly interest payments they were entitled to. ***Id.*** That court ultimately determined, however, that the parties' motivations were mixed because the borrower—the urine testing company—planned to

use the money to pay outstanding debt obligations, issue shareholder distributions, and pay fees and expenses related to the note, not to fund general business operations. ***Id.*** This is not the scenario presented here. Rather, CAG's stated intention was to use the proceeds of the CAG/FC Notes to purchase charged-off receivables. Thus, CAG intended to use the proceeds of the CAG/FC Notes to fund CAG's general business enterprise.

The CAG/FC Notes strongly suggest an investment structure and causes the first factor to weigh in favor of finding the CAG/FC Notes are investments, not commercial loans.

### 2. THE PLAN OF DISTRIBUTION

For the second factor, the Supreme Court in ***Reves*** asked whether the notes were instruments "in which there is common trading for speculation or investment." ***Reves***, 494 U.S. at 66. A sufficient but not required affirmative answer is that the notes were "offered and sold to a broad segment of the public." ***Id.*** at 68; ***Delgado***, 2012 WL 2878622, at *4 ("The fact that a note was not broadly distributed, however, is not necessarily fatal to a claim that the note is a security."). Even if a note is only sold to one lender/buyer, it can be deemed a security if a secondary market exists and was used for that single note. *See* ***Trust Co. of La.***, 104 F.3d at 1489 ("Though the notes were made out to TCL, those notes were funded by TCL's ERISA plan customers, thus there existed a plan of distribution."); *cf* ***Kirschner***, 79 F.4th at 306–07 (discussing a limited secondary market); ***Aubrey***, 159 F. Supp. 3d at 756 (finding the second factor not met where "there [was] no proof or even allegation that a secondary market existed for these loans or that Plaintiffs provided the loans in order to re-sell the notes on a speculative market").

The only evidence in the record that the FC/Investor Notes were offered and sold to the public is the eighty-five individuals who have brought this adversary against CAG alleging they

were sold FC/Investor Notes.[8] However, as few as six investors have been sufficient to find common trading where the investors were not sophisticated parties. ***McNabb***, 298 F.3d at 1132; *see also* ***Stoiber v. SEC***, 161 F.3d 745, 751 (D.C. Cir. 1998) (finding thirteen investors sufficient for common trading). Given the purpose of the Texas Securities Act is to protect investors, TEX. GOV'T CODE § 4001.002(a), and that the definition of security is to be construed broadly in furtherance of that purpose, ***Life Partners***, 464 S.W.3d at 681, it makes sense to consider the sophistication of the investors in addition to their raw number. *See* ***SEC v. Simeon***, No. 21-CV-5266 (ARR) (LGD), 2026 WL 73973, at *6 (E.D.N.Y. Jan. 9, 2026) (slip op.) (concluding the second factor weighed neutrally where, though investments were not broadly offered to the public, they were directed at Haitian-Americans—"a group who would benefit from the protection of the securities laws").

Here, Ferrum Capital's bar to investing was very low: it only required the investors of the FC/Investor Notes (the CAG/FC Notes' secondary market) to be at least eighteen years old, have a bank account and social security number, not have liquidity concerns, and not to lend too much money. Every purported investor is an individual (or trust) and not a business entity, and no evidence was offered of their understanding of investments, business acumen, or educational background. *See* ***Thompson***, 2026 WL 1910345, at *7 (noting the sophistication of the parties caused this factor to weigh against finding the note a security); ***Aubrey***, 159 F. Supp. 3d at 756 (finding specific individual investors deserved less protection because of their law, business, and finance degrees and experience with similar investments and businesses). The Trustee and the

[8] Randy Sparks's Declaration does state that when he met with a representative of Ferrum Capital, "he recommended to me and my wife an investment in Collins Asset Group, LLC through Ferrum Capital, LLC." Pls.' Ex. 4 ¶ 3; *see also* Pls.' Ex. 10 ¶ 5 ("Ms. Willy recommended an investment in a Ferrum Capital Promissory Note."). This is not the same as publicly advertising an investment. But it is strong, uncontroverted evidence of how Ferrum Capital classified the CAG/FC Notes.

Oliphant Entities did not put on evidence that would suggest the Musgrove Parties are experienced investors or otherwise should be afforded a lower degree of protection than ordinary individual investors.

Though the CAG/FC Notes were only sold to Ferrum Capital, they were placed on a secondary market by Ferrum Capital and passed through to eighty-five investors through the FC/Investor Notes. The CAG/FC Notes contemplated their assignment, it did not prohibit it, and the Lending Relationship Agreement explicitly assigned Ferrum Capital's rights in the CAG/FC Notes to the Musgrove Parties. Unlike the notes at issue in ***Kirschner***, the CAG/FC Notes were freely assignable. ***Kirschner***, 79 F.4th at 306–07 (finding the second factor not met where "the restrictions on any assignment of the Notes rendered them unavailable to the general public"); *see also* ***Fragin v. Mezei***, No. 09 Civ. 10287(AJN), 2012 WL 3613813, at *11 (S.D.N.Y. Aug. 22, 2012) (finding the second factor weighed neutrally where the note was offered to eleven investors and "part of a complex financing operation with a breadth of participation positions"); ***Grotjohn Precise Connexiones Int'l***, 12 S.W.3d at 869 (commenting on the lack of a clause prohibiting assignment of the notes). Thus, the CAG/FC Notes were instruments that could be commonly traded.

Like the notes in ***Trust Company of Louisiana***, the CAG/FC Notes were made out only to Ferrum Capital, but they were funded by Ferrum Capital clients. ***Trust Co. of La.***, 104 F.3d at 1489. CAG knew Ferrum Capital raised the money through crowd-sourcing efforts; and Ferrum Capital knew (because it executed or planned to execute the FC/Investor Notes) that it would pass on the CAG/FC Notes to the FC/Investors. Faced with a similar investment structure, the Fifth Circuit concluded the notes "were investment instruments, not consumer or commercial bank loans or financing." ***Trust Co. of La.***, 104 F.3d at 1489–90.

Because the CAG/FC Notes were instruments that could be commonly traded for investment and were offered to a broader segment of the public, the second factor weighs in favor of finding the CAG/FC Notes were investment notes.

### 3. PUBLIC PERCEPTION

The third factor looks at "the reasonable expectations of the investing public." ***Reves***, 494 U.S. at 66. "[E]ven where an economic analysis of the circumstances of the particular transaction might suggest [] the instruments are not securities as used in that transaction," the Court should still "consider instruments to be securities on the basis of the public's reasonable expectations." ***Aubrey***, 159 F. Supp. 3d at 756–57 (cleaned up).

There is no evidence in the record that the CAG/FC Notes were advertised as investments when Ferrum Capital and CAG executed these notes. This would have been the strongest evidence that a reasonable person would have perceived the note as an investment. *See* ***Reves***, 494 U.S. at 69 (saying notes advertised as investments were reasonably perceived as investments); ***Delgado***, 2012 WL 2878622, at *5 (same). There is, however, evidence that Ferrum Capital marketed the CAG/FC Notes as investments on the secondary market, i.e., to the Musgrove Parties. Declarations in the record reflect that the FC/Investor Notes, and through assignment the CAG/FC Notes, were pitched to the Musgrove Parties as an investment in CAG's business enterprise.

Evaluating the CAG/FC Notes and the documents in the record from an objective perspective, the CAG/FC Notes can fairly be characterized as investment securities. The FC/Investor Notes and accompanying documents referenced Ferrum Capital's interest in the CAG/FC Notes and stated that Ferrum Capital was assigning its interests in the CAG/FC Notes to the Musgrove Parties. The documents made clear that investing in Ferrum Capital meant investing in CAG, this is why CAG and its business model is explained throughout those documents. It's

also why some Musgrove Parties had conversations with a Ferrum Capital representative regarding CAG and its business model.

The FC/Investor Notes were described as loans dependent on the CAG/FC Notes. The character of this type of dependent loan is ultimately a security; it is money in exchange for an interest in the rights to repayment of another loan. This is a speculative transaction; purchasers (the Musgrove Parties) are taking a chance on repayment of another debt obligation (the CAG/FC Notes) they did not originate or negotiate.

A reasonable person in the Musgrove Parties' shoes would think the CAG/FC Notes were investments—not just because that was what they were shown in the documents that accompanied their respective FC/Investor Note, but because that was what they were told. Likewise, a reasonable person in Ferrum Capital's position would see the CAG/FC Notes as investments, given the nature of the transaction is the unprotected advancement of funds to a business to be used generally in that business's enterprise. The third factor, therefore, weighs in favor of finding the CAG/FC Notes are securities.

#### 4. Presence of Risk-Reducing Factors

The fourth factor asks: "whether some factor such as the existence of another regulatory scheme significantly reduces the risk of the instrument, thereby rendering application of the Securities Act unnecessary." ***Reves***, 494 U.S. at 67. Collateral or insurance might also reduce the risk of a note's default. ***Id.*** at 69; ***Grotjohn Precise Connexiones Int'l***, 12 S.W.3d at 870.

The CAG/FC Notes are uninsured. The collateral mentioned in the CAG/FC Notes is undefined, and no evidence has been offered as to what property of CAG served as collateral for the CAG/FC Notes—for all the Court knows, it could be nothing. Similarly, no evidence was

offered of an alternative regulatory scheme that would reduce any risk posed by the CAG/FC Notes. Therefore, the fourth factor favors finding the CAG/FC Notes are securities.

Given repeated endorsements in federal and state law of a broad definition of "security," and the economic realities apparent in the ***Reves*** factor analysis applied to the CAG/FC Notes, the non-movants have failed to present sufficient evidence of a genuine issue of material fact to rebut the presumption that the CAG/FC Notes are securities. Accordingly, the Court finds the CAG/FC Notes are securities subject to the Texas Securities Act.

**e. <u>THE NOTES WERE UNREGISTERED SECURITIES</u>**

The Court must next decide whether the CAG/FC Notes and FC/Investor Notes *and their sellers* were required to be registered with the state.

The Texas Securities Act requires securities and their sellers to be registered. TEXAS GOV'T CODE §§ 4003.001, 4004.051, 4004.101(a).

No evidence in the record shows that CAG or Ferrum Capital registered as sellers of securities, or that the FC/Investor Notes and CAG/FC Notes were registered as securities. The Trustee and the Oliphant Entities do not dispute or offer evidence to dispute that the FC/Investor Notes or the CAG/FC Notes were not registered.

The Trustee, however, disputes that CAG and the CAG/FC Notes were required to be registered. ECF No. 96 ¶¶ 26–27. He says CAG and the CAG/FC Notes were exempt from registration by § 4005.012(a)(1) of the Texas Securities Act because they were private offerings sold only to Ferrum Capital. ***Id.*** The Musgrove Parties in turn argue that the Commercial Loan Illustration is an advertisement and that the CAG/FC Notes do not comply with the requirements for private limited offerings outlined in the Texas Administrative Code. ECF No. 135 ¶ 21.

Because the burden for establishing an exemption from the Texas Securities Act's registration requirements lies with the person claiming the exemption, ***Tex. Cap. Secs., Inc. v. Sandefer***, 58 S.W.3d 760, 777–78 (Tex. App.—Houston [1st] 2001, pet. denied), the Musgrove Parties need only point to a lack of evidence of the exemption to succeed on their *Partial MSJ*. The Trustee and Oliphant Entities need only present some summary judgment evidence CAG is entitled to the exemption to defeat the *Partial MSJ*. *See*, *e.g.*, ***Lindsey***, 16 F.3d at 618.

The Texas Securities Act exempts an issuer's private sale of securities when "the total number of security holders of the issuer does not exceed 35 persons after the sale." TEX. GOV'T CODE § 4005.012(a)(1). CAG, as issuer of the CAG/FC Notes, is eligible for this exemption. TEX. GOV'T CODE § 4001.061; ***Aubrey***, 159 F. Supp. 3d at 758.

CAG initially sold the CAG/FC Notes only to Ferrum Capital, and there is no evidence in the summary judgment record that CAG marketed the notes to others before selling them to Ferrum Capital. Though Ferrum Capital later sliced the CAG/FC Notes up and assigned its interests in them to at least eighty-five other people, such that each Plaintiff held a piece of the CAG/FC Notes, the exemption is determined at the time CAG issued the security. TEX. GOV'T CODE § 4005.012(a)(1) ("after the sale"). Subsequent sales and sellers are not entitled to the benefit of the exemption and cannot hamper the propriety of the exemption as to the initial sale by the issuer. *See* ***Aubrey***, 159 F. Supp. 3d at 758 ("[T]he legislature meant the exemption to only apply to non-public sales by issuers and not to other dealers, brokers, or third-party agents.").

The Texas Securities Act offers a two-part definition of "sale": (a) a sale includes "every disposition or attempted disposition of a security for value" and (b) sale means "a contract or agreement in which a security is sold." TEX. GOV'T CODE § 4001.067(a), (b)(1). The language is

not pluralized, suggesting the legislature's definition of sale refers to only a single transaction, though it may encompass many different buyers of the same security.

The Texas Administrative Code lays out how to count the number of security holders, saying: "[it] includes all security holders without regard to" where they live or where they bought the securities. 7 TEX. ADMIN. CODE § 109.13(d).[9] What matters is the total number of security holders after CAG issued the CAG/FC Notes. And the only security holder of the CAG/FC Notes after the initial sale was Ferrum Capital. That Ferrum Capital later subdivided and sold the CAG/FC Notes is of no consequence for this exemption inquiry.

Thus, CAG may be eligible for the limited private offering exemption and whether that exemption applies is dependent on evidence regarding the CAG/FC Notes non-public sale at the time CAG issued them. The Commercial Loan Illustration the Musgrove Parties point to does not conclusively evidence that CAG marketed the CAG/FC Notes because that document accompanied the FC/Investor Notes, not the CAG/FC Notes. It was provided by Ferrum Capital to the Musgrove Parties, not by CAG to Ferrum Capital. Therefore, it does not show that CAG marketed the CAG/FC Notes. Even if it could be imputed to CAG, it may not qualify as an advertisement. The Commercial Loan Illustration may have been created to inform potential investors and thus may fall outside the scope of "advertisements" as understood within the Texas Administrative Code. 7 TEX. ADMIN. CODE § 109.13(a)(5), (b) ("The term 'advertisements' does not include the use of the type of printed material as set out in [the well-informed] subsection (a) of this section.").

Finally, the Musgrove Parties' remaining argument—that the issuer must "place a legend on the certificate or other document evidencing the security to the effect that the securities have

[9] The Texas Administrative Code is "prima facie evidence of the text of the rules." TEX. GOV'T CODE § 2002.054.

not been registered under any securities law and setting forth or referring to the restrictions on transferability and sale of the securities" (ECF No. 135 ¶ 20)—is non-sensical. The Musgrove Parties cite generally to § 109.13 of the Texas Administrative Code to support their proposition. ***Id.*** ¶¶ 20–21. But no such obligation can be found in the cited authority. Instead, § 109.13(j) offers a suggestion that issuers *may* place a legend (the Musgrove Parties complain is absent) on some offering document to meet an issuer's obligation to "exercise reasonable care to assure [] the purchasers are acquiring the securities as an investment." 7 TEX. ADMIN. CODE § 109.13(j). The legend is not a pre-requisite to establishing that a security is exempt from the registration requirement; and the lack of a legend does not negate an issuer's eligibility for a limited private offering exemption.

The Court finds a genuine material fact issue remains as to whether the CAG/FC Notes were exempt from the Texas Securities Act's registration requirements.

**f. CAG'S INVOLVEMENT IN THE SECURITIES OFFERING**

Through the *Partial MSJ*, the Musgrove Parties seek to hold CAG liable for the failure of the CAG/FC Notes and the FC/Investor Notes to be registered as securities. Throughout the *Partial MSJ*, the Musgrove Parties collapse these two notes into a single security. ECF No. 91 ¶ 1; ECF No. 96 ¶ 4. But these are two separate transactions and the Musgrove Parties offer insufficient evidence that the two securities should be conclusively treated as the same offering or transaction.

Having concluded that the failure to register the FC/Investor Notes as securities violated the Texas Securities Act, the Court now turns to whether CAG is liable for this Texas Securities Act violation. The Court's inquiry in this section only focuses on the FC/Investors Notes because whether the CAG/FC Notes were required to be registered is still subject to a factual dispute.

#### 1. PRIMARY-SELLER LIABILITY

The Musgrove Parties point to a 1956 Texas Supreme Court case adopting broad primary-seller liability, defining a seller as "any link in the chain of the selling process or . . . one who performs any act by which a sale is made." ***Brown v. Cole***, 291 S.W.2d 704, 708 (Tex. 1956) (internal quotations omitted). But the Texas Securities Act has been amended since ***Brown***, and federal and state courts alike have found those amendments made ***Brown***'s "broad definition of 'seller' [] no longer appropriate." ***Aubrey***, 159 F. Supp. 3d at 759; ***In re Enron Corp. Sec., Derivative & "ERISA" Litig.***, 258 F. Supp. 2d 576, 603 (S.D. Tex. 2003) ("***Enron I***"); ***Seib Fam. GP v. Bank of the Ozarks***, No. 05-12-01171-CV, 2014 WL 1056595, at *3 (Tex. App.—Dallas Mar. 18, 2014, no pet.); ***Frank v. Bear***, 11 S.W.3d 380, 383 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

Indeed, in 1981 the Fifth Circuit recognized that the definition of seller under the amendments is limited to only those "who are actively engaged in the sale process and [does not include] those who merely participate in preparing an offering." ***Huddleston v. Herman & MacLean***, 640 F.2d 534, 551 (5th Cir. Unit A 1981), *aff'd in part and rev'd in part on other grounds*, ***Herman & MacLean v. Huddleston***, 459 U.S. 375 (1983). The Supreme Court in ***Pinter v. Dahl***, 486 U.S. 622, 647 (1988), reached a similar, if not slightly expanded, conclusion when it interpreted the definition of seller under the federal securities act to "suggest that liability extends only to the person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner."

The Oliphant Entities and the Trustee argue that primary-seller liability under the Texas Securities Act imposes a privity requirement on the seller and buyer. ECF No. 91 ¶¶ 21–22, ECF No. 96 ¶ 22. But the law is clear as mud on that point. Some courts agree. ***Aubrey***, 159 F. Supp.

3d at 759; ***Janvey v. Willis of Colo. Inc.***, No. 3:13-CV-3980-N, 2014 WL 12670763, at *9–10 (N.D. Tex. Dec. 5, 2014). Others don't. ***Davis v. MSR Holdings, LLC***, No. 01-22-00451-CV, 2024 WL 3237623, at *9–11 (Tex. App.—Houston [1st Dist.] June 28, 2024, pet. denied); ***O'Donnell v. Roo Inv. Fund II, LLC***, No. 05-23-00238-CV, 2024 WL 469558, at *6 (Tex. App.—Dallas Feb. 7, 2024, no pet.); ***Highland Cap. Mgmt., L.P. v. Ryder Scott Co.***, 402 S.W.3d 719, 742 (Tex. App.—Houston [1st Dist.] 2012, no pet.). And still another appears to say both. ***Enron I***, 258 F. Supp. 2d at 603, 605–06 (saying there is a privity requirement on one page and later adopting the ***Pinter*** rule embracing solicitor liability). When Judge Harmon of the Southern District of Texas revisited the privity requirement in a subsequent ***Enron*** opinion, she said her 2003 decision, "while rejecting as too expansive the definition in ***Brown v. Cole***, . . . did not limit the term 'seller' by a privity requirement, but allowed some extension where the plaintiff could show that the party . . . was acting as a broker or agent of the vendor." ***In re Enron Corp. Sec., Derivative & "ERISA" Litig.***, 540 F. Supp. 2d 759, 782 n.28 (S.D. Tex. 2007) ("***Enron II***").

Given the Supreme Court's ***Pinter*** and the Fifth Circuit's ***Huddleston*** opinions, and the Southern District of Texas's persuasive ***Enron II*** opinion, the Court interprets the Texas Securities Act's definition of "seller" not to impose a privity requirement. Instead, primary-seller liability extends to solicitors. This understanding is consistent with the published comments regarding the legislative committee's purpose for the 1977 amendments to the Texas Securities Act. *See* House Comm. on Financial Institutions, Tex. S.B. 469, 65th Leg., R.S. (1977) (discussing liability for brokers who fail to exercise due diligence).

Solicitors directly liable under the Texas Securities Act are those that communicate directly with the buyer and (i) act on behalf of or for the benefit of the security issuer or (ii) who are motivated by their own financial interests. ***Pinter***, 486 U.S. at 647; ***Rosenzweig v. Azurix Corp.***,

332 F.3d 854, 871 (5th Cir. 2003). An example would be a broker. *See*, *e.g.*, ***Davis***, 2024 WL 3237623, at *9.

The Musgrove Parties did not purchase the FC/Investor Notes from CAG. Instead, they were purchased from Ferrum Capital. There being no privity between CAG and the Musgrove Parties, CAG was not a seller, in this narrow sense, of the FC/Investor Notes.

Thus, for CAG to be liable as a seller of the FC/Investor Notes to the Musgrove Parties, the Musgrove Parties must show CAG acted as Ferrum Capital's agent or solicited the Musgrove Parties' investments. There is scant evidence of this in the summary judgment record. Only one Plaintiff interacted directly with a CAG representative prior to purchasing the FC/Investor Notes and investing with Ferrum Capital. All others appear to have spoken exclusively to representatives of Ferrum Capital. There is no evidence CAG prepared the documents that accompanied the FC/Investor Notes when Ferrum Capital solicited the Musgrove Parties' investments. The documents make many references to CAG and describe CAG's business model and the successes and risks of the industry within which it operates. But nothing in the record suggests these documents were prepared by CAG.

Even with the one Plaintiff who spoke directly to CAG, it is unclear that CAG was an agent of Ferrum Capital or that CAG's motivation in that isolated conversation was to benefit CAG. According to the documents, Ferrum Capital had already acquired the CAG/FC Notes. Thus, CAG had already obtained the funds it was seeking. No evidence suggests soliciting an investment from that one Plaintiff would have benefited CAG at all. There is also insufficient evidence to conclusively establish that CAG solicited that investment to benefit Ferrum Capital.

Here, the only evidence that CAG solicited the Musgrove Parties' investments is that it entertained questions from Ferrum Capital investors. This is insufficient evidence to impose

primary-seller liability based on the solicitor extension. *See* ***Janvey***, 2014 WL 12670763, at *9–10 (finding an insurance broker was not a seller of a security because it was not a party to the transaction and did not stand to benefit from it). The one conversation with Dan Doolittle does little to suggest CAG's participation was anything more than collateral to the transaction. ***Davis***, 2024 WL 3237623, at *11 ("[S]eller liability does not extend to persons whose participation is 'collateral to the offer or sale.'"). Walt Collins did not call Dan Doolittle, rather Brooklynn Willy from Ferrum Capital called Walt Collins. The summary judgment evidence does not suggest CAG reached out to Mr. Doolittle or any other Musgrove Party to facilitate their investment in Ferrum Capital.

No evidence in the summary judgment record establishes, without question, that CAG colluded with Ferrum Capital to cook up a scheme whereby Ferrum Capital would facilitate funding to CAG from the Musgrove Parties. The evidence in the record suggests Ferrum Capital came up with this scheme by itself. Based on the facts submitted in the summary judgment record, a fact question remains as to whether CAG can be liable to the Musgrove Parties under a primary-seller liability theory for unregistered FC/Investor Notes.

#### 2. SECONDARY LIABILITY

In addition to direct liability under Texas Government Code § 4008.051, the Texas Securities Act holds aiders and abettors liable "for another person's securities violation." ***Christie***, 2022 WL 3572690, at *5; TEX. GOV'T CODE § 4008.055. The party who is secondarily liable for the primary violation is "jointly and severally liable with the primary violator to the same extent as if they were the primary violator." ***Sterling Trust Co. v. Adderley***, 168 S.W.3d 835, 839 (Tex. 2005) (internal quotations omitted).

Ferrum Capital's liability to the Musgrove Parties for unregistered FC/Investor Notes and unregistered CAG/FC Notes is clear. Ferrum Capital sold those notes directly to the Musgrove Parties. CAG's liability under aider and abettor principles for the unregistered FC/Investor Notes, however, is less clear.

The Fifth Circuit has established a four-part test for aider and abettor liability: "(1) a primary violation of the securities laws, (2) that the aider and abettor has a general awareness of his role in the violation, (3) that he gave substantial assistance in the violation, and (4) that he intended to deceive the plaintiff or acted with reckless disregard for the truth of the primary violator's misrepresentations." ***Dorsey v. Portfolio Equities, Inc.***, 540 F.3d 333, 344 (5th Cir. 2008). One court has applied this test when the primary violation was the sale of unregistered securities. ***Kneese v. Pershing, L.L.C.***, No. 3:10-CV-1908-N, 2012 WL 13019677, at *3 (N.D. Tex. Nov. 14, 2012).

"[A]n aider must be aware of the primary violator's improper activities before it may be liable for assisting in the securities violation." ***Sterling Trust***, 168 S.W.3d at 841; *see also* ***Thomas v. Carter***, No. 3:22-cv-00423-S-BT, 2025 WL 2881575, at *8 (N.D. Tex. Aug. 28, 2025) ("[G]eneral awareness is typically used as a shorthand to describe actual awareness of general wrongdoing.") (cleaned up); ***Lamm v. State Street Bank and Trust***, 749 F.3d 938, 950 (11th Cir. 2014) (concluding that ignoring red flags and atypical activities alone is insufficient for the actual awareness requirement). And the fourth element "impose[s] a requirement of recklessness in its subjective form, and this recklessness must be directly related to the primary violator's securities violation." ***Sterling Trust***, 168 S.W.3d at 842 (internal quotations omitted). This "standard means that an alleged aider can only be held liable if it rendered assistance in the face of a perceived risk

that its assistance would facilitate untruthful or illegal activity by the primary violator." ***Id.*** at 842 (internal quotations omitted).

The first element is met easily. As discussed earlier, no one disputes that the FC/Investor Notes were securities that should have been but were not registered. That the FC/Investor Notes were not registered, is the primary violation and Ferrum Capital, the primary violator. A primary violation being found, the first element is satisfied. The second, third, and fourth elements are much murkier.

Though evidence in the record suggests CAG knew Ferrum Capital was crowd-sourcing its funding of the CAG/FC Notes, nothing hints that CAG knew how Ferrum Capital was accomplishing this—i.e., the sale of unregistered FC/Investor Notes. No evidence suggests CAG was aware Ferrum Capital was issuing securities to the Musgrove Parties, let alone unregistered ones. *Compare* ***Thomas***, 2025 WL 2881575, at *8–9 (defendant found liable where (i) she knew the primary violator was not registered to sell securities and (ii) discussed investors with the primary violator), *with* ***Fernea v. Merrill Lynch Pierce Fenner & Smith, Inc.***, 559 S.W.3d 537, 554 (Tex. App.—Austin 2011, no pet.) (defendant found not liable where it had at most a mere suspicion of the primary violator's sale of unregistered securities). Therefore, the second element is not conclusively met.

For substantial assistance, the Musgrove Parties point to a single interaction one of them had with Walt Collins prior to investing with Ferrum Capital. No other evidence in the record suggested anyone from CAG assisted in anyway with Ferrum Capital's sale of the FC/Investor Notes. There is no evidence that CAG helped Ferrum Capital prepare any of the documents, like the Commercial Loan Illustration, that accompanied the FC/Investor Notes.

The single Plaintiff conversation with Walt Collins concerned CAG's business model, past performance, likelihood of success, and the industry risks. Though this does go beyond ministerial duties or routine services, this falls short of the substantial assistance found necessary by other courts. ***Turk v. Pershing, LLC***, No. 3:09-CV-2199-N, 2014 WL 12572906, at *3 (N.D. Tex. Dec. 8, 2014) (defendant offered margin financing to purchase unregistered securities from primary violator); ***Goldovsky v. Rauld***, No. 6:24-CV-00159-ADA-DTG, 2025 WL 1691913, at *6 (W.D. Tex. May 28, 2025) (defendant repeatedly participated in marketing fraudulent securities by explaining tax benefits); ***Thomas***, 2025 WL 2881575, at *10 (defendant called investors, recommended the primary violator to those investors, and set up accounts for those investors); ***Rotstain v. Trustmark Nat'l Bank***, No. 3:09-CV-2384-N, 2022 WL 179609, at *10 (N.D. Tex. Jan. 20, 2022) (defendants provided unusual loans and revolving credit or lent their reputation to primary violator to open new relationships and avoid scrutiny). Without clear proof CAG intended to violate the law, a single interaction with one of eighty-five Musgrove Parties is insufficient to satisfy the substantial assistance element at the summary judgment phase. *See* ***Amacker v. Renaissance Asset Mgmt. LLC***, 657 F.3d 252, 257 (5th Cir. 2011) ("If the evidence shows no more than transactions constituting the daily grist of the mill, [courts are] loathe to find aiding and abetting liability without clear proof of intent to violate the law.") (cleaned up). To be clear, CAG need not have interacted with each of the Musgrove Parties to substantially, materially assist Ferrum Capital's primary violation, ***Thomas***, 2025 WL 2881575, at *7; ***Enron II***, 540 F. Supp. 2d at 770, but more evidence is needed before the Court can find the third element satisfied.

Finally, for largely the same reasons stated in the three preceding paragraphs—that is: because there is a lack of evidence of CAG's general awareness and substantial assistance in Ferrum Capital's primary Texas Securities Act violation—there is insufficient evidence that CAG

acted intentionally or recklessly. No evidence in the record suggests CAG knew of Ferrum Capital's unlawful activity, therefore there can be no conscious indifference to a known risk. And an allegation that CAG "should have known does not satisfy the scienter requirement." ***Highland Cap. Mgmt.***, 402 S.W.3d at 738 (internal quotation omitted). Thus, the fourth element is unmet.

There remains a factual dispute as to CAG's aider-and-abettor liability to the Musgrove Parties under the Texas Securities Act for Ferrum Capital's securities violation.

## V. CONCLUSION

The Court agrees with the Musgrove Parties that the FC/Investor Notes were securities that should have been but were not registered. As notes, the CAG/FC Notes were presumptively securities. Because the Trustee and Oliphant Entities did not present sufficient evidence to rebut that presumption, the Court concludes that the CAG/FC Notes were securities. Because the Trustee and Oliphant Entities presented no evidence that the CAG/FC Notes were registered as securities or that CAG was a registered seller of securities, the Court finds those two points established. Therefore, the Court grants the *Partial MSJ* that the FC/Investor Notes are securities that should have been but were not registered and that the CAG/FC Notes are unregistered securities. However, because a fact question remains, the Court cannot conclude whether the CAG/FC Notes were exempt from the Texas Securities Act's registration requirements and will deny the *Partial MSJ* as to that point.

Because the FC/Investor Notes and Ferrum Capital were not registered with the State, Ferrum Capital violated the Texas Securities Act. However, because material fact questions remain, the Court cannot conclude whether CAG is liable for the non-registration of the FC/Investor Notes under primary-seller or aider-and-abettor theories of the Texas Securities Act and will deny the *Partial MSJ* on those points.

Having concluded the FC/Investor Notes and CAG/FC Notes are securities that were not registered, and that the FC/Investor Notes were required to be registered, the only questions remaining for this cause of action are whether the CAG/FC Notes were exempt from the Texas Securities Act's registration requirements and whether CAG is liable to the Musgrove Parties for any non-registration violation. The Court, therefore, finds and concludes that:

1. The FC/Investor Notes are unregistered securities which were sold in violation of the Texas Securities Act;
2. The CAG/FC Notes are unregistered securities which were sold;
3. Fact questions remain on whether the CAG/FC Notes were exempt from the Texas Securities Act's registration requirements;
4. Fact questions remain on whether CAG is liable to the Musgrove Parties under a primary-seller theory of the Texas Securities Act; and
5. Fact questions remain on whether CAG is liable to the Musgrove Parties under an aider-and-abettor theory of the Texas Securities Act.

It is, therefore:

**ORDERED** that the above-referenced *Partial MSJ* (ECF No. 85) is **GRANTED IN PART** and **DENIED IN PART.**

###